# COMPOSITE EXHIBIT A



# Carolyn N. Budnik, PLLC
*Law Office*

800 SE Third Avenue, 4th Floor, Fort Lauderdale, FL 33316
Ofc. (954) 353-6250
Fax: (954) 323-0999
carolyn@cbudlaw.com

July 22, 2021

***Delivery Via FedEx***

Daniel De La Vega, President
MDLV, LLC
d/b/a One Sotheby's
    International Realty
1430 South Dixie Highway
Suite 110
Coral Gables, Florida 33146

Thomas Toolin, Managing Broker-
    Miami Beach
119 Washington Ave
Suite 102
Miami Beach, Florida 33139

Mayi De La Vega, Registered Agent
MDLV, LLC
4100 North Miami Avenue
Floor 2
Miami, Florida 33127

> **Re:** **Our Clients: Heliac, Inc., and Heliluxe, Inc.**
> **Demand for Pre-Suit Mediation**

Dear Messrs. De La Vega and Toolin and Ms. De La Vega:

Please be advised that Olesia Y. Belchenko, P.A., and Carolyn N. Budnik, PLLC, represent Heliac, Inc. ("Heliac'), and Heliluxe, Inc. ("Heliluxe"), in connection with their respective Exclusive Rights of Sale Listing Agreements with your company, and the recovery of funds unlawfully converted by One Sotheby's International Realty's real estate associate, Gleb Klioner, from Heliac following the sale of its property.

Since at least 2019, One Sotheby's International Realty ("Sotheby's") had listing agreements with both Heliac and Heliluxe, listing the respective properties owned by each company for sale and, with respect to Heliluxe, for lease as well. During that time, Mr. Klioner, as Sotheby's agent, not only marketed both properties for sale, but also managed the properties, paid monthly and special assessments and annual property taxes on the properties and, with respect to Heliluxe, collected rents. In facilitation of his property management duties, he had access to the companies' bank accounts.

Heliac, Inc.'s and Heliluxe, Inc.'s Pre-Suit Demand
July 22, 2021
Page 2

Our initial investigation into these relationships uncovered evidence that Mr. Klioner used his position with Sotheby's to gain our clients' trust and improperly pressure them into selling Heliac's condominium (located at 9701 Collins Avenue, Unit 502S, Bal Harbour, Florida) for the price Heliac accepted only as a result of Mr. Klioner's misrepresentations that the Miami Beach real estate market was on the verge of crashing. The attached draft complaint details the facts related to Mr. Klioner's activities while employed by Sotheby's.

More importantly, on March 17, 2021, Mr. Klioner used his position of trust with Heliac's and Heliluxe's principals to unlawfully convert the sale proceeds of Heliac's condominium, in the amount of $3,734,277.21. He admitted doing so in a phone conversation with our clients' principal, Kirill Stadnikov, on June 7, 2021, and in numerous WhatsApp messages since.

**Demand for Rescission of the Listing Agreement and Cancellation of the MLS Listing**

A demand is hereby made for the immediate rescission of the pending Listing Agreement dated February 26, 2021, between Sotheby's and Heliluxe with respect to the properly located at 10201 Collins Avenue, Unit 2401S, Bal Harbour, Florida 33154, for cause due to Mr. Klioner's improper actions, including a waiver of the protection period of Paragraph 4 and any cancellation fees and penalties of Paragraph 5 (one-half of one percent of the listing price).

Additionally, please cancel the MLS listing and remove and/or cancel all advertising for Heliluxe's property.

Your written confirmation of rescission of the Listing Agreement, including the waivers requested above, along with written confirmation of the cancellation of the MLS listing and advertising is requested no later than **July 28, 2021.**

**Demand for Pre-Suit Mediation**

Please allow this letter to serve as a demand, pursuant to Paragraph 9 ("Dispute Resolution") of the Listing Agreement between Sotheby's and Heliac, for pre-suit mediation. The claims to be asserted by Heliac in court, should the above-mentioned dispute not be resolved in mediation, include: (a) negligent employee training; (b) vicarious liability; (c) breach of fiduciary duty pursuant to § 475.278 of the Florida Statutes, and (d) violation of §475.42 of the Florida Statutes, as outlined in detail in the attached draft complaint.

Heliac, Inc.'s and Heliluxe, Inc.'s Pre-Suit Demand
July 22, 2021
Page 3

Please advise if you have a mediator preference from the roster of mediators of the American Mediation Association, or if you agree to use the Honorable Scott Silverman (Ret.) of JAMS, Inc., as a mediator in this matter, in accordance with Paragraph 9 of the Listing Agreement.

In the event Sotheby's wishes to waive the requirements of Paragraph 9, please so notify us in writing.

The written response to our request for pre-suit mediation or waiver of Paragraph 9's requirements is requested no later than **July 30, 2021.**

**Demand for Disclosure of Insurance Information Pursuant to § 627.4137, Fla. Stat.**

Pursuant to § 627.4137 of the Florida Statutes, please allow this letter to serve as formal written request for disclosure of the name and coverage of each known insurer of Sotheby's and/or Mr. Klioner. Moreover, pursuant to § 627.4137 of the Florida Statutes, Sotheby's is required to forward this request or information to all affected insurers, who, in turn, are required to supply the following information to Heliac, as the claimant, **within thirty (30) days**:

(a)  The name(s) of the insurer(s);
(b)  The name(s) of each insured(s);
(c)  The limits of the liability coverage(s);
(d)  A statement of any policy or coverage defense which such insurer reasonably believes is available to such insurer at the time of filing such statement;
(e)  A copy of the policy.

Thank you for your prompt attention to this matter.

Sincerely,

Carolyn N. Budnik

Enclosure: Complaint
cc: Olesia Y. Belchenko, Esquire

IN THE CIRCUIT COURT OF THE
ELEVENTH JUDICIAL CIRCUIT IN AND
FOR MIAMI-DADE COUNTY, FLORIDA

CIRCUIT CIVIL DIVISION

CASE NO.

HELIAC, INC., a Florida corporation,

      Plaintiff,

v.

MDLV, LLC, a Florida limited liability
company, d/b/a ONE SOTHEBY'S
INTERNATIONAL REALTY,

      Defendant.

_____/

## COMPLAINT

Plaintiff, Heliac, Inc. ("Heliac"), sues defendant, MDLV, LLC, d/b/a One Sotheby's International Realty ("Sotheby's"), for damages, and states:

## I.    NATURE OF THIS ACTION

1.    This action is by a real estate holding company – Heliac – against its real estate broker – Sotheby's – for damages resulting from the broker's failing to prevent theft by Sotheby's sales associate of over $3,700,000.00 million Heliac received from a sale of its real property listed and marketed by Sotheby's.

2.    As a result of the events described in this Complaint, Heliac was required to retain the services of Carolyn N. Budnik, PLLC, and Olesia Y. Belchenko, P.A., to represent it in this action, and is obligated to pay these law firms a reasonable fee for their services.

3.    All conditions precedent to the commencement of this action have occurred, have been performed or have been waived.

1

## II.     JURISDICTION AND VENUE

4.     This is an action for damages exceeding $30,000.00, excluding prejudgment interest, attorneys' fees and court costs, and is therefore within the jurisdiction of this Court.

5.     This Court has subject matter jurisdiction pursuant to § 26.012(2)(a) of the Florida Statutes.

6.     Venue is proper in Miami-Dade County, Florida, pursuant to § 47.011 of the Florida Statutes, as the events giving rise to this action and the incidents complained of accrued in Miami-Dade County, Florida; and because Sotheby's is headquartered in Miami-Dade County, Florida.

## III.     PARTIES

### A.  Plaintiff Heliac

7.     Heliac is a Florida profit corporation with its principal place of business in Miami-Dade County, Florida.

8.     Heliac's beneficial owners and principals are Tatiana Zorina ("Zorina") and Kirill Stadnikov ("Stadnikov"), who are married, are citizens and residents of the Russian Federation, and who are otherwise *sui juris*.

9.     Zorina and Stadnikov are Heliac's only officers and directors, with Zorina being Heliac's President and a director, and Stadnikov being its Vice President and a director.

### B.  Defendant Sotheby's

10.     Sotheby's is a Florida limited liability company with its principal place of business located in Miami-Dade County, Florida.

11.     Sotheby's is licensed in Florida to carry out real estate transactions under license number CQ1033191.

2

12. From approximately October 19, 2018, through approximately July 1, 2021, Sotheby's employed Gleb Klioner ("Klioner") as its real estate broker or sales associate licensed by the State of Florida under license number BK3093516.

13. Pursuant to Florida common law and § 475.25(1)(u) of the Florida Statutes, Sotheby's had a duty to direct, control or manage Klioner.

14. Klioner was one of Sotheby's top producers and was well known within South Florida's Russian-speaking community, as he was fluent in Russian.

## IV.   FACTUAL ALLEGATIONS

### A. Klioner Is Hired to Manage and to Sell the St. Regis Condo

15. On March 6, 2013, Heliac acquired a condominium located at 9701 Collins Avenue, Unit 502S, Bal Harbour, Florida 333154, which building is known as St. Regis ("St. Regis Condo").

16. Starting in October 2018, through Klioner's efforts, Heliac entered into an Exclusive Right of Sale Listing Agreement with Sotheby's, whereby Heliac retained Sotheby's as its listing agent for the sale of the St. Regis Condo with the listing price of $5,995,000.00 ("Listing Agreement").

17. The Listing Agreement was thereafter renewed annually on March 7, 2019, and March 7, 2020 (with the same listing price of $5,995,000.00).

18. Sotheby's extended the Multiple Listing Service (MLS) listing for the St. Regis Condo through March 7, 2021.

19. Likewise, in February 2021, through Klioner's efforts, Heliac's principals entered into an Exclusive Right of Sale Listing Agreement with Sotheby's, whereby the principals' second Florida corporation, Heliluxe, Inc. ("Heliluxe"), retained Sotheby's as its listing agent for the sale

3

of a condominium located at 10201 Collins Avenue, Unit 2401S, Bal Harbour, Florida 33154, with the listing price of $10,795,000.00 ("Oceana Condo").

20.     Beginning in 2013, Heliac retained Klioner to manage the St. Regis Condo and later the Oceana Condo pursuant to a verbal agreement with Zorina and Stadnikov.

21.     In exchange for a monthly payment of $250.00, Klioner was responsible for making timely payments of the monthly condominium assessments, special assessments that may have come due, and annual real property taxes.

22.     Moreover, Klioner was responsible for leasing the Oceana Condo and collecting rents on behalf of Heliluxe, initially, through his own real estate company and later, through Sotheby's.

23.     To facilitate Klioner's property management duties, Klioner was given access as a non-owner signatory to Heliac's and Heliluxe's operating accounts at Citibank, N.A. ("Citibank").

### B. Klioner Pressures Heliac's Principals to Sell the St. Regis Condo

24.     Beginning in December 2020 through early June 2021, Klioner actively provided Heliac's principals with disinformation regarding the South Florida real estate market and pressured them to sell the St. Regis Condo by advising them that:

      a.  The real estate market in Miami Beach was on the verge of crashing;

      b.  The drop in the St. Regis Condo's value by as much as 60-70% was imminent;

      c.  It would be difficult to sell anything in the South Florida real estate market beyond mid-March 2021;

      d.  The U.S. economy was on the verge of crashing at any moment;

      e.  The U.S. stock market was on the verge of crashing at any moment;

4

      f.   Heliac had to sell the St. Regis Condo immediately, or it would lose money due to its inability to sell the property.

25.     Klioner made these statements while having had superior knowledge of the real estate market, and while knowing that Heliac's principals did not live in the U.S., were underinformed about the real estate market in South Florida, and the U.S. generally, and were completely unaware that the South Florida was experiencing a real estate boom.

26.     In December 2020, Klioner, as a broker associate with Sotheby's, presented Heliac with an "AS IS" Residential Contract for Sale and Purchase of the St. Regis Condo in the amount of $3,800,000.00, which was significantly below the market price of the St. Regis Condo.

27.     Klioner tried to convince Heliac's principals – together and by pressuring each of them individually via phone calls and WhatsApp messages – to sell the St. Regis Condo for that price as soon as possible. However, Heliac's principals refused and decided to wait until a better offer was made.

28.     In February 2021, Klioner, as broker associate with Sotheby's, presented Heliac with a new "AS IS" Residential Contract for Sale and Purchase of the St. Regis Condo in the amount of $4,200,000.00 ("Sale Contract"), which was still less than what Heliac wanted to accept for the St. Regis Condo.

29.     After being pressured by Klioner mercilessly for months, Zorina and Stadnikov acquiesced and signed the Sale Contract on February 8, 2021. A true and correct copy of the Sale Contract is attached hereto as Exhibit "A."

## C. Klioner Convinces Heliac's Principals to Grant Him Unlimited Power for Closing

30.     Klioner withheld from the officers of Heliac the fact that all documents required to close the transaction for the sale of the St. Regis Condo could be executed via an online notary, as

5

has become customary in international real estate closings.

31.     Instead, Klioner had a corporate resolution prepared for Heliac, and sent to Heliac's principals in Russia requiring the principals to grant him full authority to:

> [E]xecute and deliver on behalf of the corporation such deeds, bills of sale and other affidavits, agreements, assignments, closing statements, and such other documents as may be necessary or required in connection with the sale of [the St. Regis Condo].

32.     Klioner misrepresented to the principals that only through the signing of this resolution on an urgent basis could the closing be completed and completed in a timely manner, and that doing so was the customary practice in international real property closings.

33.     Through this corporate resolution, Klioner obtained unlimited power to prepare and sign any documents related to the St. Regis Condo closing.

**D. Klioner Uses His Sole Access to Heliac's Operating Account to His Benefit**

34.     From the date of the signing of the Sale Contract, Klioner was informed that the proceeds of the sale of the St. Regis Condo were to be returned to the same account at UBS Group AG, from which the funds for the purchase of the St. Regis Condo in 2013 originated.

35.     Yet, Klioner told Heliac's principals that the proceeds of the sale of the St. Regis Condo could only be deposited into Heliac's operating account with Citibank in Florida and could not be sent to UBS post-closing.

36.     Klioner knew that Zorina was the only other signatory on the Heliac's operating account at Citibank, and that she would not be able to travel to the U.S. for the closing or to access the proceeds of the St. Regis Condo sale because her U.S. visa had expired.

37.     Moreover, Klioner knew that Stadnikov, although able to travel to the U.S., was not a signatory on the account and could not access the proceeds of the sale of the St. Regis Condo.

38.    Knowing that he was the only person with access to Heliac's account, Klioner signed a letter directing St. Regis Condo's buyer's closing attorney to wire Heliac's proceeds into Heliac's account to which only he had access.

39.    Thus, Klioner manipulated Heliac into selling its property for less than it wanted to, improperly obtained full power to sign the closing documents, and ensured the sale proceeds would only be sent to an account over which only he had physical access.

### E. Klioner Steals Proceeds of the St. Regis Condo Sale

40.    On March 10, 2021, a closing for the sale of the St. Regis Condo took place, and $3,885,023.02 was wired from the closing agent's escrow account into Heliac's operating account at Citibank, in reliance on Klioner's wire instructions letter.

41.    On the same day, Klioner advised Heliac's principals the deal was closed, forwarded to them copies of the closing documents, informed them the funds were credited to Heliac's operating account, and confirmed he was waiting for their instructions for a transfer of the funds to UBS.

42.    Klioner also informed Heliac's principals that he moved all the furniture previously furnishing the St. Regis Condo into a storage.

43.    At the same time, Heliac's principals forwarded the St. Regis Condo closing documents they received from Klioner to UBS to have the bank's questions concerning the source of the funds answered ahead of time.

44.    On March 17, 2021, Klioner secretly wired $3,734,277.21 from Heliac's account into his personal account at Wells Fargo Bank, N.A., without the knowledge or permission of Heliac's principals.

7

45.     On March 26, 2021, Stadnikov, believing the funds were still in Heliac's account, provided Klioner with wire transfer instructions to send the proceeds of the St. Regis Condo sale to Heliac's principals' account at UBS.

46.     From March 26, 2021, through June 7, 2021, Klioner lied to Heliac's principals there were various reasons for Citibank's inability or refusal to approve the transfer of the St. Regis Condo sale proceeds to UBS, including, that:

     a. Klioner was too busy to initiate the transfer;

     b. Citibank refused to accept Zorina's signature on Heliac's tax-related documents;

     c. Citibank requested information on the source of the funds and the reason for the transfer to UBS;

     d. Citibank required a new original IRS W-8 BEN Form (Certificate of Foreign Status of Beneficial Owner for United Stated Tax Withholding and Reporting (Individuals) signed by Zorina, and a scanned copy was not accepted;

     e. Citibank had to send the IRS W-8 BEN Form to its New York office for approval;

     f. Citibank did not accept Zorina's original signature on the IRS W-8 BEN Form because it was not notarized in Russia;

     g. Citibank did not accept Zorina's original signature on the IRS W-8 BEN Form because the notarization was not translated into English;

     h. Citibank did not accept Zorina's original signature on the IRS W-8 BEN Form because no apostille was attached to it;

     i. Preparation of an apostille was delayed.

8

47.     On June 6, 2021, Stadnikov demanded Klioner schedule a telephone conference call with Citibank's in-house counsel for June 7, 2021, to discuss any issues that were preventing the approval of the wire transfer of UBS.

48.     At the scheduled time, Stadnikov called Klioner for the conference with Citibank only to have Klioner admit in a telephone conversation that he stole the $3,734,277.21 that was supposed to be transferred to UBS from Heliac's account and spent the entire sum buying options.

49.     Klioner requested that Heliac's principals allow him until June 18, 2021, to repay the stolen amount before Heliac reaches out to the police and initiates any lawsuits for the recovery of the funds.

**F.  Klioner Fails to Cancel the Listing Agreement**

50.     On June 8, 2021, following Klioner's confession, Stadnikov demanded from Klioner that:

>     a.  The listing agreement for the Oceana Condo be cancelled immediately by Sotheby's, as Heliac's principals' trust in the company had vanished following Klioner's actions;
>
>     b.  The MLS listing for the Oceana Condo be cancelled immediately by Sotheby's for the same reason;
>
>     c.  Heliac is provided the information concerning storage of its St. Regis Condo furniture;
>
>     d.  Klioner provide to Heliac's principals all documents related to the St. Regis Condo, including the Listing Agreement, and the Sale Contract, and all documents related to the Oceana Condo;
>
>     e.  Klioner return the funds he stole from Heliac.

9

51.     Klioner agreed to provide all the requested documents to Heliac, and to come up with a way to return the money he stole.

52.     On June 16, 2021, Stadnikov against requested that Klioner immediately provide him with the cancellation of the listing agreement for Oceana Condo.

53.     Instead of the listing agreement cancellation documents from Sotheby's, Klioner sent Stadnikov an MLS listing cancellation for Oceana Condo, which Stadnikov deemed insufficient, and demanded that Klioner return all keys to the Oceana Condo, and not be allowed to show it to potential buyers anymore.

54.     On June 20, 2021, Klioner turned over the key to the Oceana Condo to Stadnikov's acquaintance.

55.     Klioner never provided the Oceana Condo's listing agreement's cancellation from Sotheby's and, to date, has not returned any funds he has stolen from Heliac.

56.     Further, an investigation into Klioner's use of Heliac's account revealed that Klioner routinely "borrowed" funds from Heliac's bank account without Heliac's principals' knowledge and consent.

## COUNT I – NEGLIGENT EMPLOYEE TRAINING

57.     Heliac realleges and incorporates by reference the allegations contained in paragraphs 1 through 56 above, as if fully set forth herein.

58.     Sotheby's owed a duty to Heliac to properly and adequately train its employees to have such employees follow the standard guidelines and procedures related to international real estate transactions, including to ensure Sotheby's sales associates:

> a.  Advise Sotheby's clients of the true market value of the properties listed for sale;

10

b.  Refrain from pressuring Sotheby's clients into selling properties for prices lower than what the clients are comfortable accepting from buyers;

c.  Inform Sotheby's clients of the practices involved in international real estate transactions, such as online notarizations and options to wire proceeds of real estate closings abroad to end beneficiaries of Florida's corporate property sellers;

d.  Not overstep their powers by taking on full signing authority in real estate transactions;

e.  Not overstep their powers by taking on full funds disposition authority in real estate transactions; and

f.  Precisely follow Sotheby's clients' instructions regarding delivery of proceeds of such real estate transactions.

59.    Sotheby's failed to property and adequately train Klioner in the above-mentioned obligations, as is evident from his handling of the sale of the St. Regis Condo.

60.    Because Heliac was Sotheby's client, it was in reasonably foreseeable zone of risk from actions of Sotheby's employee, who was to oversee that the transaction for the sale of Heliac's real property is closed correctly, and that the proceeds of such transaction reach Heliac's beneficiaries.

61.    Accordingly, Sotheby's duty of care in training Klioner, as its employee, ran from Sotheby's directly to Heliac, as Sotheby's client.

62.    As a direct and proximate result of Sotheby's failure to adequately train its employee, Heliac was damaged.

11

WHEREFORE, the Heliac respectfully requests judgment against Sotheby's for damages, prejudgment interest, costs and attorneys' fees (if Heliac shows entitlement), and for such other and further relief the Court deems just and proper.

<div align="center">

**COUNT II – VICARIOUS LIABILITY**

</div>

63.     Plaintiff realleges and incorporates by reference the allegations contained in Paragraphs 1 through 56 above, as if fully set forth herein.

64.     Klioner, as Sotheby's employee, had a duty to Heliac to:

    a.  Advise Heliac of the true market value of the St. Regis Condo;

    b.  Refrain from pressuring Heliac into selling the St. Regis Condo for a sale price lower than what Heliac was comfortable accepting from buyers;

    c.  Inform Heliac of the practices involved in international real estate transactions, such as online notarizations and options to wire proceeds of real estate closings abroad to end beneficiaries of Florida's corporate property sellers;

    d.  Not overstep his powers by taking on full signing authority in the St. Regis Condo sale;

    e.  Not overstep his powers by taking on full funds disposition authority in the St. Regis Condo sale; and

    f.  Follow precisely Heliac's instructions regarding delivery of proceeds of the St. Regis Condo sale.

65.     Klioner breached his duties to Heliac by:

    a.  Failing to advise Heliac of the true market value of the St. Regis Condo;

    b.  Manipulating Heliac into selling its property for less than the market price;

    c.  Manipulating Heliac into selling its property for less than it wanted to;

<div align="center">

12

</div>

          d.  Failing to inform Heliac of the practices involved in international real estate transactions, such as online notarizations and options to wire proceeds of real estate closings abroad to end beneficiaries of Heliac;

          e.  Improperly obtaining full power to sign the closing documents;

          f.  Ensuring the sale proceeds could only be sent to an account over which only he had physical access; and

          g.  Disregarding Heliac's instructions with respect to where the proceeds had to be sent.

66.    Sotheby's employee's acts were committed within the scope or course of his employment, as his actions: (a) were the kind he was hired to perform – Klioner had to ensure the documents for the real estate closing were prepared and signed promptly; (b) occurred substantially within the time and place limits authorized or required by the work to be performed – Klioner communicated using Sotheby's signature block, arranged for the closing as Sotheby's sales associate, and was required to follow instructions regarding the transaction proceeds as a Sotheby's employee; and (c) at least in part, were activated by the purpose of serving his employer (who had the right to control his action at the time) in that Klioner performed his duties in ensuring the sale of the St. Regis Condo took place and he could maintain his high producer status with Sotheby's.

67.    As a direct and proximate result of Klioner's breach of his duty to Heliac, Heliac was damaged.

68.    As an employer of Klioner, Sotheby's is vicariously liable for Klioner's wrongful conduct.

13

69.     For this reason, Heliac seeks to recover damages from Sotheby's, including but not limited to, the full amount of the funds Klioner failed to transfer to Heliac's principals' UBS account, in accordance with their pre- and post-closing instructions.

WHEREFORE, Heliac respectfully requests judgment against Sotheby's for damages, prejudgment interest, costs and attorneys' fees (if Heliac shows entitlement), and for such other and further relief the Court deems just and proper.

## COUNT III – BREACH OF FIDUCIARY DUTY
## PURSUANT TO § 475.278 OF THE FLORIDA STATUTES

70.     Plaintiff realleges and incorporates by reference the allegations contained in Paragraphs 1 through 56 below, as if fully set forth herein.

71.     Sotheby's is a Real Estate Agency "Broker" as defined in § 475.01(a) of the Florida Statutes and has held itself out as the "Transaction Broker" pursuant to § 475.278(2) of the Florida Statutes.

72.     As a broker/real estate agency employing Klioner, Sotheby's owed Heliac the duties of loyalty, confidentiality, obedience, full disclosure and accounting, and the ongoing duty to use skill, care and diligence in the performance of its duties, pursuant to §475.278(2)(a) through (g) of the Florida Statutes, as well as a general duty to act in the best interest of Heliac, and not in its own benefit.

73.     Sotheby's knew or should have known that Klioner, as a seasoned real estate professional holding a position with Sotheby's – a prestigious name in the luxury real estate business – was exercising his influence over Heliac's principals in his representation of Heliac.

74.     Sotheby's knew or should have known that Heliac's principals, as non-residents of the U.S., were not independently informed of the market conditions in the South Florida real estate

14

market and fully relied on Klioner's discretion and expertise in advising Heliac on the St. Regis Condo sale.

      75.     Sotheby's breached its fiduciary duties to Heliac in allowing Klioner to:

        a.  Fail to advise Heliac of the true market value of the St. Regis Condo;

        b.  Manipulate Heliac into selling its property for less than it wanted to;

        c.  Failing to inform Heliac of the practices involved in international real estate transactions, such as online notarizations and options to wire proceeds of real estate closings abroad to end beneficiaries of Heliac;

        d.  Improperly obtain full power to sign the closing documents;

        e.  Ensure the sale proceeds could only be sent to an account over which only he had physical access; and

        f.  Disregard Heliac's instructions with respect to where the proceeds had to be sent;

        g.  Fail to act in the best interest of Heliac and, instead, act in his own benefit in the St. Regis Condo sale.

      76.     Further, Sotheby's breached its fiduciary duties to Heliac in turning a blind eye to Klioner's actions because Klioner was Sotheby's top producer, thus, failing to act in the best interest of Heliac and, instead, acting in its own benefit.

      77.     As a direct and proximate result of Sotheby's breach of its duties to Heliac, Heliac was damaged.

      WHEREFORE, Heliac respectfully requests judgment against Sotheby's for damages, prejudgment interest, costs and attorneys' fees (if Heliac shows entitlement), and for such other and further relief the Court deems just and proper.

<center>15</center>

## COUNT IV – VIOLATION OF § 475.42 OF THE FLORIDA STATUTES

78.  Heliac realleges and incorporates by reference the allegations contained in Paragraphs 1 through 56 above, as if fully set forth herein.

79.  This is an action permitted by § 475.42(2) of the Florida Statutes based on §475.42(1)(e) of the Florida Statutes, prohibiting violations of § 475.25(1)(b).

80.  Sotheby's has violated a duty imposed upon it by law or by the terms of a listing contract, written, oral, express, or implied, in a real estate transaction, including a general duty to act in the best interest of Heliac, and not in its own benefit, by allowing Klioner to:

  a.  Fail to advise Heliac of the true market value of the St. Regis Condo

  b.  Manipulate Heliac into selling its property for less than it wanted to;

  c.  Fail to inform Heliac of the practices involved in international real estate transactions, such as online notarizations and options to wire proceeds of real estate closings abroad to end beneficiaries of Heliac;

  d.  Improperly obtain full power to sign the closing documents;

  e.  Ensure the sale proceeds could only be sent to an account over which only he had physical access;

  f.  Disregard Heliac's instructions with respect to where the proceeds had to be sent;

  g.  Fail to act in the best interest of Heliac and, instead, act in his own benefit in the St. Regis Condo sale.

81.  As a direct and proximate result of Sotheby's breach of its duties to Heliac, Heliac was damaged.

16

WHEREFORE, the Heliac respectfully requests judgment against Sotheby's for damages,

prejudgment interest, costs and attorneys' fees (if Heliac shows entitlement), and for such other

and further relief the Court deems just and proper.

Dated: July 22, 2021.

Respectfully submitted,

CAROLYN N. BUDNIK, PLLC
*Co-Counsel for Plaintiff, Heliac, Inc.*
800 SE Third Avenue, 4th Floor
Fort Lauderdale, FL 33316
Ofc. (954) 353-6250
Fax (954) 323-0999
Emails: carolyn@cbudlaw.com;
info@lawstaff.info

*s/Carolyn N. Budnik*
    Carolyn N. Budnik
    Florida Bar No. 223610

and

OLESIA Y. BELCHENKO, P.A.
*Co-Counsel for Plaintiff, Heliac, Inc.*
1221 Brickell Ave Ste 2400
Miami, FL 33131-3225
Ofc. (305) 200-5553
Email: olesia@belchenkolaw.com

*s/Olesia Y. Belchenko*
    Olesia Y. Belchenko
    Florida Bar No. 0025717

Case 1:21-cv-24284-FAM Document 1-4 Entered on FLSD Docket 12/08/2021 Page 22 of 36
DocuSign Envelope ID: DE070C9F-3F7E-45AB-A94F-E78ACF6DE715

## "AS IS" Residential Contract For Sale And Purchase
**THIS FORM HAS BEEN APPROVED BY THE FLORIDA REALTORS AND THE FLORIDA BAR**  FloridaRealtors®

1\* **PARTIES:** Heliac Inc, a Florida corporation ("Seller"),
2\* and Meyer Bierbrier and/or Assigns ("Buyer"),
3 agree that Seller shall sell and Buyer shall buy the following described Real Property and Personal Property
4 (collectively "Property") pursuant to the terms and conditions of this AS IS Residential Contract For Sale And Purchase
5 and any riders and addenda ("Contract"):
6 **1. PROPERTY DESCRIPTION:**
7\* (a) Street address, city, zip: 9701 Collins Ave, Unit 502S, Bal Harbour, FL 33154
8\* (b) Located in: Miami-Dade County, Florida. Property Tax ID #: 12-2226-048-1330
9\* (c) Real Property: The legal description is BAL HARBOUR NORTH SOUTH CONDO UNIT 502S UNDIV 0.355462%
10 INT IN COMMON ELEMENTS OFF REC 27891-0454
11
12 together with all existing improvements and fixtures, including built-in appliances, built-in furnishings and
13 attached wall-to-wall carpeting and flooring ("Real Property") unless specifically excluded in Paragraph 1(e) or
14 by other terms of this Contract.
15 (d) Personal Property: Unless excluded in Paragraph 1(e) or by other terms of this Contract, the following items
16 which are owned by Seller and existing on the Property as of the date of the initial offer are included in the
17 purchase: range(s)/oven(s), refrigerator(s), dishwasher(s), disposal, ceiling fan(s), intercom, light fixture(s),
18 drapery rods and draperies, blinds, window treatments, smoke detector(s), garage door opener(s), security gate
19 and other access devices, and storm shutters/panels ("Personal Property").
20\* Other Personal Property items included in this purchase are: washer and dryer
21
22 Personal Property is included in the Purchase Price, has no contributory value, and shall be left for the Buyer.
23\* (e) The following items are excluded from the purchase:
24

### PURCHASE PRICE AND CLOSING

26\* **2. PURCHASE PRICE** (U.S. currency):................................................................ $ 4,200,000

27\* (a) Initial deposit to be held in escrow in the amount of (checks subject to COLLECTION) ....... $ 20,000
28 The initial deposit made payable and delivered to "Escrow Agent" named below
29\* **(CHECK ONE):** (i) ☒ accompanies offer or (ii) ☐ is to be made within _____ (if left
30 blank, then 3) days after Effective Date. IF NEITHER BOX IS CHECKED, THEN
31 OPTION (ii) SHALL BE DEEMED SELECTED.
32\* Escrow Agent Information: Name: Mendy Lieberman, Esq. / The Lieberman Law Firm, PA
33\* Address: 20801 Biscayne Blvd, Suite 304, Miami, FL 33180
34\* Phone: 305-912-7789    E-mail: mlieberman@sflatty.com    Fax: -------------
35\* (b) Additional deposit to be delivered to Escrow Agent within 2 (if left blank, then 10)
36\* days after Effective Date .................................................................................$ 400,000
37 (All deposits paid or agreed to be paid, are collectively referred to as the "Deposit")
38\* (c) Financing: Express as a dollar amount or percentage ("Loan Amount") see Paragraph 8 .........

39\* (d) Other: _____ ................ $
40 (e) Balance to close (not including Buyer's closing costs, prepaids and prorations) by wire
41\* transfer or other **COLLECTED** funds ................................................................. $ Balance
42 NOTE: For the definition of "COLLECTION" or "COLLECTED" see STANDARD S.
43 **3. TIME FOR ACCEPTANCE OF OFFER AND COUNTER-OFFERS; EFFECTIVE DATE:**
44 (a) If not signed by Buyer and Seller, and an executed copy delivered to all parties on or before
45\* 10:00 AM - February 8, 2021 , this offer shall be deemed withdrawn and the Deposit, if any, shall be returned to
46 Buyer. Unless otherwise stated, time for acceptance of any counter-offers shall be within 2 days after the day
47 the counter-offer is delivered.
48 (b) The effective date of this Contract shall be the date when the last one of the Buyer and Seller has signed or
49 initialed and delivered this offer or final counter-offer ("Effective Date").
50 **4. CLOSING DATE:** Unless modified by other provisions of this Contract, the closing of this transaction shall occur
51 and the closing documents required to be furnished by each party pursuant to this Contract shall be delivered
52\* ("Closing") on or before 30 days FED (from Effective Date) ("Closing Date"), at the time established by the Closing Agent.

Buyer's Initials MB   **PLAINTIFF'S EXHIBIT "A"**   Seller's Initials kS
FloridaRealtors/FloridaBar-ASIS-5 Rev.4/17 © 2017   Bar. All rights reserved.
Serial#: 024044-300151-1846248   formsimplicity

**5. EXTENSION OF CLOSING DATE:**

    (a) If Paragraph 8(b) is checked and Closing funds from Buyer's lender(s) are not available on Closing Date due to Consumer Financial Protection Bureau Disclosure delivery requirements ("CFPB Requirements"), then Closing Date shall be extended for such period necessary to satisfy CFPB Requirements, provided such period shall not exceed 10 days.

    (b) If an event constituting "Force Majeure" causes services essential for Closing to be unavailable, including the unavailability of utilities or issuance of hazard, wind, flood or homeowners' insurance, Closing Date shall be extended as provided in STANDARD G.

**6. OCCUPANCY AND POSSESSION:**

    (a) Unless the box in Paragraph 6(b) is checked, Seller shall, at Closing, deliver occupancy and possession of the Property to Buyer free of tenants, occupants and future tenancies. Also, at Closing, Seller shall have removed all personal items and trash from the Property and shall deliver all keys, garage door openers, access devices and codes, as applicable, to Buyer. If occupancy is to be delivered before Closing, Buyer assumes all risks of loss to the Property from date of occupancy, shall be responsible and liable for maintenance from that date, and shall be deemed to have accepted the Property in its existing condition as of time of taking occupancy.

    (b) ☐ **CHECK IF PROPERTY IS SUBJECT TO LEASE(S) OR OCCUPANCY AFTER CLOSING.** If Property is subject to a lease(s) after Closing or is intended to be rented or occupied by third parties beyond Closing, the facts and terms thereof shall be disclosed in writing by Seller to Buyer and copies of the written lease(s) shall be delivered to Buyer, all within 5 days after Effective Date. If Buyer determines, in Buyer's sole discretion, that the lease(s) or terms of occupancy are not acceptable to Buyer, Buyer may terminate this Contract by delivery of written notice of such election to Seller within 5 days after receipt of the above items from Seller, and Buyer shall be refunded the Deposit thereby releasing Buyer and Seller from all further obligations under this Contract. Estoppel Letter(s) and Seller's affidavit shall be provided pursuant to STANDARD D. If Property is intended to be occupied by Seller after Closing, see Rider U. POST-CLOSING OCCUPANCY BY SELLER.

**7. ASSIGNABILITY: (CHECK ONE):** Buyer ☐ may assign and thereby be released from any further liability under this Contract; ☒ may assign but not be released from liability under this Contract; or ☐ may not assign this Contract.

**FINANCING**

**8. FINANCING:**

    ☒ (a) Buyer will pay cash for the purchase of the Property at Closing. There is no financing contingency to Buyer's obligation to close. If Buyer obtains a loan for any part of the Purchase Price of the Property, Buyer acknowledges that any terms and conditions imposed by Buyer's lender(s) or by CFPB Requirements shall not affect or extend the Buyer's obligation to close or otherwise affect any terms or conditions of this Contract.

    ☐ (b) This Contract is contingent upon Buyer obtaining written approval of a ☐ conventional ☐ FHA ☐ VA or ☐ other _____ (describe) loan within _____ (if left blank, then 30) days after Effective Date ("Loan Approval Period") for **(CHECK ONE):** ☐ fixed, ☐ adjustable, ☐ fixed or adjustable rate in the Loan Amount (See Paragraph 2(c)), at an initial interest rate not to exceed _____ % (if left blank, then prevailing rate based upon Buyer's creditworthiness), and for a term of _____ (if left blank, then 30) years ("Financing").

        (i) Buyer shall make mortgage loan application for the Financing within _____ (if left blank, then 5) days after Effective Date and use good faith and diligent effort to obtain approval of a loan meeting the Financing terms ("Loan Approval") and thereafter to close this Contract. Loan Approval which requires a condition related to the sale by Buyer of other property shall not be deemed Loan Approval for purposes of this subparagraph.

Buyer's failure to use diligent effort to obtain Loan Approval during the Loan Approval Period shall be considered a default under the terms of this Contract. For purposes of this provision, "diligent effort" includes, but is not limited to, timely furnishing all documents and information and paying of all fees and charges requested by Buyer's mortgage broker and lender in connection with Buyer's mortgage loan application.

        (ii) Buyer shall keep Seller and Broker fully informed about the status of Buyer's mortgage loan application, Loan Approval, and loan processing and authorizes Buyer's mortgage broker, lender, and Closing Agent to disclose such status and progress, and release preliminary and finally executed closing disclosures and settlement statements, to Seller and Broker.

        (iii) Upon Buyer obtaining Loan Approval, Buyer shall promptly deliver written notice of such approval to Seller.

        (iv) If Buyer is unable to obtain Loan Approval after the exercise of diligent effort, then at any time prior to expiration of the Loan Approval Period, Buyer may provide written notice to Seller stating that Buyer has been unable to obtain Loan Approval and has elected to either:

        (1) waive Loan Approval, in which event this Contract will continue as if Loan Approval had been obtained; or

        (2) terminate this Contract.

109       (v) If Buyer fails to timely deliver either notice provided in Paragraph 8(b)(iii) or (iv), above, to Seller prior to
110 expiration of the Loan Approval Period, then Loan Approval shall be deemed waived, in which event this Contract
111 will continue as if Loan Approval had been obtained, provided however, Seller may elect to terminate this Contract
112 by delivering written notice to Buyer within 3 days after expiration of the Loan Approval Period.

113       (vi) If this Contract is timely terminated as provided by Paragraph 8(b)(iv)(2) or (v), above, and Buyer is not in
114 default under the terms of this Contract, Buyer shall be refunded the Deposit thereby releasing Buyer and Seller
115 from all further obligations under this Contract.

116       (vii) If Loan Approval has been obtained, or deemed to have been obtained, as provided above, and Buyer
117 fails to close this Contract, then the Deposit shall be paid to Seller unless failure to close is due to: (1) Seller's
118 default or inability to satisfy other contingencies of this Contract; (2) Property related conditions of the Loan Approval
119 have not been met (except when such conditions are waived by other provisions of this Contract); or (3) appraisal
120 of the Property obtained by Buyer's lender is insufficient to meet terms of the Loan Approval, in which event(s) the
121 Buyer shall be refunded the Deposit, thereby releasing Buyer and Seller from all further obligations under this
122 Contract.

123* ☐ (c) Assumption of existing mortgage (see rider for terms).
124* ☐ (d) Purchase money note and mortgage to Seller (see riders; addenda; or special clauses for terms).

125 **CLOSING COSTS, FEES AND CHARGES**

126 9. **CLOSING COSTS; TITLE INSURANCE; SURVEY; HOME WARRANTY; SPECIAL ASSESSMENTS:**
127     (a) **COSTS TO BE PAID BY SELLER:**
128     • Documentary stamp taxes and surtax on deed, if any      • HOA/Condominium Association estoppel fees
129     • Owner's Policy and Charges (if Paragraph 9(c)(i) is checked)      • Recording and other fees needed to cure title
130     • Title search charges (if Paragraph 9(c)(iii) is checked)      • Seller's attorneys' fees
131*     • Municipal lien search (if Paragraph 9(c)(i) or (iii) is checked)      • Other: <u>Broker's commissions</u>
132     If, prior to Closing, Seller is unable to meet the AS IS Maintenance Requirement as required by Paragraph 11
133     a sum equal to 125% of estimated costs to meet the AS IS Maintenance Requirement shall be escrowed at
134     Closing. If actual costs to meet the AS IS Maintenance Requirement exceed escrowed amount, Seller shall pay
135     such actual costs. Any unused portion of escrowed amount(s) shall be returned to Seller.
136     (b) **COSTS TO BE PAID BY BUYER:**
137     • Taxes and recording fees on notes and mortgages      • Loan expenses
138     • Recording fees for deed and financing statements      • Appraisal fees
139     • Owner's Policy and Charges (if Paragraph 9(c)(ii) is checked)      • Buyer's Inspections
140     • Survey (and elevation certification, if required)      • Buyer's attorneys' fees
141     • Lender's title policy and endorsements      • All property related insurance
142     • HOA/Condominium Association application/transfer fees      • Owner's Policy Premium (if Paragraph
143     • Municipal lien search (if Paragraph 9(c)(ii) is checked)      9 (c)(iii) is checked.)
144*     • Other:_____
145*     (c) **TITLE EVIDENCE AND INSURANCE:** At least _____ (if left blank, then 15, or if Paragraph 8(a) is checked,
146     then 5) days prior to Closing Date ("Title Evidence Deadline"), a title insurance commitment issued by a Florida
147     licensed title insurer, with legible copies of instruments listed as exceptions attached thereto ("Title
148     Commitment") and, after Closing, an owner's policy of title insurance (see STANDARD A for terms) shall be
149     obtained and delivered to Buyer. If Seller has an owner's policy of title insurance covering the Real Property, a
150     copy shall be furnished to Buyer and Closing Agent within 5 days after Effective Date. The owner's title policy
151     premium, title search and closing services (collectively, "Owner's Policy and Charges") shall be paid, as set
152     forth below. The title insurance premium charges for the owner's policy and any lender's policy will be calculated
153     and allocated in accordance with Florida law, but may be reported differently on certain federally mandated
154     closing disclosures and other closing documents. For purposes of this Contract "municipal lien search" means a
155     search of records necessary for the owner's policy of title insurance to be issued without exception for unrecorded
156     liens imposed pursuant to Chapters 159 or 170, F.S., in favor of any governmental body, authority or agency.
157     **(CHECK ONE):**
158*     ☐ (i) Seller shall designate Closing Agent and pay for Owner's Policy and Charges, and Buyer shall pay the
159     premium for Buyer's lender's policy and charges for closing services related to the lender's policy,
160     endorsements and loan closing, which amounts shall be paid by Buyer to Closing Agent or such other
161     provider(s) as Buyer may select; or
162*     ☐ (ii) Buyer shall designate Closing Agent and pay for Owner's Policy and Charges and charges for closing
163     services related to Buyer's lender's policy, endorsements and loan closing; or

Buyer's Initials |̲ ̲M̲ß̲ ̲|_____     Page 3 of 12      Seller's Initials |̲ ̲ḳ̲Ṣ̲ ̲|_____
FloridaRealtors/FloridaBar-ASIS-5    Rev.4/17 © 2017 Florida Realtors® and The Florida Bar. All rights reserved.

formsimplicity

164*  ☒ (iii) **[MIAMI-DADE/BROWARD REGIONAL PROVISION]**: Seller shall furnish a copy of a prior owner's policy
165  of title insurance or other evidence of title and pay fees for: (A) a continuation or update of such title evidence,
166  which is acceptable to Buyer's title insurance underwriter for reissue of coverage; (B) tax search; and (C)
167  municipal lien search. Buyer shall obtain and pay for post-Closing continuation and premium for Buyer's owner's
168*  policy, and if applicable, Buyer's lender's policy. Seller shall not be obligated to pay more than $_____
169  (if left blank, then $200.00) for abstract continuation or title search ordered or performed by Closing Agent.
170  (d) **SURVEY:** On or before Title Evidence Deadline, Buyer may, at Buyer's expense, have the Real Property
171  surveyed and certified by a registered Florida surveyor ("Survey"). If Seller has a survey covering the Real
172  Property, a copy shall be furnished to Buyer and Closing Agent within 5 days after Effective Date.
173*  (e) **HOME WARRANTY:** At Closing,☐ Buyer ☐ Seller ☒N/A shall pay for a home warranty plan issued by
174*  _____ at a cost not to exceed $_____ . A home
175  warranty plan provides for repair or replacement of many of a home's mechanical systems and major built-in
176  appliances in the event of breakdown due to normal wear and tear during the agreement's warranty period.
177  (f) **SPECIAL ASSESSMENTS:** At Closing, Seller shall pay: (i) the full amount of liens imposed by a public body
178  ("public body" does not include a Condominium or Homeowner's Association) that are certified, confirmed and
179  ratified before Closing; and (ii) the amount of the public body's most recent estimate or assessment for an
180  improvement which is substantially complete as of Effective Date, but that has not resulted in a lien being
181  imposed on the Property before Closing. Buyer shall pay all other assessments. If special assessments may
182  be paid in installments **(CHECK ONE):**
183*  ☐ (a) Seller shall pay installments due prior to Closing and Buyer shall pay installments due after Closing.
184  Installments prepaid or due for the year of Closing shall be prorated.
185*  ☐ (b) Seller shall pay the assessment(s) in full prior to or at the time of Closing.
186  IF NEITHER BOX IS CHECKED, THEN OPTION (a) SHALL BE DEEMED SELECTED.
187  This Paragraph 9(f) shall not apply to a special benefit tax lien imposed by a community development district
188  (CDD) pursuant to Chapter 190, F.S., which lien shall be prorated pursuant to STANDARD K.

189  **DISCLOSURES**

190  **10. DISCLOSURES:**
191  (a) **RADON GAS:** Radon is a naturally occurring radioactive gas that, when it is accumulated in a building in
192  sufficient quantities, may present health risks to persons who are exposed to it over time. Levels of radon that
193  exceed federal and state guidelines have been found in buildings in Florida. Additional information regarding
194  radon and radon testing may be obtained from your county health department.
195  (b) **PERMITS DISCLOSURE:** Except as may have been disclosed by Seller to Buyer in a written disclosure, Seller
196  does not know of any improvements made to the Property which were made without required permits or made
197  pursuant to permits which have not been properly closed. If Seller identifies permits which have not been
198  properly closed or improvements which were not permitted, then Seller shall promptly deliver to Buyer all plans,
199  written documentation or other information in Seller's possession, knowledge, or control relating to
200  improvements to the Property which are the subject of such open permits or unpermitted improvements.
201  (c) **MOLD:** Mold is naturally occurring and may cause health risks or damage to property. If Buyer is concerned or
202  desires additional information regarding mold, Buyer should contact an appropriate professional.
203  (d) **FLOOD ZONE; ELEVATION CERTIFICATION:** Buyer is advised to verify by elevation certificate which flood
204  zone the Property is in, whether flood insurance is required by Buyer's lender, and what restrictions apply to
205  improving the Property and rebuilding in the event of casualty. If Property is in a "Special Flood Hazard Area"
206  or "Coastal Barrier Resources Act" designated area or otherwise protected area identified by the U.S. Fish and
207  Wildlife Service under the Coastal Barrier Resources Act and the lowest floor elevation for the building(s) and/or
208  flood insurance rating purposes is below minimum flood elevation or is ineligible for flood insurance coverage
209  through the National Flood Insurance Program or private flood insurance as defined in 42 U.S.C. §4012a, Buyer
210*  may terminate this Contract by delivering written notice to Seller within _____ (if left blank, then 20) days after
211  Effective Date, and Buyer shall be refunded the Deposit thereby releasing Buyer and Seller from all further
212  obligations under this Contract, failing which Buyer accepts existing elevation of buildings and flood zone
213  designation of Property. The National Flood Insurance Program may assess additional fees or adjust premiums
214  for pre-Flood Insurance Rate Map (pre-FIRM) non-primary structures (residential structures in which the insured
215  or spouse does not reside for at least 50% of the year) and an elevation certificate may be required for actuarial
216  rating.
217  (e) **ENERGY BROCHURE:** Buyer acknowledges receipt of Florida Energy-Efficiency Rating Information Brochure
218  required by Section 553.996, F.S.

Buyer's Initials [ MB ]    Page 4 of 12    Seller's Initials [ kS ]
FloridaRealtors/FloridaBar-ASIS-5   Rev.4/17 © 2017 Florida Realtors® and The Florida Bar. All rights reserved.
Serial#: 024044-300151-1846248

formsimplicity

219  (f) **LEAD-BASED PAINT:** If Property includes pre-1978 residential housing, a lead-based paint disclosure is
220      mandatory.
221  (g) **HOMEOWNERS' ASSOCIATION/COMMUNITY DISCLOSURE: BUYER SHOULD NOT EXECUTE THIS**
222      **CONTRACT    UNTIL    BUYER    HAS    RECEIVED    AND    READ    THE    HOMEOWNERS'**
223      **ASSOCIATION/COMMUNITY DISCLOSURE, IF APPLICABLE.**
224  (h) **PROPERTY TAX DISCLOSURE SUMMARY:** BUYER SHOULD NOT RELY ON THE SELLER'S CURRENT
225      PROPERTY TAXES AS THE AMOUNT OF PROPERTY TAXES THAT THE BUYER MAY BE OBLIGATED TO
226      PAY IN THE YEAR SUBSEQUENT TO PURCHASE. A CHANGE OF OWNERSHIP OR PROPERTY
227      IMPROVEMENTS TRIGGERS REASSESSMENTS OF THE PROPERTY THAT COULD RESULT IN HIGHER
228      PROPERTY TAXES. IF YOU HAVE ANY QUESTIONS CONCERNING VALUATION, CONTACT THE
229      COUNTY PROPERTY APPRAISER'S OFFICE FOR INFORMATION.
230  (i) **FOREIGN INVESTMENT IN REAL PROPERTY TAX ACT ("FIRPTA"):** Seller shall inform Buyer in writing if
231      Seller is a "foreign person" as defined by the Foreign Investment in Real Property Tax Act ("FIRPTA"). Buyer
232      and Seller shall comply with FIRPTA, which may require Seller to provide additional cash at Closing. If Seller
233      is not a "foreign person", Seller can provide Buyer, at or prior to Closing, a certification of non-foreign status,
234      under penalties of perjury, to inform Buyer and Closing Agent that no withholding is required. See STANDARD
235      V for further information pertaining to FIRPTA. Buyer and Seller are advised to seek legal counsel and tax
236      advice regarding their respective rights, obligations, reporting and withholding requirements pursuant to
237      FIRPTA.
238  (j) **SELLER DISCLOSURE:** Seller knows of no facts materially affecting the value of the Real Property which are
239      not readily observable and which have not been disclosed to Buyer. Except as provided for in the preceding
240      sentence, Seller extends and intends no warranty and makes no representation of any type, either express or
241      implied, as to the physical condition or history of the Property. Except as otherwise disclosed in writing Seller
242      has received no written or verbal notice from any governmental entity or agency as to a currently uncorrected
243      building, environmental or safety code violation.

244  <center>**PROPERTY MAINTENANCE, CONDITION, INSPECTIONS AND EXAMINATIONS**</center>

245  **11. PROPERTY MAINTENANCE:** Except for ordinary wear and tear and Casualty Loss, Seller shall maintain the
246      Property, including, but not limited to, lawn, shrubbery, and pool, in the condition existing as of Effective Date ("AS
247      IS Maintenance Requirement").

248  **12. PROPERTY INSPECTION; RIGHT TO CANCEL:**
249* (a) *PROPERTY INSPECTIONS AND RIGHT TO CANCEL: Buyer shall have ___2___ (if left blank, then 15)*
250      *days after Effective Date ("Inspection Period") within which to have such inspections of the Property*
251      *performed as Buyer shall desire during the Inspection Period. If Buyer determines, in Buyer's sole*
252      *discretion, that the Property is not acceptable to Buyer, Buyer may terminate this Contract by delivering*
253      *written notice of such election to Seller prior to expiration of Inspection Period. If Buyer timely*
254      *terminates this Contract, the Deposit paid shall be returned to Buyer, thereupon, Buyer and Seller shall*
255      *be released of all further obligations under this Contract; however, Buyer shall be responsible for*
256      *prompt payment for such inspections, for repair of damage to, and restoration of, the Property resulting*
257      *from such inspections, and shall provide Seller with paid receipts for all work done on the Property (the*
258      *preceding provision shall survive termination of this Contract). Unless Buyer exercises the right to*
259      *terminate granted herein, Buyer accepts the physical condition of the Property and any violation of*
260      *governmental, building, environmental, and safety codes, restrictions, or requirements, but subject to*
261      *Seller's continuing AS IS Maintenance Requirement, and Buyer shall be responsible for any and all*
262      *repairs and improvements required by Buyer's lender.*
263  (b) **WALK-THROUGH INSPECTION/RE-INSPECTION:** On the day prior to Closing Date, or on Closing Date prior
264      to time of Closing, as specified by Buyer, Buyer or Buyer's representative may perform a walk-through (and
265      follow-up walk-through, if necessary) inspection of the Property solely to confirm that all items of Personal
266      Property are on the Property and to verify that Seller has maintained the Property as required by the AS IS
267      Maintenance Requirement and has met all other contractual obligations.
268  (c) **SELLER ASSISTANCE AND COOPERATION IN CLOSE-OUT OF BUILDING PERMITS:** If Buyer's inspection
269      of the Property identifies open or needed building permits, then Seller shall promptly deliver to Buyer all plans,
270      written documentation or other information in Seller's possession, knowledge, or control relating to
271      improvements to the Property which are the subject of such open or needed Permits, and shall promptly
272      cooperate in good faith with Buyer's efforts to obtain estimates of repairs or other work necessary to resolve
273      such Permit issues. Seller's obligation to cooperate shall include Seller's execution of necessary authorizations,

274  consents, or other documents necessary for Buyer to conduct inspections and have estimates of such repairs
275  or work prepared, but in fulfilling such obligation, Seller shall not be required to expend, or become obligated to
276  expend, any money.
277  (d) **ASSIGNMENT OF REPAIR AND TREATMENT CONTRACTS AND WARRANTIES:** At Buyer's option and
278  cost, Seller will, at Closing, assign all assignable repair, treatment and maintenance contracts and warranties
279  to Buyer.

280  **ESCROW AGENT AND BROKER**

281  **13. ESCROW AGENT:** Any Closing Agent or Escrow Agent (collectively "Agent") receiving the Deposit, other funds
282  and other items is authorized, and agrees by acceptance of them, to deposit them promptly, hold same in escrow
283  within the State of Florida and, subject to **COLLECTION**, disburse them in accordance with terms and conditions
284  of this Contract. Failure of funds to become **COLLECTED** shall not excuse Buyer's performance. When conflicting
285  demands for the Deposit are received, or Agent has a good faith doubt as to entitlement to the Deposit, Agent may
286  take such actions permitted by this Paragraph 13, as Agent deems advisable. If in doubt as to Agent's duties or
287  liabilities under this Contract, Agent may, at Agent's option, continue to hold the subject matter of the escrow until
288  the parties agree to its disbursement or until a final judgment of a court of competent jurisdiction shall determine
289  the rights of the parties, or Agent may deposit same with the clerk of the circuit court having jurisdiction of the
290  dispute. An attorney who represents a party and also acts as Agent may represent such party in such action. Upon
291  notifying all parties concerned of such action, all liability on the part of Agent shall fully terminate, except to the
292  extent of accounting for any items previously delivered out of escrow. If a licensed real estate broker, Agent will
293  comply with provisions of Chapter 475, F.S., as amended and FREC rules to timely resolve escrow disputes through
294  mediation, arbitration, interpleader or an escrow disbursement order.
295  In any proceeding between Buyer and Seller wherein Agent is made a party because of acting as Agent hereunder,
296  or in any proceeding where Agent interpleads the subject matter of the escrow, Agent shall recover reasonable
297  attorney's fees and costs incurred, to be paid pursuant to court order out of the escrowed funds or equivalent. Agent
298  shall not be liable to any party or person for mis-delivery of any escrowed items, unless such mis-delivery is due to
299  Agent's willful breach of this Contract or Agent's gross negligence. This Paragraph 13 shall survive Closing or
300  termination of this Contract.
301  **14. PROFESSIONAL ADVICE; BROKER LIABILITY:** Broker advises Buyer and Seller to verify Property condition,
302  square footage, and all other facts and representations made pursuant to this Contract and to consult appropriate
303  professionals for legal, tax, environmental, and other specialized advice concerning matters affecting the Property
304  and the transaction contemplated by this Contract. Broker represents to Buyer that Broker does not reside on the
305  Property and that all representations (oral, written or otherwise) by Broker are based on Seller representations or
306  public records. **BUYER AGREES TO RELY SOLELY ON SELLER, PROFESSIONAL INSPECTORS AND**
307  **GOVERNMENTAL AGENCIES FOR VERIFICATION OF PROPERTY CONDITION, SQUARE FOOTAGE AND**
308  **FACTS THAT MATERIALLY AFFECT PROPERTY VALUE AND NOT ON THE REPRESENTATIONS (ORAL,**
309  **WRITTEN OR OTHERWISE) OF BROKER.** Buyer and Seller (individually, the "Indemnifying Party") each
310  individually indemnifies, holds harmless, and releases Broker and Broker's officers, directors, agents and
311  employees from all liability for loss or damage, including all costs and expenses, and reasonable attorney's fees at
312  all levels, suffered or incurred by Broker and Broker's officers, directors, agents and employees in connection with
313  or arising from claims, demands or causes of action instituted by Buyer or Seller based on: (i) inaccuracy of
314  information provided by the Indemnifying Party or from public records; (ii) Indemnifying Party's misstatement(s) or
315  failure to perform contractual obligations; (iii) Broker's performance, at Indemnifying Party's request, of any task
316  beyond the scope of services regulated by Chapter 475, F.S., as amended, including Broker's referral,
317  recommendation or retention of any vendor for, or on behalf of, Indemnifying Party; (iv) products or services
318  provided by any such vendor for, or on behalf of, Indemnifying Party; and (v) expenses incurred by any such vendor.
319  Buyer and Seller each assumes full responsibility for selecting and compensating their respective vendors and
320  paying their other costs under this Contract whether or not this transaction closes. This Paragraph 14 will not relieve
321  Broker of statutory obligations under Chapter 475, F.S., as amended. For purposes of this Paragraph 14, Broker
322  will be treated as a party to this Contract. This Paragraph 14 shall survive Closing or termination of this Contract.

323  **DEFAULT AND DISPUTE RESOLUTION**

324  **15. DEFAULT:**
325  (a) **BUYER DEFAULT:** If Buyer fails, neglects or refuses to perform Buyer's obligations under this Contract,
326  including payment of the Deposit, within the time(s) specified, Seller may elect to recover and retain the Deposit
327  for the account of Seller as agreed upon liquidated damages, consideration for execution of this Contract, and
328  in full settlement of any claims, whereupon Buyer and Seller shall be relieved from all further obligations under

Buyer's Initials  MB    Page 6 of 12    Seller's Initials  kS
FloridaRealtors/FloridaBar-ASIS-5  Rev.4/17 © 2017 Florida Realtors® and The Florida Bar. All rights reserved.
Serial#: 024044-300151-1846248

formsimplicity

329 this Contract, or Seller, at Seller's option, may, pursuant to Paragraph 16, proceed in equity to enforce Seller's
330 rights under this Contract. The portion of the Deposit, if any, paid to Listing Broker upon default by Buyer, shall
331 be split equally between Listing Broker and Cooperating Broker; provided however, Cooperating Broker's share
332 shall not be greater than the commission amount Listing Broker had agreed to pay to Cooperating Broker.
333 (b) **SELLER DEFAULT:** If for any reason other than failure of Seller to make Seller's title marketable after
334 reasonable diligent effort, Seller fails, neglects or refuses to perform Seller's obligations under this Contract,
335 Buyer may elect to receive return of Buyer's Deposit without thereby waiving any action for damages resulting
336 from Seller's breach, and, pursuant to Paragraph 16, may seek to recover such damages or seek specific
337 performance.
338 This Paragraph 15 shall survive Closing or termination of this Contract.
339 **16. DISPUTE RESOLUTION:** Unresolved controversies, claims and other matters in question between Buyer and
340 Seller arising out of, or relating to, this Contract or its breach, enforcement or interpretation ("Dispute") will be settled
341 as follows:
342 (a) Buyer and Seller will have 10 days after the date conflicting demands for the Deposit are made to attempt to
343 resolve such Dispute, failing which, Buyer and Seller shall submit such Dispute to mediation under Paragraph
344 16(b).
345 (b) Buyer and Seller shall attempt to settle Disputes in an amicable manner through mediation pursuant to Florida
346 Rules for Certified and Court-Appointed Mediators and Chapter 44, F.S., as amended (the "Mediation Rules").
347 The mediator must be certified or must have experience in the real estate industry. Injunctive relief may be
348 sought without first complying with this Paragraph 16(b). Disputes not settled pursuant to this Paragraph 16
349 may be resolved by instituting action in the appropriate court having jurisdiction of the matter. This Paragraph
350 16 shall survive Closing or termination of this Contract.
351 **17. ATTORNEY'S FEES; COSTS:** The parties will split equally any mediation fee incurred in any mediation permitted
352 by this Contract, and each party will pay their own costs, expenses and fees, including attorney's fees, incurred in
353 conducting the mediation. In any litigation permitted by this Contract, the prevailing party shall be entitled to recover
354 from the non-prevailing party costs and fees, including reasonable attorney's fees, incurred in conducting the
355 litigation. This Paragraph 17 shall survive Closing or termination of this Contract.

356 **STANDARDS FOR REAL ESTATE TRANSACTIONS ("STANDARDS")**

357 **18. STANDARDS:**
358 **A. TITLE:**
359 (i) **TITLE EVIDENCE; RESTRICTIONS; EASEMENTS; LIMITATIONS:** Within the time period provided in
360 Paragraph 9(c), the Title Commitment, with legible copies of instruments listed as exceptions attached thereto, shall
361 be issued and delivered to Buyer. The Title Commitment shall set forth those matters to be discharged by Seller at
362 or before Closing and shall provide that, upon recording of the deed to Buyer, an owner's policy of title insurance
363 in the amount of the Purchase Price, shall be issued to Buyer insuring Buyer's marketable title to the Real Property,
364 subject only to the following matters: (a) comprehensive land use plans, zoning, and other land use restrictions,
365 prohibitions and requirements imposed by governmental authority; (b) restrictions and matters appearing on the
366 Plat or otherwise common to the subdivision; (c) outstanding oil, gas and mineral rights of record without right of
367 entry; (d) unplatted public utility easements of record (located contiguous to real property lines and not more than
368 10 feet in width as to rear or front lines and 7 1/2 feet in width as to side lines); (e) taxes for year of Closing and
369 subsequent years; and (f) assumed mortgages and purchase money mortgages, if any (if additional items, attach
370 addendum); provided, that, none prevent use of Property for **RESIDENTIAL PURPOSES.** If there exists at Closing
371 any violation of items identified in (b) – (f) above, then the same shall be deemed a title defect. Marketable title shall
372 be determined according to applicable Title Standards adopted by authority of The Florida Bar and in accordance
373 with law.
374 (ii) **TITLE EXAMINATION:** Buyer shall have 5 days after receipt of Title Commitment to examine it and notify Seller
375 in writing specifying defect(s), if any, that render title unmarketable. If Seller provides Title Commitment and it is
376 delivered to Buyer less than 5 days prior to Closing Date, Buyer may extend Closing for up to 5 days after date of
377 receipt to examine same in accordance with this STANDARD A. Seller shall have 30 days ("Cure Period") after
378 receipt of Buyer's notice to take reasonable diligent efforts to remove defects. If Buyer fails to so notify Seller, Buyer
379 shall be deemed to have accepted title as it then is. If Seller cures defects within Cure Period, Seller will deliver
380 written notice to Buyer (with proof of cure acceptable to Buyer and Buyer's attorney) and the parties will close this
381 Contract on Closing Date (or if Closing Date has passed, within 10 days after Buyer's receipt of Seller's notice). If
382 Seller is unable to cure defects within Cure Period, then Buyer may, within 5 days after expiration of Cure Period,

## STANDARDS FOR REAL ESTATE TRANSACTIONS ("STANDARDS") CONTINUED

383 deliver written notice to Seller: (a) extending Cure Period for a specified period not to exceed 120 days within which
384 Seller shall continue to use reasonable diligent effort to remove or cure the defects ("Extended Cure Period"); or
385 (b) electing to accept title with existing defects and close this Contract on Closing Date (or if Closing Date has
386 passed, within the earlier of 10 days after end of Extended Cure Period or Buyer's receipt of Seller's notice), or (c)
387 electing to terminate this Contract and receive a refund of the Deposit, thereby releasing Buyer and Seller from all
388 further obligations under this Contract. If after reasonable diligent effort, Seller is unable to timely cure defects, and
389 Buyer does not waive the defects, this Contract shall terminate, and Buyer shall receive a refund of the Deposit,
390 thereby releasing Buyer and Seller from all further obligations under this Contract.

391 **B. SURVEY:** If Survey discloses encroachments on the Real Property or that improvements located thereon
392 encroach on setback lines, easements, or lands of others, or violate any restrictions, covenants, or applicable
393 governmental regulations described in STANDARD A (i)(a), (b) or (d) above, Buyer shall deliver written notice of
394 such matters, together with a copy of Survey, to Seller within 5 days after Buyer's receipt of Survey, but no later
395 than Closing. If Buyer timely delivers such notice and Survey to Seller, such matters identified in the notice and
396 Survey shall constitute a title defect, subject to cure obligations of STANDARD A above. If Seller has delivered a
397 prior survey, Seller shall, at Buyer's request, execute an affidavit of "no change" to the Real Property since the
398 preparation of such prior survey, to the extent the affirmations therein are true and correct.

399 **C. INGRESS AND EGRESS:** Seller represents that there is ingress and egress to the Real Property and title to
400 the Real Property is insurable in accordance with STANDARD A without exception for lack of legal right of access.

401 **D. LEASE INFORMATION:** Seller shall, at least 10 days prior to Closing, furnish to Buyer estoppel letters from
402 tenant(s)/occupant(s) specifying nature and duration of occupancy, rental rates, advanced rent and security
403 deposits paid by tenant(s) or occupant(s)("Estoppel Letter(s)"). If Seller is unable to obtain such Estoppel Letter(s)
404 the same information shall be furnished by Seller to Buyer within that time period in the form of a Seller's affidavit
405 and Buyer may thereafter contact tenant(s) or occupant(s) to confirm such information. If Estoppel Letter(s) or
406 Seller's affidavit, if any, differ materially from Seller's representations and lease(s) provided pursuant to Paragraph
407 6, or if tenant(s)/occupant(s) fail or refuse to confirm Seller's affidavit, Buyer may deliver written notice to Seller
408 within 5 days after receipt of such information, but no later than 5 days prior to Closing Date, terminating this
409 Contract and receive a refund of the Deposit, thereby releasing Buyer and Seller from all further obligations under
410 this Contract. Seller shall, at Closing, deliver and assign all leases to Buyer who shall assume Seller's obligations
411 thereunder.

412 **E. LIENS:** Seller shall furnish to Buyer at Closing an affidavit attesting (i) to the absence of any financing
413 statement, claims of lien or potential lienors known to Seller and (ii) that there have been no improvements or
414 repairs to the Real Property for 90 days immediately preceding Closing Date. If the Real Property has been
415 improved or repaired within that time, Seller shall deliver releases or waivers of construction liens executed by all
416 general contractors, subcontractors, suppliers and materialmen in addition to Seller's lien affidavit setting forth
417 names of all such general contractors, subcontractors, suppliers and materialmen, further affirming that all charges
418 for improvements or repairs which could serve as a basis for a construction lien or a claim for damages have been
419 paid or will be paid at Closing.

420 **F. TIME:** Calendar days shall be used in computing time periods. **Time is of the essence in this Contract.** Other
421 than time for acceptance and Effective Date as set forth in Paragraph 3, any time periods provided for or dates
422 specified in this Contract, whether preprinted, handwritten, typewritten or inserted herein, which shall end or occur
423 on a Saturday, Sunday, or a national legal holiday (see 5 U.S.C. 6103) shall extend to 5:00 p.m. (where the Property
424 is located) of the next business day.

425 **G. FORCE MAJEURE:** Buyer or Seller shall not be required to perform any obligation under this Contract or be
426 liable to each other for damages so long as performance or non-performance of the obligation, or the availability of
427 services, insurance or required approvals essential to Closing, is disrupted, delayed, caused or prevented by Force
428 Majeure. "Force Majeure" means: hurricanes, floods, extreme weather, earthquakes, fire, or other acts of God,
429 unusual transportation delays, or wars, insurrections, or acts of terrorism, which, by exercise of reasonable diligent
430 effort, the non-performing party is unable in whole or in part to prevent or overcome. All time periods, including
431 Closing Date, will be extended a reasonable time up to 7 days after the Force Majeure no longer prevents
432 performance under this Contract, provided, however, if such Force Majeure continues to prevent performance under
433 this Contract more than 30 days beyond Closing Date, then either party may terminate this Contract by delivering
434 written notice to the other and the Deposit shall be refunded to Buyer, thereby releasing Buyer and Seller from all
435 further obligations under this Contract.

436 **H. CONVEYANCE:** Seller shall convey marketable title to the Real Property by statutory warranty, trustee's,
437 personal representative's, or guardian's deed, as appropriate to the status of Seller, subject only to matters
438 described in STANDARD A and those accepted by Buyer. Personal Property shall, at request of Buyer, be

## STANDARDS FOR REAL ESTATE TRANSACTIONS ("STANDARDS") CONTINUED

439  transferred by absolute bill of sale with warranty of title, subject only to such matters as may be provided for in this
440  Contract.

441  **I.  CLOSING LOCATION; DOCUMENTS; AND PROCEDURE:**

442  (i)  **LOCATION:** Closing will be conducted by the attorney or other closing agent ("Closing Agent") designated by
443  the party paying for the owner's policy of title insurance and will take place in the county where the Real Property
444  is located at the office of the Closing Agent, or at such other location agreed to by the parties. If there is no title
445  insurance, Seller will designate Closing Agent. Closing may be conducted by mail, overnight courier, or electronic
446  means.

447  (ii)  **CLOSING DOCUMENTS:** Seller shall at or prior to Closing, execute and deliver, as applicable, deed, bill of
448  sale, certificate(s) of title or other documents necessary to transfer title to the Property, construction lien affidavit(s),
449  owner's possession and no lien affidavit(s), and assignment(s) of leases. Seller shall provide Buyer with paid
450  receipts for all work done on the Property pursuant to this Contract. Buyer shall furnish and pay for, as applicable,
451  the survey, flood elevation certification, and documents required by Buyer's lender.

452  (iii)  **FinCEN GTO NOTICE.  If Closing Agent is required to comply with the U.S. Treasury Department's
453  Financial Crimes Enforcement Network ("FinCEN") Geographic Targeting Orders ("GTOs"), then Buyer
454  shall provide Closing Agent with the information related to Buyer and the transaction contemplated by this
455  Contract that is required to complete IRS Form 8300, and Buyer consents to Closing Agent's collection and
456  report of said information to IRS.**

457  (iv)  **PROCEDURE:** The deed shall be recorded upon **COLLECTION** of all closing funds. If the Title Commitment
458  provides insurance against adverse matters pursuant to Section 627.7841, F.S., as amended, the escrow closing
459  procedure required by STANDARD J shall be waived, and Closing Agent shall, **subject to COLLECTION of all
460  closing funds,** disburse at Closing the brokerage fees to Broker and the net sale proceeds to Seller.

461  **J.  ESCROW CLOSING PROCEDURE:** If Title Commitment issued pursuant to Paragraph 9(c) does not provide
462  for insurance against adverse matters as permitted under Section 627.7841, F.S., as amended, the following
463  escrow and closing procedures shall apply: (1) all Closing proceeds shall be held in escrow by the Closing Agent
464  for a period of not more than 10 days after Closing; (2) if Seller's title is rendered unmarketable, through no fault of
465  Buyer, Buyer shall, within the 10 day period, notify Seller in writing of the defect and Seller shall have 30 days from
466  date of receipt of such notification to cure the defect; (3) if Seller fails to timely cure the defect, the Deposit and all
467  Closing funds paid by Buyer shall, within 5 days after written demand by Buyer, be refunded to Buyer and,
468  simultaneously with such repayment, Buyer shall return the Personal Property, vacate the Real Property and re-
469  convey the Property to Seller by special warranty deed and bill of sale; and (4) if Buyer fails to make timely demand
470  for refund of the Deposit, Buyer shall take title as is, waiving all rights against Seller as to any intervening defect
471  except as may be available to Buyer by virtue of warranties contained in the deed or bill of sale.

472  **K.  PRORATIONS; CREDITS:** The following recurring items will be made current (if applicable) and prorated as of
473  the day prior to Closing Date, or date of occupancy if occupancy occurs before Closing Date: real estate taxes
474  (including special benefit tax assessments imposed by a CDD), interest, bonds, association fees, insurance, rents
475  and other expenses of Property. Buyer shall have option of taking over existing policies of insurance, if assumable,
476  in which event premiums shall be prorated. Cash at Closing shall be increased or decreased as may be required
477  by prorations to be made through day prior to Closing. Advance rent and security deposits, if any, will be credited
478  to Buyer. Escrow deposits held by Seller's mortgagee will be paid to Seller. Taxes shall be prorated based on
479  current year's tax. If Closing occurs on a date when current year's millage is not fixed but current year's assessment
480  is available, taxes will be prorated based upon such assessment and prior year's millage. If current year's
481  assessment is not available, then taxes will be prorated on prior year's tax. If there are completed improvements
482  on the Real Property by January 1st of year of Closing, which improvements were not in existence on January 1st
483  of prior year, then taxes shall be prorated based upon prior year's millage and at an equitable assessment to be
484  agreed upon between the parties, failing which, request shall be made to the County Property Appraiser for an
485  informal assessment taking into account available exemptions. In all cases, due allowance shall be made for the
486  maximum allowable discounts and applicable homestead and other exemptions.  A tax proration based on an
487  estimate shall, at either party's request, be readjusted upon receipt of current year's tax bill. This STANDARD K
488  shall survive Closing.

489  **L.  ACCESS TO PROPERTY TO CONDUCT APPRAISALS, INSPECTIONS, AND WALK-THROUGH:** Seller
490  shall, upon reasonable notice, provide utilities service and access to Property for appraisals and inspections,
491  including a walk-through (or follow-up walk-through if necessary) prior to Closing.

492  **M.  RISK OF LOSS:** If, after Effective Date, but before Closing, Property is damaged by fire or other casualty
493  ("Casualty Loss") and cost of restoration (which shall include cost of pruning or removing damaged trees) does not
494  exceed 1.5% of Purchase Price, cost of restoration shall be an obligation of Seller and Closing shall proceed
495  pursuant to terms of this Contract. If restoration is not completed as of Closing, a sum equal to 125% of estimated

## STANDARDS FOR REAL ESTATE TRANSACTIONS ("STANDARDS") CONTINUED

cost to complete restoration (not to exceed 1.5% of Purchase Price) will be escrowed at Closing. If actual cost of restoration exceeds escrowed amount, Seller shall pay such actual costs (but, not in excess of 1.5% of Purchase Price). Any unused portion of escrowed amount shall be returned to Seller. If cost of restoration exceeds 1.5% of Purchase Price, Buyer shall elect to either take Property "as is" together with the 1.5%, or receive a refund of the Deposit thereby releasing Buyer and Seller from all further obligations under this Contract. Seller's sole obligation with respect to tree damage by casualty or other natural occurrence shall be cost of pruning or removal.

**N.  1031 EXCHANGE:** If either Seller or Buyer wish to enter into a like-kind exchange (either simultaneously with Closing or deferred) under Section 1031 of the Internal Revenue Code ("Exchange"), the other party shall cooperate in all reasonable respects to effectuate the Exchange, including execution of documents; provided, however, cooperating party shall incur no liability or expense related to the Exchange, and Closing shall not be contingent upon, nor extended or delayed by, such Exchange.

**O.  CONTRACT NOT RECORDABLE; PERSONS BOUND; NOTICE; DELIVERY; COPIES; CONTRACT EXECUTION:** Neither this Contract nor any notice of it shall be recorded in any public records. This Contract shall be binding on, and inure to the benefit of, the parties and their respective heirs or successors in interest. Whenever the context permits, singular shall include plural and one gender shall include all. Notice and delivery given by or to the attorney or broker (including such broker's real estate licensee) representing any party shall be as effective as if given by or to that party. All notices must be in writing and may be made by mail, personal delivery or electronic (including "pdf") media. A facsimile or electronic (including "pdf") copy of this Contract and any signatures hereon shall be considered for all purposes as an original. This Contract may be executed by use of electronic signatures, as determined by Florida's Electronic Signature Act and other applicable laws.

**P.  INTEGRATION; MODIFICATION:** This Contract contains the full and complete understanding and agreement of Buyer and Seller with respect to the transaction contemplated by this Contract and no prior agreements or representations shall be binding upon Buyer or Seller unless included in this Contract. No modification to or change in this Contract shall be valid or binding upon Buyer or Seller unless in writing and executed by the parties intended to be bound by it.

**Q.  WAIVER:** Failure of Buyer or Seller to insist on compliance with, or strict performance of, any provision of this Contract, or to take advantage of any right under this Contract, shall not constitute a waiver of other provisions or rights.

**R.  RIDERS; ADDENDA; TYPEWRITTEN OR HANDWRITTEN PROVISIONS:** Riders, addenda, and typewritten or handwritten provisions shall control all printed provisions of this Contract in conflict with them.

**S.  COLLECTION or COLLECTED: "COLLECTION" or "COLLECTED" means any checks tendered or received, including Deposits, have become actually and finally collected and deposited in the account of Escrow Agent or Closing Agent. Closing and disbursement of funds and delivery of closing documents may be delayed by Closing Agent until such amounts have been COLLECTED in Closing Agent's accounts.**

**T.  RESERVED.**

**U.  APPLICABLE LAW AND VENUE:** This Contract shall be construed in accordance with the laws of the State of Florida and venue for resolution of all disputes, whether by mediation, arbitration or litigation, shall lie in the county where the Real Property is located.

**V.  FIRPTA TAX WITHHOLDING:** If a seller of U.S. real property is a "foreign person" as defined by FIRPTA, Section 1445 of the Internal Revenue Code ("Code") requires the buyer of the real property to withhold up to 15% of the amount realized by the seller on the transfer and remit the withheld amount to the Internal Revenue Service (IRS) unless an exemption to the required withholding applies or the seller has obtained a Withholding Certificate from the IRS authorizing a reduced amount of withholding.

(i)  No withholding is required under Section 1445 of the Code if the Seller is not a "foreign person". Seller can provide proof of non-foreign status to Buyer by delivery of written certification signed under penalties of perjury, stating that Seller is not a foreign person and containing Seller's name, U.S. taxpayer identification number and home address (or office address, in the case of an entity), as provided for in 26 CFR 1.1445-2(b). Otherwise, Buyer shall withhold the applicable percentage of the amount realized by Seller on the transfer and timely remit said funds to the IRS.

(ii)  If Seller is a foreign person and has received a Withholding Certificate from the IRS which provides for reduced or eliminated withholding in this transaction and provides same to Buyer by Closing, then Buyer shall withhold the reduced sum required, if any, and timely remit said funds to the IRS.

(iii)  If prior to Closing Seller has submitted a completed application to the IRS for a Withholding Certificate and has provided to Buyer the notice required by 26 CFR 1.1445-1(c) (2)(i)(B) but no Withholding Certificate has been received as of Closing, Buyer shall, at Closing, withhold the applicable percentage of the amount realized by Seller on the transfer and, at Buyer's option, either (a) timely remit the withheld funds to the IRS or (b) place the funds in escrow, at Seller's expense, with an escrow agent selected by Buyer and pursuant to terms negotiated by the

Buyer's Initials  _M̶B̶_  Page 10 of 12  Seller's Initials  _k̶S̶_

formsimplicity

## STANDARDS FOR REAL ESTATE TRANSACTIONS ("STANDARDS") CONTINUED

553 parties, to be subsequently disbursed in accordance with the Withholding Certificate issued by the IRS or remitted
554 directly to the IRS if the Seller's application is rejected or upon terms set forth in the escrow agreement.

555 (iv) In the event the net proceeds due Seller are not sufficient to meet the withholding requirement(s) in this
556 transaction, Seller shall deliver to Buyer, at Closing, the additional COLLECTED funds necessary to satisfy the
557 applicable requirement and thereafter Buyer shall timely remit said funds to the IRS or escrow the funds for
558 disbursement in accordance with the final determination of the IRS, as applicable.

559 (v) Upon remitting funds to the IRS pursuant to this STANDARD, Buyer shall provide Seller copies of IRS Forms
560 8288 and 8288-A, as filed.

561 **W. RESERVED**

562 **X. BUYER WAIVER OF CLAIMS:** *To the extent permitted by law, Buyer waives any claims against Seller*
563 *and against any real estate licensee involved in the negotiation of this Contract for any damage or defects*
564 *pertaining to the physical condition of the Property that may exist at Closing of this Contract and be*
565 *subsequently discovered by the Buyer or anyone claiming* by, through, under or against the Buyer. *This*
566 *provision does not relieve Seller's obligation to comply with Paragraph 10(j). This Standard X shall survive*
567 *Closing.*

568 ### ADDENDA AND ADDITIONAL TERMS

569* **19. ADDENDA:** The following additional terms are included in the attached addenda or riders and incorporated into this
570 Contract (**Check if applicable**):

| | | |
|---|---|---|
| [X] A. Condominium Rider | [ ] K. RESERVED | [ ] T. Pre-Closing Occupancy |
| [ ] B. Homeowners' Assn. | [ ] L. RESERVED | [ ] U. Post-Closing Occupancy |
| [ ] C. Seller Financing | [ ] M. Defective Drywall | [ ] V. Sale of Buyer's Property |
| [ ] D. Mortgage Assumption | [ ] N. Coastal Construction Control | [ ] W. Back-up Contract |
| [ ] E. FHA/VA Financing | Line | [ ] X. Kick-out Clause |
| [ ] F. Appraisal Contingency | [ ] O. Insulation Disclosure | [ ] Y. Seller's Attorney Approval |
| [ ] G. Short Sale | [ ] P. Lead Paint Disclosure (Pre-1978) | [ ] Z. Buyer's Attorney Approval |
| [ ] H. Homeowners/Flood Ins. | [ ] Q. Housing for Older Persons | [ ] AA. Licensee Property Interest |
| [ ] I. RESERVED | [ ] R. Rezoning | [ ] BB. Binding Arbitration |
| [ ] J. Interest-Bearing Acct. | [ ] S. Lease Purchase/ Lease Option | [ ] Other: _____ |

571* **20. ADDITIONAL TERMS:** _____
572 Seller must close all open permits and/or city code violations (if any) prior to Closing Date at Seller's expense and present evidence to Buyer that
573 said items have been closed, corrected, repaired and/or paid.
574
575
576
577
578
579
580
581
582
583
584
585
586
587

588 ### COUNTER-OFFER/REJECTION

589* [ ] Seller counters Buyer's offer (to accept the counter-offer, Buyer must sign or initial the counter-offered terms and
590 deliver a copy of the acceptance to Seller).
591* [ ] Seller rejects Buyer's offer.

**THIS IS INTENDED TO BE A LEGALLY BINDING CONTRACT. IF NOT FULLY UNDERSTOOD, SEEK THE ADVICE OF AN ATTORNEY PRIOR TO SIGNING.**

**THIS FORM HAS BEEN APPROVED BY THE FLORIDA REALTORS AND THE FLORIDA BAR.**

*Approval of this form by the Florida Realtors and The Florida Bar does not constitute an opinion that any of the terms and conditions in this Contract should be accepted by the parties in a particular transaction. Terms and conditions should be negotiated based upon the respective interests, objectives and bargaining positions of all interested persons.*

AN ASTERISK (*) FOLLOWING A LINE NUMBER IN THE MARGIN INDICATES THE LINE CONTAINS A BLANK TO BE COMPLETED.

DocuSigned by:
Buyer: Meyer Bierbrier 51F13487DDBB48A... Date: 2/8/2021

Buyer: ______________________ Date: __________

DocuSigned by:
Seller: Kirill Stadnikov 1A5EE669034A469... Date: 2/8/2021

Seller: ______________________ Date: __________

| Buyer's address for purposes of notice | Seller's address for purposes of notice |
|---|---|
| c/o Attorney on page 1 | 4045 Sheridan Ave, Unit 322, Miami Beach, FL 33140 |

**BROKER:** Listing and Cooperating Brokers, if any, named below (collectively, "Broker"), are the only Brokers entitled to compensation in connection with this Contract. Instruction to Closing Agent: Seller and Buyer direct Closing Agent to disburse at Closing the full amount of the brokerage fees as specified in separate brokerage agreements with the parties and cooperative agreements between the Brokers, except to the extent Broker has retained such fees from the escrowed funds. This Contract shall not modify any MLS or other offer of compensation made by Seller or Listing Broker to Cooperating Brokers.

| | |
|---|---|
| Gleb Klioner | Gleb Klioner |
| **Cooperating Sales Associate, if any** | **Listing Sales Associate** |
| ONE Sotheby's International Realty | ONE Sotheby's International Realty |
| **Cooperating Broker, if any** | **Listing Broker** |

COMMISSION AGREEMENT BETWEEN BROKER AND BUYER: Broker, hereby, agrees to credit the Buyer at Closing 2.5% of the purchase price from Broker's commission.

Agreed, Acknowledged and Accepted by:

DocuSigned by:
Gleb Klioner 2/7/2021
Gleb Klioner
On behalf of ONE Sotheby's Int'l Realty

DocuSigned by:
Meyer Bierbrier 2/8/2021
Meyer Bierbrier

 © 2017 Florida Realtors® and The Florida Bar. All rights reserved.

DocuSign Envelope ID: DE070C9F-3F7E-45AB-A94F-E78ACF6DE715

## Comprehensive Rider to the
## Residential Contract For Sale And Purchase
**THIS FORM HAS BEEN APPROVED BY THE FLORIDA REALTORS AND THE FLORIDA BAR**

 FloridaRealtors®

**If initialed by all parties,** the clauses below will be incorporated into the Florida Realtors®/Florida Bar Residential Contract For Sale And Purchase between ___Heliac Inc, a FL corp___ **(SELLER)** and ___Meyer Bierbrier and/or Assigns___ **(BUYER)** concerning the Property described as ___9701 Collins Ave, Unit 502S, Bal Harbour, FL 33154___

**Buyer's Initials** ⌐DS MB _____   **Seller's Initials** ⌐DS kS _____

### A. CONDOMINIUM RIDER

1. **CONDOMINIUM ASSOCIATION APPROVAL:**
   The Association's approval of Buyer (**CHECK ONE**): ☒ is ☐ is not required. If approval is required, this Contract is contingent upon Buyer being approved by the Association no later than _____ (if left blank, then 5) days prior to Closing. Within _____ (if left blank, then 5) days after Effective Date Seller shall initiate the approval process with the Association and Buyer shall apply for such approval. Buyer and Seller shall sign and deliver any documents required by the Association in order to complete the transfer of the Property and each shall use diligent effort to obtain such approval, including making personal appearances if required. If Buyer is not approved within the stated time period, this Contract shall terminate and Buyer shall be refunded the Deposit, thereby releasing Buyer and Seller from all further obligations under this Contract.

2. **RIGHT OF FIRST REFUSAL:**
   (a) The Association (**CHECK ONE**): ☒ has ☐ does not have a right of first refusal ("Right"). If the Association has a Right, this Contract is contingent upon the Association, within the time permitted for the exercise of such Right, either providing written confirmation to Buyer that the Association is not exercising such Right, or failing to timely exercise such Right pursuant to the terms of the Declaration of Condominium ("Declaration", which reference includes all amendments thereto).
   (b) The members of the Association (**CHECK ONE**): ☒ have ☐ do not have a Right. If the members do have a Right, this Contract is contingent upon the members, within the time permitted for the exercise of such Right, either providing written confirmation to Buyer that the members are not exercising that Right, or failing to timely exercise such Right pursuant to the terms of the Declaration.
   (c) Buyer and Seller shall, within _____ (if left blank, then 5) days after Effective Date, sign and deliver any documents required as a condition precedent to the exercise of the Right, and shall use diligent effort to submit and process the matter with the Association and members, including personal appearances, if required.
   (d) If, within the stated time period, the Association, the members of the Association, or both, fail to provide the written confirmation or the Right has not otherwise expired, then this Contract shall terminate and the Deposit shall be refunded to the Buyer, thereby releasing Buyer and Seller from all further obligations under this Contract.
   (e) If the Association or a member timely exercises its or their Right, this Contract shall terminate and the Deposit shall be refunded to Buyer (unless this Contract provides otherwise), thereby releasing Buyer and Seller from all further obligations under this Contract, and Seller shall pay to Broker the full commission at Closing in recognition that Broker procured the sale.

3. **FEES; ASSESSMENTS; PRORATIONS; LITIGATION:**
   (a) Condominium Association assessment(s) and Rents: Seller represents that the current Association assessment(s) installments is/are

   $ __4,350_____ payable (**CHECK ONE**): ☒monthly ☐quarterly ☐semi-annually ☐annually

   and if more than one Association assessment
   $ _____ payable (**CHECK ONE**): ☐monthly ☐quarterly ☐semi-annually ☐annually

   and the current rent on recreation areas, if any, is
   $ _____ payable (**CHECK ONE**): ☐monthly ☐quarterly ☐semi-annually ☐annually

**Page 1 of 3   A. CONDOMINIUM RIDER**                    **(SEE CONTINUATION)**
CR-4  Rev. 9/15 © 2015 Florida Realtors® and The Florida Bar. All rights reserved.

Serial#: 084495-700145-1446788                    formsimplicity

## A. CONDOMINIUM RIDER (CONTINUED)

All annual assessments levied by the Association and rent on recreational areas, if any, shall be made current by Seller at Closing, and Buyer shall reimburse Seller for prepayments.

(b) Fees: Seller shall, at Closing, pay all fines imposed against the Unit by the Condominium Association as of Closing Date and any fees the Association charges to provide information about the Property, assessment(s) and fees.

*If Property is part of a Homeowners' Association, see Rider B. HOMEOWNERS' ASSOCIATION/COMMUNITY DISCLOSURE for further information including additional assessments and fees.*

(c) Special Assessments and Prorations:
  (i) Seller represents that Seller is not aware of any special or other assessment that has been levied by the Association or that has been an item on the agenda, or reported in the minutes, of the Association within twelve (12) months prior to Effective Date, ("pending") except as follows: _____

  (ii) If special assessments levied or pending exist as of the Effective Date are disclosed above by Seller and may be paid in installments (**CHECK ONE**):  ☐ Buyer  ☒ Seller (if left blank, then Buyer) shall pay installments due after Closing Date. **If Seller is checked, Seller shall pay the assessment in full prior to or at the time of Closing.**
  (iii) If special assessments levied or pending exist as of the Effective Date and have not been disclosed above by Seller, then Seller shall pay such assessments in full at the time of Closing.
  (iv) If, after Effective Date, the Association imposes a special assessment for improvements, work or services, which was not pending as of the Effective Date, then Seller shall pay all amounts due before Closing Date and Buyer shall pay all amounts due after Closing Date.
  (v) A special assessment shall be deemed levied for purposes of this paragraph on the date when the assessment has been approved as required for enforcement pursuant to Florida law and the condominium documents listed in Paragraph 5.
  (vi) Association assets and liabilities, including Association reserve accounts, shall not be prorated.
(d) Litigation: Seller represents that Seller is not aware of pending or anticipated litigation affecting the Property or the common elements, if any, except as follows: _____

## 4. SPRINKLER SYSTEM RETROFIT:
If, pursuant to Sections 718.112(2)(l), F.S., the Association has voted to forego retrofitting its fire sprinkler system or handrails and guardrails for the condominium units, then prior to Closing Seller shall furnish to Buyer the written notice of Association's vote to forego such retrofitting.

## 5. NON-DEVELOPER DISCLOSURE:
(CHECK ONE):

☒ **(a) THE BUYER HEREBY ACKNOWLEDGES THAT BUYER HAS BEEN PROVIDED A CURRENT COPY OF THE DECLARATION OF CONDOMINIUM, ARTICLES OF INCORPORATION OF THE ASSOCIATION, BYLAWS AND RULES OF THE ASSOCIATION, AND A COPY OF THE MOST RECENT YEAR-END FINANCIAL INFORMATION AND FREQUENTLY ASKED QUESTIONS AND ANSWERS DOCUMENT MORE THAN 3 DAYS, EXCLUDING SATURDAYS, SUNDAYS, AND LEGAL HOLIDAYS, PRIOR TO EXECUTION OF THIS CONTRACT.**

☐ **(b) THIS AGREEMENT IS VOIDABLE BY BUYER BY DELIVERING WRITTEN NOTICE OF THE BUYER'S INTENTION TO CANCEL WITHIN 3 DAYS, EXCLUDING SATURDAYS, SUNDAYS, AND LEGAL HOLIDAYS, AFTER THE DATE OF EXECUTION OF THIS AGREEMENT BY THE BUYER AND RECEIPT BY BUYER OF A CURRENT COPY OF THE DECLARATION OF CONDOMINIUM, ARTICLES OF INCORPORATION, BYLAWS AND RULES OF THE ASSOCIATION, AND A COPY OF THE MOST RECENT YEAR-END FINANCIAL INFORMATION AND FREQUENTLY ASKED QUESTIONS AND ANSWERS DOCUMENT IF SO REQUESTED IN WRITING. ANY PURPORTED WAIVER OF THESE VOIDABILITY RIGHTS SHALL BE OF NO EFFECT. BUYER MAY EXTEND THE TIME FOR CLOSING FOR A PERIOD OF NOT MORE THAN 3 DAYS, EXCLUDING SATURDAYS, SUNDAYS, AND**

## A. CONDOMINIUM RIDER (CONTINUED)

**LEGAL HOLIDAYS, AFTER THE BUYER RECEIVES THE DECLARATION, ARTICLES OF INCORPORATION, BYLAWS AND RULES OF THE ASSOCIATION, AND A COPY OF THE MOST RECENT YEAR-END FINANCIAL INFORMATION AND FREQUENTLY ASKED QUESTIONS AND ANSWERS DOCUMENT IF REQUESTED IN WRITING. BUYER'S RIGHT TO VOID THIS AGREEMENT SHALL TERMINATE AT CLOSING.**

6. **BUYER'S REQUEST FOR DOCUMENTS:**
   Buyer is entitled, at Seller's expense, to current copies of the condominium documents specified in Paragraph 5, above. Buyer **(CHECK ONE):** ☐ requests ☒ does not request a current copy of the documents specified in Paragraph 5, above. If this Contract does not close, Buyer shall immediately return the documents to Seller or reimburse Seller for the cost of the documents.

7. **BUYER'S RECEIPT OF DOCUMENTS:**
   **(COMPLETE AND CHECK ONLY IF CORRECT)** ☒ Buyer received the documents described in Paragraph 5, above, ~~on~~ during a prior transaction of another unit which did not come to fruition.

8. **COMMON ELEMENTS; PARKING:**
   The Property includes the unit being purchased and an undivided interest in the common elements and appurtenant limited common elements of the condominium, as specified in the Declaration. Seller's right and interest in or to the use of the following parking space(s), garage, and other areas are included in the sale of the Property and shall be assigned to Buyer at Closing, subject to the Declaration:
   Parking Space(s) # 1 assigned  Garage # _____  Other: _____

9. **INSPECTIONS AND REPAIRS:**
   The rights and obligations arising under Paragraphs 11 and 12 of this Contract to maintain, repair, replace or treat are limited to Seller's individual condominium unit and unless Seller is otherwise responsible do not extend to common elements, limited common elements, or any other part of the condominium property.

10. **GOVERNANCE FORM:**
    PURSUANT TO CHAPTER 718, FLORIDA STATUTES, BUYER IS ENTITLED TO RECEIVE FROM SELLER A COPY OF THE GOVERNANCE FORM IN THE FORMAT PROVIDED BY THE DIVISION OF FLORIDA CONDOMINIUMS, TIMESHARES AND MOBILE HOMES OF THE DEPARTMENT OF BUSINESS AND PROFESSIONAL REGULATION, SUMMARIZING THE GOVERNANCE OF THE CONDOMINIUM ASSOCIATION.

Serial#: 084495-700145-1446788