# Exhibit A

IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA

COMPLEX BUSINESS LITIGATION DIVISION

CASE NO.  2022-001943 CA 43

HELIAC, INC., a Florida corporation,

      Plaintiff,

v.

MDLV, LLC, a Florida limited liability company, d/b/a ONE SOTHEBY'S INTERNATIONAL REALTY; GLEB KLIONER, individually; and CITIBANK, N.A., a national banking association,

      Defendants.

_____/

## AMENDED COMPLAINT

Plaintiff, Heliac, Inc. ("Heliac"), sues defendants, MDLV, LLC, d/b/a ONE Sotheby's International Realty ("OSIR"), and Gleb Klioner ("Klioner"), for damages, and states:

### I. NATURE OF THIS ACTION

1. This action is by a real estate holding company – Heliac – against its real estate broker – OSIR – for damages resulting from the broker's negligence.

2. This action is also against OSIR's real estate sales associate – Klioner – for misappropriation of over $3.7 million in real estate sale proceeds.

3. As a result of the events described in this Complaint, Heliac was required to retain the services of Carolyn N. Budnik, PLLC, and Olesia Y. Belchenko, P.A., to represent it in this action, and is obligated to pay these law firms reasonable fees for their services.

*Heliac, Inc. v. MDLV, LLC, et al.*

4.     All conditions precedent to the commencement of this action have occurred, have been performed, or have been waived.

## II.  JURISDICTION AND VENUE

5.     This is an action for money damages exceeding $750,000.00, excluding interest, court costs, and attorneys' fees, and is therefore within the jurisdiction of this Court.

6.     This Court has subject matter jurisdiction pursuant to § 26.012(2)(a) of the Florida Statutes.

7.     Venue is proper in Miami-Dade County, Florida, pursuant to § 47.011 of the Florida Statutes, as: (a) the events giving rise to this action accrued in Miami-Dade County, Florida; (b) OSIR is headquartered in Miami-Dade County, Florida; (c) Heliac's agreement with OSIR provides for resolution of disputes in Miami-Dade County, Florida; and (d) Klioner resides in Miami-Dade County, Florida.

## III.  PARTIES

### A.  Plaintiff Heliac

8.     Heliac is a Florida profit corporation with its principal place of business in Miami-Dade County, Florida.

9.     Heliac's beneficial owners and principals are Tatiana Zorina ("Zorina") and Kirill Stadnikov ("Stadnikov"), who are married, are citizens and residents of the Russian Federation, and who are both *sui juris*.

10.     Zorina and Stadnikov are Heliac's only officers and directors, with Zorina being Heliac's President, and Stadnikov being its Vice President.

11.     Until recently, Heliac was a real estate holding company.

2

*Heliac, Inc. v. MDLV, LLC, et al.*

**B.  Defendant OSIR**

12.    OSIR is a Florida limited liability company with its principal place of business in Miami-Dade County, Florida.

13.    OSIR is a real estate broker, as defined in § 475.01(1)(a) of the Florida Statutes, and has held itself out in its agreement with Heliac as a transaction broker, as defined in §475.01(1)(l) of the Florida Statutes and in accordance with § 475.278(2) of the Florida Statutes.

14.    From approximately October 19, 2018, through approximately July 1, 2021, OSIR employed Klioner as its real estate sales associate.

15.    Pursuant to Florida common law and § 475.25(1)(u) of the Florida Statutes, OSIR had a duty to direct, control or manage Klioner.

**C.  Defendant Klioner**

16.    Klioner is an individual who is *sui juris* and who resides in Miami-Dade County, Florida.

17.    Klioner was one of OSIR's top real estate sales associate producers and was well known within South Florida's Russian-speaking community, as he was fluent in Russian.

18.    Prior to being hired by OSIR, Klioner was a defendant in an action filed by Gelfman International Enterprises, Inc., in the United States District Court for the Eastern District of New York, Case No. CV-05-3826-RJD-RML, for fraudulently diverting an estimated $1,000,000.00 into a business owned by Klioner's mother.

## IV.  FACTUAL ALLEGATIONS

**A.  Heliac Retains OSIR to Sell the St. Regis Condo**

19.    On March 6, 2013, Heliac purchased a condominium located at 9701 Collins Avenue, Unit 502S, Bal Harbour, Florida 33154, which building is known as St. Regis Bal Harbour

*Heliac, Inc. v. MDLV, LLC, et al.*

("St. Regis Condo").

20.    In 2013, Heliac retained Klioner, who did not assist Heliac with its St. Regis Condo purchase, to manage the St. Regis Condo pursuant to a verbal agreement with Zorina and Stadnikov.

21.    In exchange for a monthly payment of $250.00, Klioner was responsible for making timely payments of the monthly condominium assessments, special assessments that may have come due, and annual real property taxes.

22.    To facilitate Klioner's property management duties, Klioner was given access to Heliac's operating account at Citibank, N.A. ("Bank") as a non-owner signatory.

23.    In October 2018, once Klioner joined OSIR and because Klioner joined OSIR, Heliac entered into an Exclusive Right of Sale Listing Agreement with OSIR, whereby retaining OSIR as its listing agent for the St. Regis Condo sale at the listing price of $5,995,000.00 ("Listing Agreement").  A copy of the Listing Agreement is attached hereto as Exhibit 1.

24.    The Listing Agreement was thereafter renewed annually on March 7, 2019, and March 7, 2020, with the same listing price of $5,995,000.00 for the St. Regis Condo.

25.    Since 2018, OSIR utilized the Multiple Listing Service (MLS) to market the St. Regis Condo and extended the MLS listing for the St. Regis Condo several times through March 7, 2021.

**B.  Klioner Advises Heliac to Sell the St. Regis Condo for a Below Market Price**

26.    From December 2020 through February 2021, Klioner continuously advised Heliac's principals to sell the St. Regis Condo immediately, identifying to Zorina and Stadnikov the following reasons behind his advice:

(a) The real estate market in Miami Beach, Florida, was on the verge of crashing;

*Heliac, Inc. v. MDLV, LLC, et al.*

(b) The drop in the St. Regis Condo's value by as much as 60-70% was imminent;

(c) It would be nearly impossible to sell the St. Regis Condo beyond mid-March 2021;

(d) The U.S. economy was on the verge of crashing at any moment;

(e) The U.S. stock market was on the verge of crashing at any moment;

(f) Heliac had to sell the St. Regis Condo urgently, or it would lose money due to its inability to sell the property.

27.     Klioner made the above statements while having superior knowledge of the real estate market, and while knowing that Heliac's principals did not reside in the U.S., were underinformed about the real estate market in South Florida and the U.S. generally, and were unaware that South Florida was experiencing a real estate boom.

28.     In December 2020, Klioner, as a sales associate with OSIR, presented Heliac with an "AS IS" Residential Contract for Sale and Purchase of the St. Regis Condo in the amount of $3,800,000.00, which was significantly below the market price of the St. Regis Condo.

29.     Klioner tried to convince Heliac's principals – together and by pressuring each of them individually via phone calls and WhatsApp messages – to sell the St. Regis Condo for that price as soon as possible.  However, Heliac's principals refused to sell the St. Regis Condo at that time and decided to wait until a better purchase offer was made.

30.     In February 2021, Klioner, as a sales associate with OSIR, presented Heliac with a new "AS IS" Residential Contract for Sale and Purchase of the St. Regis Condo in the amount of $4,200,000.00 ("Sale Contract"), which was still below the price Heliac wanted to accept for the St. Regis Condo.

*Heliac, Inc. v. MDLV, LLC, et al.*

31.     After being pressured by Klioner mercilessly for over two (2) months, Zorina and Stadnikov acquiesced to the sale, and signed the Sale Contract on February 8, 2021.  A copy of the Sale Contract is attached hereto as <u>Exhibit 2</u>.

**C.  <u>Klioner Fails to Advise Heliac About Available Closing Options</u>**

32.     At no point in the St. Regis Condo sale did Klioner inform Heliac's principals that all documents required to close the transaction could be signed with assistance of an online notary, as has become customary in international real estate closings, or by mailing the documents to Russia for signing and notarizing.

33.     Instead, Klioner had a corporate resolution prepared for Heliac, and sent to Heliac's principals in Russia, requiring them to grant Klioner full authority to sign on Heliac's behalf all documents needed to close the St. Regis Condo sale.

34.     Klioner advised the principals that only through the signing of this resolution on an urgent basis could the St. Regis Condo sale be completed and completed in a timely manner, and that doing so was the customary practice in international real estate closings.

35.     Through this corporate resolution, Klioner obtained unlimited power to prepare and sign any documents related to the St. Regis Condo sale.

**D.  <u>Klioner Fails to Advise Heliac About Options for Disbursement of Sale Proceeds</u>**

36.     From the date of the signing of the Sale Contract, Klioner was instructed that the proceeds of the St. Regis Condo sale had to be returned to the same account at UBS Group AG ("UBS") in Switzerland, from which the funds for the property's purchase originated in 2013.

37.     Yet, Klioner advised Heliac's principals that the proceeds of the St. Regis Condo sale could only be deposited into Heliac's operating account with the Bank in Florida and could not be sent to UBS by the closing agent.

*Heliac, Inc. v. MDLV, LLC, et al.*

38.    Besides Klioner, Zorina was the only other signatory on Heliac's operating account at the Bank, and Klioner knew she was unable to travel to the U.S. for the St. Regis Condo sale or to access the proceeds of the St. Regis Condo sale because her U.S. visa had expired.

39.    Klioner also knew that Stadnikov, although able to travel to the U.S., was not a signatory on Heliac's operating account and could not access the proceeds of the St. Regis Condo sale.

40.    Thus, at the closing for the St. Regis Condo sale and using the corporate resolution he obtained from Heliac, Klioner directed the closing agent to wire Heliac's proceeds into Heliac's operating account at the Bank which only Klioner could access in-person.

**E.   Klioner Fails to Transfer Proceeds of the St. Regis Condo Sale as Instructed**

41.    On March 10, 2021, the St. Regis Condo closing took place, and $3,885,023.02 was wired from the closing agent's escrow account into Heliac's operating account at the Bank, in reliance on Klioner's disbursement instructions.

42.    On the same day, Klioner advised Heliac's principals the deal was closed, forwarded to them copies of the closing documents, informed them the funds were credited to Heliac's operating account, and confirmed he was waiting for their instructions for a transfer of the sale proceeds to UBS.

43.    In preparation for receipt of the sale proceeds, Heliac's principals forwarded the St. Regis Condo closing documents they received from Klioner to UBS to have the bank's questions concerning the source of the funds answered ahead of time.

44.    On March 17, 2021, Klioner secretly wired $3,734,277.21 from Heliac's operating account into his personal account at Wells Fargo Bank, N.A., without the knowledge or permission of Heliac's principals, and without authorization.

*Heliac, Inc. v. MDLV, LLC, et al.*

45.     On March 26, 2021, Stadnikov, believing the funds were still in Heliac's operating account, provided Klioner with wire transfer instructions to send the St. Regis Condo sale proceeds to Heliac's principals' account at UBS.

46.     From March 26, 2021, through June 7, 2021, Klioner gave Heliac's principals various false reasons for the Bank's alleged inability or refusal to approve the transfer of the St. Regis Condo sale proceeds to UBS, including, that:

(a)  Klioner was too busy to initiate the transfer;

(b)  The Bank refused to accept Zorina's signature on Heliac's tax-related documents;

(c)  The Bank requested information on the source of the funds and the reason for the transfer to UBS;

(d)  The Bank required a new original IRS W-8 BEN Form (Certificate of Foreign Status of Beneficial Owner for United States Tax Withholding and Reporting (Individuals)) signed by Zorina, and a scanned copy was insufficient;

(e)  The Bank had to send the IRS W-8 BEN Form to its New York office for approval;

(f)  The Bank did not accept Zorina's original signature on the IRS W-8 BEN Form because it was not notarized in Russia;

(g)  The Bank did not accept Zorina's original signature on the IRS W-8 BEN Form because its Russian notarization was not translated into English;

(h)  The Bank did not accept the new IRS W-8 BEN Form, signed by Zorina, because no apostille was attached to the form;

*Heliac, Inc. v. MDLV, LLC, et al.*

(i)  Preparation of an apostille to the IRS W-8 BEN Form was required to be done in Florida and was delayed.

47.     On June 6, 2021, Stadnikov demanded Klioner to schedule a telephone conference with the Bank's in-house counsel for June 7, 2021, to discuss any issues preventing the approval of the wire transfer to UBS.

48.     At the scheduled time, Stadnikov called Klioner for the conference with the Bank's counsel only to have Klioner admit that he converted the $3,734,277.21 that was supposed to be transferred to UBS from Heliac's operating account to his own use.

49.     Klioner requested that Heliac's principals allow him until June 18, 2021, to repay the converted amount.

50.     To date, Klioner has not repaid the amount improperly taken from Heliac's account.

## COUNT I:  NEGLIGENT MISREPRESENTATION
### (Heliac v. OSIR)

51.     Heliac realleges and incorporates by reference the allegations contained in paragraphs 1 through 50 into this Count I, as if fully set forth herein.

52.     Klioner, as agent of OSIR, misrepresented to Heliac material facts concerning the state of South Florida's real estate market and the value of the St. Regis Condo, including, that the drop in the St. Regis Condo's value by as much as 60-70% was imminent, and that Heliac would be unable to sell the St. Regis Condo beyond mid-March 2021.

53.     Klioner advised that, for the foregoing reasons, Heliac had to accept an offer as low as $3,800,000.00 for the purchase of the St. Regis Condo, and that an offer of $4,200,000.00 was the most Heliac could obtain for the property.

*Heliac, Inc. v. MDLV, LLC, et al.*

54.     Klioner further misrepresented to Heliac that the St. Regis Condo sale could not be completed without Heliac giving Klioner full authority to sign all closing documents on Heliac's behalf, and that the sale proceeds could not be transferred to Heliac's principals' account at UBS.

55.     Klioner made these statements apparently believing them to be true, while they were in fact false, because:

(a) South Florida's real estate market was booming;

(b) The value of the St. Regis Condo continued to rise;

(c) The closing of the St. Regis Condo sale could have been done electronically without Klioner's in-person signing of any documents;

(d) The original closing documents could have been sent to Heliac's principals for signing and notarizing in Russia; and

(e) The proceeds of the sale could have been transferred directly to Heliac's principals' account from which they originated.

56.     Klioner, as OSIR's sales associate, should have known that his representations about the state of South Florida's real estate market, the value of the St. Regis Condo, and the real estate closing procedures were false.

57.     OSIR and Klioner, as its sales associate, had superior knowledge of the real estate market, had access to various research tools and information regarding the state of South Florida's real estate market, and were aware that international real estate transactions were now regularly conducted electronically, and that the closing documents could have been delivered to Heliac's principals for signing and notarizing in Russia.

58.     Therefore, OSIR and Klioner should have been aware of the true value of the St. Regis Condo, should have been able to properly advise Heliac on its appropriate price and the

*Heliac, Inc. v. MDLV, LLC, et al.*

appropriate timing of its sale, and should have been able to properly advise Heliac on the correct procedures for international real estate closings, such as for the sale of the St. Regis Condo.

59.     Thus, OSIR and Klioner, as its sales associate, failed to exercise reasonable care or competence in obtaining or communicating to Heliac the information concerning the state of South Florida's real estate market, the value of the St. Regis Condo, and the correct real estate closing procedures for the St. Regis Condo sale.

60.     OSIR and Klioner, as its sales associate, intended and expected Heliac to rely on Klioner's misrepresentations to induce Heliac to sell the St. Regis Condo and, consequently, collect a commission from the sale of the St. Regis Condo as soon as possible.

61.     Because Klioner worked for such a prestigious company in the luxury real estate business as OSIR and had prior experience brokering large international real estate transactions, Heliac's principals justifiably relied on Klioner's advice to sell the St. Regis Condo urgently and, following Klioner's advice, agreed to sell the St. Regis Condo for the reduced price of $4,200,000.00, as well as justifiably relied on Klioner's advice concerning real estate closing procedures.

62.     The value of the St. Regis Condo at the time of the sale was higher than the offer Klioner advised Heliac to accept, and its value continued to increase in the few months immediately following the sale to over $4,700,000.00.

63.     Moreover, had Heliac not followed Klioner's advice concerning real estate closing procedures, including by giving Klioner full authority to sign documents on Heliac's behalf and to transfer proceeds from the sale of the St. Regis Condo to Heliac's operating account which only Klioner could access, Heliac's funds could not have been converted.

*Heliac, Inc. v. MDLV, LLC, et al.*

64.     Thus, because of OSIR's sales associate's negligent misrepresentations and poor advice, Heliac incurred damages in the form of the difference between the market price of the St. Regis Condo and its sale price, and the loss of the St. Regis Condo sale proceeds.

65.     Therefore, Heliac respectfully requests a judgment against OSIR for damages, interest, and court costs, and for such other and further relief the Court deems just and proper.

## COUNT II:  NEGLIGENT EMPLOYEE HIRING
### (Heliac v. OSIR)

66.     Heliac realleges and incorporates by reference the allegations contained in paragraphs 1 through 50 into this Count II, as if fully set forth herein.

67.     Prior to hiring Klioner as its sales associate, OSIR had a duty to conduct a thorough investigation into Klioner's background, including into whether Klioner had a history of dealings involving dishonesty, fraud, or theft.

68.     If OSIR conducted such an investigation into Klioner's background, the investigation would have revealed Klioner's unsuitability for the duty of handling OSIR's clients' funds during real estate closings.

69.     Specifically, a review of public records would have disclosed a lawsuit against Klioner involving mishandling of business funds.

70.     Considering the facts OSIR knew or should have known about Klioner's background, it was unreasonable for OSIR to hire Klioner to handle OSIR's high net worth clients' funds.

71.     Thus, because of OSIR's breach of its duty to investigate in hiring Klioner, Heliac incurred damages in the form of the St. Regis Condo sale proceeds' loss when Klioner failed to transfer the proceeds in accordance with Heliac's instructions.

*Heliac, Inc. v. MDLV, LLC, et al.*

72.     Therefore, Heliac respectfully requests a judgment against OSIR for damages, interest, and court costs, and for such other and further relief the Court deems just and proper.

## COUNT III:  NEGLIGENT EMPLOYEE TRAINING
### (Heliac v. OSIR)

73.     Heliac realleges and incorporates by reference the allegations contained in paragraphs 1 through 50 into this Count III, as if fully set forth herein.

74.     OSIR owed a duty to Heliac to properly and adequately train its sales associates to have them follow the standard guidelines and procedures related to international real estate transactions, including to ensure OSIR's sales associates:

(a)  Advise OSIR's clients of the true market value of the properties being listed for sale;

(b)  Advise OSIR's clients of the market conditions affecting the value of their properties;

(c)  Refrain from pressuring OSIR's clients into selling properties for prices below what the clients are comfortable accepting from buyers;

(d)  Inform OSIR's clients of the real estate closing procedures applicable in international real estate transactions, such as online notarizations and options to wire proceeds of real estate sales abroad to end beneficiaries of Florida's corporate property sellers;

(e)  Not overstep their powers by taking on full signing authority in real estate transactions;

(f)  Not overstep their powers by taking on full funds disposition authority in real estate transactions; and

13

*Heliac, Inc. v. MDLV, LLC, et al.*

    (g) Precisely follow OSIR's clients' instructions regarding delivery of proceeds of real estate sales.

75.    OSIR failed to property and adequately train Klioner in the above-mentioned obligations, as is evident from his handling of the St. Regis Condo sale.

76.    Because Heliac was OSIR's client, it was in a reasonably foreseeable zone of risk from the actions of Klioner, who was to ensure the St. Regis Condo sale was closed correctly, and that the proceeds of the sale reached Heliac's beneficiaries.

77.    Accordingly, OSIR's duty of care in training Klioner, as its sales associate, ran from OSIR directly to Heliac, as OSIR's client.

78.    As a direct and proximate result of OSIR's failure to adequately train its sales associate, Heliac was damaged to the extent of the difference between the market price of the St. Regis Condo and its sale price, and the loss of the St. Regis Condo sale proceeds.

79.    Therefore, Heliac respectfully requests a judgment against OSIR for damages, interest, and court costs, and for such other and further relief the Court deems just and proper.

## COUNT IV:  VICARIOUS LIABILITY FOR CONVERSION
### (Heliac v. OSIR)

80.    Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1 through 50 into this Count IV, as if fully set forth herein.

81.    Klioner, as OSIR's sales associate, had a duty to Heliac to follow precisely Heliac's instructions regarding delivery of the St. Regis Condo sale proceeds, and to ensure such proceeds reached Heliac's principals' UBS account.

82.    Klioner breached his duties to Heliac by failing to follow Heliac's instructions regarding delivery of the St. Regis Condo sale proceeds.

*Heliac, Inc. v. MDLV, LLC, et al.*

83. OSIR's sale associate's acts were committed within the scope or course of his employment, as his actions:

    (a) Were the kind he was hired to perform in that Klioner had to ensure the proceeds of the real estate closing were transferred from the St. Regis Condo's buyer pursuant to its seller's instructions;

    (b) Occurred substantially within the time and place limits authorized or required by the work to be performed in that Klioner acted as OSIR's sales associate in communicating using OSIR's signature block, and arranging for the closing as OSIR's sales associate, and, as OSIR's sales associate, was required to follow instructions regarding the sale proceeds; and

    (c) At least in part, were activated by the purpose of serving his employer, who had the right to control his action at the time, in that Klioner performed his duties in ensuring that OSIR's agreement with Heliac was performed, the sale of the St. Regis Condo took place, OSIR would collect a commission, and he could maintain his high producer status with OSIR.

84. As a direct and proximate result of Klioner's breach of his duty to Heliac in converting the St. Regis Condo sale proceeds, Heliac was damaged.

85. As Klioner's employer, OSIR is vicariously liable for Klioner's wrongful conduct.

86. For this reason, Heliac seeks to recover damages from OSIR, including but not limited to, the full amount of the funds Klioner converted.

87. Therefore, Heliac respectfully requests a judgment against OSIR for damages, interest, and court costs, and for such other and further relief the Court deems just and proper.

*Heliac, Inc. v. MDLV, LLC, et al.*

## COUNT V:  BREACH OF DUTIES IN VIOLATION OF
## § 475.25(1)(b), FLORIDA STATUTES
### (Heliac v. OSIR)

88.     Heliac realleges and incorporates by reference the allegations contained in paragraphs 1 through 50 into this Count V, as if fully set forth herein.

89.     As a broker employing Klioner, OSIR owed Heliac certain duties imposed on it by law or by the terms of a listing contract, written, oral, express, or implied, in a real estate transaction, including the duties of dealing honestly and fairly; accounting for all funds; and using skill, care, and diligence in the transaction, among others, pursuant to §§475.25(1)(b) and 475.42(1)(e), and 475.278(2) of the Florida Statutes.

90.     OSIR breached its duties to Heliac, in violation of §475.25(1)(b) of the Florida Statutes, in allowing Klioner to:

(a) Fail to advise Heliac of the true market value of the St. Regis Condo;

(b) Fail to advise Heliac of the market conditions affecting the value of the St. Regis Condo;

(c) Manipulate Heliac into selling the St. Regis Condo for a price below what Heliac sought;

(d) Fail to inform Heliac of the real estate closing procedures applicable in international transaction, such as online notarization and option to wire proceeds of real estate sales abroad to end beneficiaries of Heliac;

(e) Improperly obtain power to sign the closing documents;

(f) Improperly obtain power to access and control the St. Regis Condo sale proceeds;

*Heliac, Inc. v. MDLV, LLC, et al.*

(g) Disregard Heliac's instructions regarding delivery of the St. Regis Condo sale proceeds; and

(h) Fail to act in the best interests of Heliac.

91.    Further, OSIR breached its duties to Heliac in ignoring Klioner's conduct mentioned above because Klioner was OSIR's top real estate sales associate producer.

92.    As a direct and proximate result of OSIR's breach of its duties to Heliac, Heliac was damaged to the extent of the difference between the market price of the St. Regis Condo and its sale price, and the loss of the St. Regis Condo sale proceeds.

93.    Therefore, Heliac respectfully requests a judgment against OSIR for damages, interest, and court costs, and for such other and further relief the Court deems just and proper.

### COUNT VI:  CONVERSION
### (Heliac v. Klioner)

94.    Heliac realleges and incorporates by reference the allegations contained in paragraphs 1 through 50 into this Count VI, as if fully set forth herein.

95.    On or about January 27, 2021, Klioner converted to his own use the sum of $20,000.00 by wire transferring this amount from Heliac's operating account to his personal account ("First Transfer").  A copy of the First Transfer confirmation is attached hereto as <u>Exhibit 3</u>.

96.    On or about March 17, 2021, Klioner converted to his own use the sum of $3,734,277.21, constituting the St. Regis Condo sale proceeds, by transferring this amount from Heliac's operating account to his personal account ("Second Transfer").  A copy of the Second Transfer confirmation is attached hereto as <u>Exhibit 4</u>.

97.    Klioner had no authority to take and to keep these funds.

*Heliac, Inc. v. MDLV, LLC, et al.*

98.     On numerous occasions starting on June 6, 2021, Heliac demanded that Klioner return the funds he converted, which demand Klioner refused.

99.     To date, Klioner has not returned the funds he converted.

100.    As a result of Klioner's conversion of Heliac's funds, Heliac was damaged in the amount of $3,754,277.21, plus interest, and court costs.

101.    Therefore, Heliac respectfully requests a judgment against Klioner for damages, interest, court costs, and attorneys' fees (if Heliac shows entitlement), and for such other and further relief the Court deems just and proper.

### COUNT VII:  BREACH OF DUTIES IN VIOLATION OF
### § 475.25(1)(b), FLORIDA STATUTES
### (Heliac v. Klioner)

102.    Heliac realleges and incorporates by reference the allegations contained in Paragraphs 1 through 50 into this Count VII, as if fully set forth herein.

103.    As a real estate sales associate, Klioner owed Heliac certain duties imposed on him by law or by the terms of a listing contract, written, oral, express, or implied, in a real estate transaction, including the duties of dealing honestly and fairly; accounting for all funds; and using skill, care, and diligence in the transaction, among others, pursuant to §§475.25(1)(b), 475.42(1)(e), and 475.278(2) of the Florida Statutes.

104.    Moreover, as a real estate sales associate, Klioner had a duty to refrain from dishonest dealing by trick, scheme, or device, and breach of trust in any business transaction in this state or any other state, nation, or territory, pursuant to §§475.25(1)(b) and 475.42(1)(e) of the Florida Statutes.

105.    Klioner breached his duties to Heliac, in violation of § 475.25(1)(b) of the Florida Statutes, by:

18

*Heliac, Inc. v. MDLV, LLC, et al.*

(a)  Failing to advise Heliac of the true market value of the St. Regis Condo;

(b)  Failing to advise Heliac of the market conditions affecting the value of the St. Regis Condo;

(c)  Manipulating Heliac into selling the St. Regis Condo for a price below what Heliac sought;

(d)  Failing to inform Heliac of the real estate closing procedures applicable in international transaction, such as online notarization and option to wire proceeds of real estate sales abroad to end beneficiaries of Heliac;

(e)  Improperly obtaining power to sign the closing documents;

(f)  Improperly obtaining power to access and control the St. Regis Condo sale proceeds;

(g)  Disregarding Heliac's instructions regarding delivery of the St. Regis Condo sale proceeds; and

(h)  Failing to act in the best interests of Heliac.

106.    Klioner's conduct also amounts to dishonest dealing by trick, scheme, or device, and breach of trust in his dealing with Heliac, in violation of § 475.25(1)(b) of the Florida Statutes.

107.    As a direct and proximate result of Klioner's breach of his duties to Heliac, Heliac was damaged.

108.    Therefore, Heliac respectfully requests a judgment against Klioner for damages, interest, court costs, and attorneys' fees (if Heliac shows entitlement), and for such other and further relief the Court deems just and proper.

*Heliac, Inc. v. MDLV, LLC, et al.*

## COUNT VIII:  FAILURE TO DELIVER FUNDS IN VIOLATION OF § 475.25(1)(d)1., FLORIDA STATUTES
### (Heliac v. Klioner)

109.    Heliac realleges and incorporates by reference the allegations contained in Paragraphs 1 through 50 into this Count VIII, as if fully set forth herein.

110.    As a real estate sales associate, Klioner had a duty to deliver to Heliac, on Heliac's demand, any money which came into Klioner's hands and which was not his property or which Klioner was not in law or equity entitled to retain under the circumstances, pursuant to §§475.25(1)(d)1. and 475.42(1)(e) of the Florida Statutes.

111.    On or about March 17, 2021, Klioner converted to his own use the St. Regis Condo sale proceeds totaling $3,734,277.21.

112.    On numerous occasions starting on June 6, 2021, Heliac demanded that Klioner return the funds he converted, which demands Klioner refused.

113.    To date, Klioner has not returned the funds he converted.

114.    The St. Regis Condo sale proceeds were not Klioner's property and Klioner was not in law or equity entitled to retain the sale proceeds under the circumstances.

115.    As a result of Klioner's failure to delivery to Heliac, on Heliac's demand, the St. Regis Condo sale proceeds, in violation of § 475.25(1)(d)1. of the Florida Statutes, Heliac was damaged in the amount of $3,734,277.21, plus interest and court costs.

116.    Therefore, Heliac respectfully requests a judgment against Klioner for damages, interest, court costs, and attorneys' fees (if Heliac shows entitlement), and for such other and further relief the Court deems just and proper.

*Heliac, Inc. v. MDLV, LLC, et al.*

## COUNT IX:  CIVIL THEFT
### (Heliac v. Klioner)

117.    Heliac re-alleges and incorporates paragraphs 1 through 50 and 95 through 100 into this Count IX, as if fully restated herein.

118.    Without Heliac's knowledge, consent, and authorization, Klioner improperly transferred funds from Heliac's operating account into his own bank account via two wire transfers on two separate occasions: $20,000.00 on January 27, 2021, and $3,734,277.21 on March 17, 2021.

119.    Klioner knowingly obtained and used $3,754,277.21 of Heliac's funds with the intent to, either temporarily or permanently, deprive Heliac of the right to the funds and a benefit from them, and to appropriate the funds to Klioner's own use, in violation of § 812.014(1) of the Florida Statutes.

120.    As a result of Klioner's violation of § 812.014(1) of the Florida Statutes, Heliac has been injured and has lost $3,754,277.21, plus interest from the date Klioner wrongfully converted the funds from Heliac.

121.    Prior to filing this claim, Heliac made written demand to Klioner for three times the amount of money taken by Klioner (specifically, $11,262,831.60), to which Klioner did not respond.  A copy of the demand letter from Heliac to Klioner is attached hereto as <u>Exhibit 5</u>.

122.    Therefore, Heliac respectfully requests a judgment against Klioner for treble damages resulting from Klioner's theft of Heliac's funds, interest, court costs, and reasonable attorneys' fees, and for any other and further relief the Court deems just and proper.

Date:  April 11, 2022.

*Heliac, Inc. v. MDLV, LLC, et al.*

## **CERTIFICATE OF SERVICE**

WE CERTIFY that on April 11, 2022, the foregoing document was served via the State of

Florida ePortal Filing System on the persons listed below.

Alan S. Rosenberg, Esquire
Email: asr@krdlawgroup.com.com
Koleos Rosenberg Dionisio, PL
8211 W. Broward Blvd., Suite 330
Ft. Lauderdale, Florida 33324
*Counsel for Defendant, MDLV, LLC,*
*d/b/a*
*One Sotheby's International Realty*

Edward M. Mullins, Esquire
Email: emullins@reedsmith.com
Ana M. Barton, Esquire
Email: abarton@reedsmith.com
Reed Smith LLP
1001 Brickell Bay Drive, Suite 900
Miami, Florida 33131
*Counsel for Defendant, Citibank, N.A.*

And via U.S. Mail on:

Gleb Klioner
3146 Prairie Avenue
Miami Beach, Florida 33140

Respectfully submitted,

*s/ Carolyn N. Budnik*
Carolyn N. Budnik
Florida Bar No. 223610
Carolyn N. Budnik, PLLC
4623 N.W. 53rd Avenue, Suite 2
Gainesville, Florida 32653
Phone: (352) 792-6180
Email: carolyn@cbudlaw.com

and

*s/ Olesia Y. Belchenko*
Olesia Y. Belchenko
Florida Bar No. 0025717
Olesia Y. Belchenko, P.A.
1221 Brickell Avenue, Suite 2400
Miami, Florida 33131-3225
Phone: (305) 200-5553
Email: olesia@belchenkolaw.com

DocuSign Envelope ID: DFA96406-1274-4A2D-B108-8BAE0B4548BE

ONE

## Exclusive Right of Sale Listing Agreement

**Sotheby's**
INTERNATIONAL REALTY

This EXCLUSIVE RIGHT OF SALE LISTING AGREEMENT (the "Agreement") is entered into this date ___October 8___, ___2018___

by and between ONE Sotheby's International Realty (the "Broker") and ___Heliac Inc___

_____ (the "Owner") and shall expire at 11:59 PM, Eastern Standard time on ___October 8___, ___2019___,

("Expiration Date").

1. **EXCLUSIVE RIGHT OF SALE.** Broker agrees to use Broker's professional efforts as transaction broker for Owner:
   A. To find a buyer for the following property, situated in ___Miami-Dade___ County, Florida, described as follows:
      Street Address: ___9701 Collins Ave, Unit 502S, Bal Harbour, FL 33154___
      Folio Number: ___12-2226-048-1330___
      Legal Description: ___BAL HARBOUR NORTH SOUTH CONDO UNIT 502S UNDIV 0.355462% INT IN COMMON___
      ___ELEMENTS OFF REC 27891-0454___
      Personal Property Included: _____
      _____
      Personal Property Excluded: _____
      _____
      (The real property and personal property described above together constitute the "Property"); and
   B. To disseminate listing information on the Property to other brokers through the services of the Multiple Listing Services(s) (the "MLS") in accordance with its rules. Owner hereby agrees to the terms of this Agreement and gives Broker the sole and exclusive right and authority to find a buyer for the Property at the following price and terms or at any other price and terms the Owner accepts by executing a Sale and Purchase Contract:
      List Price: ___5,995,000___
      Financing Terms: ▢ Cash  ▢ Conventional Financing ▢ VA ▢ FHA ▢ Seller Financing ▢ Existing Mortgage Assumption
      Terms: _____

2. **BROKER'S OBLIGATIONS AND AUTHORITY.** In consideration of this Agreement, Broker agrees:
   A. To market the Property through the MLS, once the professional photos have been taken and returned to ONE Sotheby's;
   B. Owner authorizes Broker to: (a) Advertise the Property (including the Address, transaction information and Owner's name) as Broker deems advisable, in its sole discretion, in newspapers, publications, computer networks and other media, including advertising the Property on the Internet, unless limited in 2(B)(i) or 2(B)(ii) below.
      (Owner opt-out) (Check one, if applicable)
      ▢ (i) Display the Property on the Internet except the street address of the Property shall not be displayed on the Internet.
      ▢ (ii) Owner does not authorize Broker to display the Property on the Internet.
      Owner understands and acknowledges that if Owner selects option (ii), consumers who conduct searches for listings on the Internet will not see information about the listed property in response to their search. _____ / _____ Initials of Owner.
   C. **Virtual Office Websites:** Some real estate brokerages offer real estate brokerage services online. These websites are referred to as Virtual Office Websites ("VOW"). An automated estimate of market value or reviews and comments about a property may be displayed in conjunction with a property on some VOWs. Anyone who registers on a Virtual Office Website may gain access to such automated valuations or comments and reviews about any property displayed on a VOW. Unless limited below, a VOW may display automated valuations or comments/reviews (blogs) about this Property.
      ▢ Owner does not authorize an automated estimate of the market value of the listing (or hyperlink to such estimate) to be displayed in immediate conjunction with the listing of this Property.
      ▢ Owner does not authorize third parties to write comments or reviews about the listing of the Property (or display a hyperlink to such comments or reviews) in immediate conjunction with the listing of this Property.
      Notwithstanding the foregoing, Owner acknowledges and understands that Broker cannot control, change or monitor the display of the Property or Property information on sites which extract information from the MLS and redistribute online through other platforms. Broker can only make modifications and remove Property information from sources under the direct control of Broker and not any unrelated third parties.
   D. To place appropriate transaction signs on the Property in accordance with all county, municipal, and homeowner association regulations currently in effect including "For Sale" signs and "Sold" signs (once Owner signs a Sale and Purchase Contract);
   E. To furnish information requested by other Brokers to assist a cooperating Broker in finalizing the Sale and Purchase Contract and closing the transaction of the Property, including divulging the existence of offers on the Property in response to inquiries from buyers or cooperating brokers;
   F. To ▢ Withhold ▢ Not Withhold verbal and written offers received by Broker when a Sale and Purchase Contract, executed by Owner, is pending closing; and
   G. To ▢ Use   ▣ Not Use the Electronic Access and Reporting System (EARS) to show and access the Property. EARS does not ensure the Property's security; Owner is advised to secure or remove valuables as any sort of lock box system does not ensure the security of the Property). Owner agrees that EARS is for Owner's benefit and releases Broker, persons working through Broker, and Broker's local Realtor Association from all liability and responsibility in connection with any damage or loss that occurs.
   H. Act as a transaction broker.
   I. Provide objective comparative market analysis information to potential buyers.

3. **OWNER'S OBLIGATIONS.** In consideration of this Agreement, the Owner agrees:
   A. To cooperate with Broker in carrying out the purpose of this contract, including referring immediately to Broker all inquiries regarding the Property's transfer, whether by purchase or any other means of transfer;
   B. To make the Property available for showing and inspections at reasonable hours and provide Broker keys to the Property;
   C. To immediately advise Broker of:
      (1) Owner's intent to lease, mortgage, otherwise encumber the Property, and
      (2) Any facts that might affect the terms and conditions of the sale;

Owner ( ___ ) ( ___ ) and Broker/Sales Associate ( ___ ) ( ___ ) acknowledge receipt of a copy of this page, which is Page 1 of 4

Ver. 0617

# Exhibit 1

DocuSign Envelope ID: DFA96406-1274-4A2D-B108-8BAE0B4548BE

EXCLUSIVE RIGHT OF SALE LISTING AGREEMENT

      (3)  If Owner receives a notice of mortgage default or a foreclosure proceeding is initiated (in which event Broker will have the right, in addition to any other remedies, to immediately terminate this Agreement).

D.  To comply with all applicable federal, state, local, and association laws, regulations, and rules applicable to real estate transactions including FIRPTA (Foreign Investment Real Property Tax Act);

E.  To enter into a written contract with the buyer upon being presented an offer for the Property in accordance with this Agreement, which shall be in the form of a contract for sale and purchase most recently approved by the Florida Association of Realtors, or an equivalent form (the "Sale and Purchase Contract"). Copies of the Sale and Purchase Contract are available to Owner upon request;

F.  To perform all of Owner's obligations under the executed Sale and Purchase Contract, including but not limited to the obligations:
    (1)  To furnish complete evidence of title; and
    (2)  (if the Property is a condominium or belongs to a homeowner's association) to provide prospective buyer with a current copy of the Declaration of Condominium (if applicable), the Articles of Incorporation of the Association, Bylaws and the Rules of the Association, and a copy of the most recent year-end financial information, and the Frequently Asked and Answers Document. All such documents shall be provided at Owner's expense more than 3 days, excluding Saturdays, Sundays, and Legal Holidays, prior to the execution of this contract.

G.  To indemnify Broker and hold Broker harmless from losses, damages, costs and expenses of any nature, including attorney's fees, and from liability to any person, that Broker incurs because of:
    (1)  Owner's negligence, representations, misrepresentations, omissions, actions or inaction;
    (2)  The use of EARS or any lock box or Owner's failure to remove or secure valuables during Open Houses or showings; or
    (3)  The existence of undisclosed material facts about the Property.
    (4)  A court or arbitration decision that a broker who was not compensated in connection with a transaction is entitled to compensation from Broker.
    This clause shall survive Broker's performance, any expiration or termination and/or the transfer of title.

H.  To make all legally required disclosures, including all facts that materially affect the Property's value and are not readily observable or known by buyer. Owner certifies and represents that Owner knows of no such facts other than those represented on the attached Owner's Property Disclosure Addendum.  Owner will immediately inform Broker of any material facts that arise after signing this Agreement.

I.   Owner certifies and represents that (i) no one has any right to purchase or lease the Property, or any portion thereof by virtue of any agreement, option or right of first refusal, except as expressly disclosed in paragraph 13, and (ii) there are no prior listings, sale or other agreements affecting the Property that have not been lawfully terminated.

J.  Consult appropriate professionals for related legal, tax, property condition, permitting, square footage, property condition or size, environmental, foreign reporting requirements, and other specialized advice. Owner acknowledges that Broker and its salespersons are not qualified or authorized to give such advice and, if given, Owner will not rely in any way on such advice.

**4.**  **BROKERS COMPENSATION.**

A.  **AMOUNT OF COMPENSATION.**  Owner jointly and severally agrees to pay Broker a brokerage fee in the following amounts (together, the "Compensation"):

    (1)  For a sale of the Property, Compensation shall be ~~six percent (6%)~~ of the total purchase and at the time of closing, ~~Owner shall~~ pay a Brokerage fee in the amount of $295.00 to ONE Sotheby's International Realty, which shall be paid to Broker by ~~Owner~~ as provided in Paragraph 4B below; or    *five*  *$*         *Associate, Gleb Klioner* J I

                                                                                               *Associate, Gleb Klioner*

    (2)  If the Property becomes available for lease during the term of this Agreement, Compensation shall be:
      (a) In the amount of ten percent (10%) of the total lease amount for the term of such lease, which amount shall be paid to Broker at the time of the execution of such lease; and
      (b) A like amount for any continued occupancy including extension, renewal, or subsequent lease between the same or related parties, whether oral or written, which like amount shall be paid to Broker at the time of each extension, renewal or subsequent lease.

B.  **PAYMENT OF COMPENSATION.**  The Compensation, as defined above, shall be paid to Broker by Owner:
    (1)  If Broker, Owner, or any other person finds a buyer ready, willing and able to purchase the Property at the terms for the price specified herein, or at any other terms or price that Owner may accept by executing a Sale and Purchase Contract, compensation shall be paid to Broker by Owner at the time of Closing under the Sale and Purchase Contract;
    (2)  If Broker, Owner or any other person finds a tenant ready, willing and able to lease the Property at the terms specified herein, or on other terms acceptable to Owner, Compensation shall be paid to Broker by Owner at the time the tenant signs the lease, extension, renewal, or subsequent lease between the same or related parties. Any changes in the amount of rent paid, the term of the lease, or non-material changes of the conditions of the lease between the same or related parties shall not affect Broker's right to Compensation as set forth herein. If during the term of such lease, extension, renewal or subsequent lease, or within 180 days after the termination thereof, the tenant or his assigns (or to any member of that tenant's immediate family or any entity or trust in which the tenant or family member has an interest) shall buy from Owner, the Compensation agreed in Paragraph 4(A)(1) shall be deemed earned by Broker and payable to Broker as provided in this Agreement whether such sale closes before or after the Expiration Date. The provisions of this Paragraph 4(B)(2) shall survive the expiration of this Agreement and shall be binding on Owner whether or not incorporated in any lease agreement;
    (3)  If any interest in the Property is voluntarily transferred, exchanged or traded during the term of this Agreement, Compensation shall be paid to Broker by Owner at the time of transfer;
    (4)  If Owner willfully prevents the performance hereunder by Broker, Compensation shall be paid to Broker by Owner upon written demand;
    (5)  If Owner fails or refuses to perform under the Sale and Purchase Contract, Compensation shall be paid to Broker by Owner upon written demand; or
    (6)  If Owner and buyer shall mutually rescind the Sale and Purchase Contract (except as provided for therein) without Broker's consent, Compensation shall be paid to Broker upon written demand.



Owner (  ) (  ) and Broker/Sales Associate (  ) (  ) acknowledge receipt of a copy of this page, which is Page 2 of 4

Ver. 0617

DocuSign Envelope ID: DFA96406-1274-4A2D-B108-8BAE0B4548BE

**EXCLUSIVE RIGHT OF SALE LISTING AGREEMENT**

    C.   **IF BUYER DEFAULTS.** If a buyer is found in accordance with Paragraph 4(B)(1), but such buyer fails to perform (under a Sale and Purchase Contract or otherwise), Owner shall pay Broker an amount equal to fifty percent (50%) of the deposit (including deposit(s) made or agreed to be made by the buyer) which is retained or recovered by or for the account of Owner. Such amount:

        (1)  shall not exceed the amount of Compensation as provided above;

        (2)  shall be payable at the time of disbursement of any such deposit; and

        (3)  shall be deemed as full consideration for Broker's services with respect to that buyer, including costs.

    D.   **PROTECTION PERIOD.** If Owner agrees to sell, lease, option or exchange property or any interest therein within 180 days after the expiration of this Agreement, to a prospective buyer or tenant to whom Broker, Owner or any cooperating broker submitted or communicated regarding the Property prior to the Expiration Date, and the transaction thereafter closes at any time, Owner agrees to pay Broker the Compensation set forth in Paragraph 4.B. above. However, if the Property is relisted with another broker after the expiration of this Agreement, this Paragraph 4.D. shall not apply so long as Owner enters into an exclusive listing agreement with another broker after the Expiration Date, the Property is sold through that broker and Owner pays a commission at least equal to the Compensation. The provisions of this Paragraph 4.D. shall survive the expiration of the Agreement.

5.   **CONDITIONAL TERMINATION.** At Owner's request, Broker may agree to conditionally terminate this Agreement, as provided below.

    A.   If Broker agrees to conditional termination, Owner must sign a Withdrawal Agreement and pay Broker a cancellation fee equal to one-half of one percent of the listed price, all direct expenses incurred in marketing the Property and any applicable sales tax. To be valid, any conditional termination or Withdrawal Agreement must be agreed to in writing by Broker's Branch Office Manager who has the sole and exclusive authority to terminate this Agreement, regardless of who may have signed this Agreement.

    B.   If Owner transfers, or contracts to transfer, the Property prior to the original expiration of this Agreement and the Protection Period thereafter, Broker may void conditional termination and the full compensation as stated in Paragraph 5.B. above will be due to Broker upon written demand. In the event that the Property is re-listed with another Broker, Paragraph 5.B. shall not apply, so long as Owner enters into an exclusive listing agreement with another broker after the conditional termination, the Property is sold through that broker and Owner pays a commission at least equal to the Compensation.

6.   **ESCROW AUTHORITY AND TITLE WARRANTY.** Broker and any cooperating broker are hereby authorized to act as escrow agent at such time as a Sale and Purchase Contract or lease is prepared, provided that such duties shall be in accordance with the laws of the State of Florida and the rules and regulations of the Florida Real Estate Commission. Owner hereby warrants that Owner is the legal Owner of the fee simple title to the Property and has the authority and the capacity to convey such title to buyer.

7.   **COOPERATION WITH OTHER BROKERS.** ONE Sotheby's International Realty's policy is to cooperate and compensate any real estate broker who has an active license in the State of Florida who sells the Property in the capacity of buyer's agent, a non-representative broker, or as a transaction broker. Compensation to the cooperating broker shall be fifty percent (50%) of the total Compensation paid to Broker by Owner and shall be paid by Broker to cooperating broker at time Compensation is received by Broker from Owner. The total Compensation paid by Owner shall not exceed the amount set forth in Paragraph 4.A of this Agreement.

8.   **LIEN RIGHTS.** Pursuant to Fla. Stat. §475.42(1)(i), Owner authorizes Broker to record a lien against the Property to secure payment of the Compensation in Paragraph 4 and waives all homestead rights and defenses in any lien foreclosure action.

9.   **DISPUTE RESOLUTION.** This Agreement shall be construed under Florida Law. All controversies, claims, and other matters in question between the parties arising out of or relating to this Agreement or the breach thereof will be settled by first attempting mediation under the rules of the American Mediation Association or other mediator agreed upon by the parties. If litigation arises out of this contract, the prevailing party will be entitled to recover reasonable attorney's fees and costs. Venue will be exclusively in Miami-Dade County, Florida. In any claim by Owner against Broker (including negligence), Owner's damages will not exceed the amount of the Compensation that Broker was paid, or would have been paid, in connection with the sale. **BROKER AND OWNER HEREBY KNOWINGLY AND VOLUNTARILY WAIVE ANY RIGHT TO TRIAL BY JURY IN ANY LITIGATION.**

10.  **MISCELLANEOUS.** This Agreement is binding on Broker's and Owner's heirs, personal representatives, administrators, successors, and assigns. Owner (which includes all Owners executing this Agreement) shall be jointly and severally obligated under the provisions of this Agreement. The term "buyer" includes buyers, tenants, exchangers, optionees and other categories of potential or actual transferees, and members of their immediate families or any entity or trust in which they may have an interest. Time is of the essence for all provisions of this Agreement. Signatures, initials, and modifications communicated by facsimile will be considered as originals. Electronic signatures are acceptable and will be binding. Broker may assign this Agreement to another listing office. This Agreement is the entire agreement between Owner and Broker. No prior or present agreements or representations will be binding on Owner or Broker unless included in this Agreement. This Agreement may only be modified in writing signed by Owner and Broker. If any provision herein is or becomes invalid or unenforceable, all remaining provisions will remain fully effective and valid.

11.  **PLEASE DO NOT ASK OR EXPECT BROKER TO DISCRIMINATE, OR TO RESTRICT THE SALE OR SHOWING OF YOUR PROPERTY ON THE BASIS OF RACE, COLOR, AGE, RELIGION, SEX, HANDICAP, FAMILIAL STATUS, OR NATIONAL ORIGIN. ONE SOTHEBY'S INTERNATIONAL REALTY'S POLICY AS WELL AS FEDERAL LAW PROHIBITS BROKER FROM ANY SUCH DISCRIMINATION OR RESTRICTIONS. THIS PROPERTY SHALL BE LISTED AND MARKETED IN COMPLIANCE WITH SUCH POLICY AND LAW AS IN EFFECT DURING THE TERM OF THIS AGREEMENT.**

12.  **NOTE.** Owner understands that this Agreement does not guarantee the sale of the Property, but that it does provide that the Broker will make earnest effort to market the Property as provided in this Agreement until the Expiration Date. Broker advises Owner to consult an appropriate professional for related legal, tax, property condition, environmental, foreign reporting requirements, and other specialized advice.

13.  **ADDITIONAL CLAUSES:**  <u>Brokerage name change from Miami Villa Realty to One Sotheby's on the MLS will occur on or before</u> <u>Oct 25, 2018 by which time Gleb Klioner's brokerage change forms will be processed with Miami's real estate board and the DBPR.</u>



Owner (  ) (  ) and Broker/Sales Associate (  ) acknowledge receipt of a copy of this page, which is Page 3 of 4

                                                                      Ver. 0817

DocuSign Envelope ID: DFA96406-1274-4A2D-B108-8BAE0B4548BE

**EXCLUSIVE RIGHT OF SALE LISTING AGREEMENT**

14. **THIRD PARTY VENDORS.** Broker may provide Owner with names and service providers (including but not limited to, title agents, contractors, movers, accountants, attorneys) that other customers have used or whom Broker may know.  If Broker provides any such names or service providers such act shall not be construed to be a recommendation or endorsement of, nor is Broker warranting the work of, any such provider(s).  Owner agrees to release and hold Broker harmless from all claims or losses that in any way arise out of or, relate to, the section or use of any such service provider or vendor.  The final choice to use any service provider or vendor rests solely with Owner and Owner is not obligated in any way to use such providers or vendors.

15. **EXTENSION OF AGREEMENT.** If Owner enters in a Sale and Purchase Contract, this Agreement shall automatically extend through the date of closing of the Sale and Purchase Contract. If a Sale and Purchase Contract entered into on or before the Expiration Date does not close, this Agreement will automatically be extended for the number of days the Property was under the Sale and Purchase Contract. If Owner leases the Property, Broker in its sole discretion, may either: (a) stop marketing the Property while occupied and the Agreement will be extended for the number of days then remaining until the Expiration Date; or (b) continue marketing the Property and Owner will (i) include a provision in the lease that requires the tenant to cooperate with Broker, and (ii) take all reasonable actions to ensure cooperation.

16. **ADDENDA.** Attached hereto and made part hereof are the following addenda:
    □ Owner's Property Disclosure   □ Other: _____

This is a legally binding contract. Neither Broker nor its representatives make any representations as to the legal effect or tax consequences of this Agreement or the transactions contemplated herein. If you do not understand this contract, consult an attorney before you sign it.

By signing below, Owner understands and agree(s) to all of the terms and conditions of this Agreement.

Owner Signature: *Kirill Stadnikov*                          Date: 10/8/2018
Print Name of Owner: 1A5EE...  Stadnikov          Tax ID#: _____ Phone: _____
Address: _____  Email: _____

Owner Signature: _____  Date: _____
Print Name of Owner: _____  Tax ID#: ____ Phone: ____
Address: _____  Email: _____

Associate Signature: *Gleb Klioner*          Date: 10/8/2018
Print Name of Agent for ONE Sotheby's International Realty: Gleb Klioner   Phone: ____
Address: _____  Email: _____

Copy Returned to Owner on _____, _____ by: □ Personal Delivery □ Mail □ Email

*Thure Toch/Broker -10/9/18*

Owner (__)(__) and Broker/Sales Associate (__)(__) acknowledge receipt of a copy of this page, which is Page 4 of 4
Ver. 0617

DocuSign Envelope ID: DE070C9F-3F7E-45AB-A94F-E78ACF6DE715

# "AS IS" Residential Contract For Sale And Purchase
**THIS FORM HAS BEEN APPROVED BY THE FLORIDA REALTORS AND THE FLORIDA BAR**

 FloridaRealtors®

1* **PARTIES:** Heliac Inc, a Florida corporation ("Seller"),
2* and Meyer Bierbrier and/or Assigns ("Buyer"),
3 agree that Seller shall sell and Buyer shall buy the following described Real Property and Personal Property
4 (collectively "Property") pursuant to the terms and conditions of this AS IS Residential Contract For Sale And Purchase
5 and any riders and addenda ("Contract"):

6 **1. PROPERTY DESCRIPTION:**
7*   (a) Street address, city, zip: 9701 Collins Ave, Unit 502S, Bal Harbour, FL 33154
8*   (b) Located in: Miami-Dade County, Florida. Property Tax ID #: 12-2226-048-1330
9*   (c) Real Property: The legal description is BAL HARBOUR NORTH SOUTH CONDO UNIT 502S UNDIV 0.355462%
10   INT IN COMMON ELEMENTS OFF REC 27891-0454
11
12   together with all existing improvements and fixtures, including built-in appliances, built-in furnishings and
13   attached wall-to-wall carpeting and flooring ("Real Property") unless specifically excluded in Paragraph 1(e) or
14   by other terms of this Contract.
15   (d) Personal Property: Unless excluded in Paragraph 1(e) or by other terms of this Contract, the following items
16   which are owned by Seller and existing on the Property as of the date of the initial offer are included in the
17   purchase: range(s)/oven(s), refrigerator(s), dishwasher(s), disposal, ceiling fan(s), intercom, light fixture(s),
18   drapery rods and draperies, blinds, window treatments, smoke detector(s), garage door opener(s), security gate
19   and other access devices, and storm shutters/panels ("Personal Property").
20*   Other Personal Property items included in this purchase are: washer and dryer
21
22   Personal Property is included in the Purchase Price, has no contributory value, and shall be left for the Buyer.
23*   (e) The following items are excluded from the purchase:
24

25                         **PURCHASE PRICE AND CLOSING**

26* **2. PURCHASE PRICE** (U.S. currency): ........................................................................ $ 4,200,000

27*   (a) Initial deposit to be held in escrow in the amount of **(checks subject to COLLECTION)** ...... $ 20,000
28     The initial deposit made payable and delivered to "Escrow Agent" named below
29*     **(CHECK ONE):** (i) [x] accompanies offer or (ii) ☐ is to be made within _____ (if left
30     blank, then 3) days after Effective Date. IF NEITHER BOX IS CHECKED, THEN
31     OPTION (ii) SHALL BE DEEMED SELECTED.
32*     Escrow Agent Information: Name: Mendy Lieberman, Esq. / The Lieberman Law Firm, PA
33*     Address: 20801 Biscayne Blvd, Suite 304, Miami, FL 33180
34*     Phone: 305-912-7789   E-mail: mlieberman@sflatty.com   Fax: ------------
35*   (b) Additional deposit to be delivered to Escrow Agent within 2 (if left blank, then 10)
36*     days after Effective Date ........................................................................ $ 400,000
37     (All deposits paid or agreed to be paid, are collectively referred to as the "Deposit")
38*   (c) Financing: Express as a dollar amount or percentage ("Loan Amount") see Paragraph 8 .........

39*   (d) Other: ........................................................................ $
40   (e) Balance to close (not including Buyer's closing costs, prepaids and prorations) by wire
41*     transfer or other **COLLECTED** funds ........................................................................ $ Balance
42     **NOTE: For the definition of "COLLECTION" or "COLLECTED" see STANDARD S.**

43 **3. TIME FOR ACCEPTANCE OF OFFER AND COUNTER-OFFERS; EFFECTIVE DATE:**
44   (a) If not signed by Buyer and Seller, and an executed copy delivered to all parties on or before
45*     10:00 AM - February 8, 2021 , this offer shall be deemed withdrawn and the Deposit, if any, shall be returned to
46     Buyer. Unless otherwise stated, time for acceptance of any counter-offers shall be within 2 days after the day
47     the counter-offer is delivered.
48   (b) The effective date of this Contract shall be the date when the last one of the Buyer and Seller has signed or
49     initialed and delivered this offer or final counter-offer ("Effective Date").

50 **4. CLOSING DATE:** Unless modified by other provisions of this Contract, the closing of this transaction shall occur
51 and the closing documents required to be furnished by each party pursuant to this Contract shall be delivered
52* ("Closing") on or before 30 days FED (from Effective Date) ("Closing Date"), at the time established by the Closing Agent.

Buyer's Initials [MB]         Page 1 of 12         Seller's Initials [kS]

FloridaRealtors/FloridaBar-ASIS-5   Rev.4/17 © 2017 Florida Realtors® and The Florida Bar. All rights reserved.

Serial#: 024044-300151-1846248

**Exhibit 2**     formsimplicity

DocuSign Envelope ID: DE070C9F-3F7E-45AB-A94F-E78ACF6DE715

**5. EXTENSION OF CLOSING DATE:**
    (a) If Paragraph 8(b) is checked and Closing funds from Buyer's lender(s) are not available on Closing Date due to Consumer Financial Protection Bureau Closing Disclosure delivery requirements ("CFPB Requirements"), then Closing Date shall be extended for such period necessary to satisfy CFPB Requirements, provided such period shall not exceed 10 days.
    (b) If an event constituting "Force Majeure" causes services essential for Closing to be unavailable, including the unavailability of utilities or issuance of hazard, wind, flood or homeowners' insurance, Closing Date shall be extended as provided in STANDARD G.

**6. OCCUPANCY AND POSSESSION:**
    (a) Unless the box in Paragraph 6(b) is checked, Seller shall, at Closing, deliver occupancy and possession of the Property to Buyer free of tenants, occupants and future tenancies. Also, at Closing, Seller shall have removed all personal items and trash from the Property and shall deliver all keys, garage door openers, access devices and codes, as applicable, to Buyer. If occupancy is to be delivered before Closing, Buyer assumes all risks of loss to the Property from date of occupancy, shall be responsible and liable for maintenance from that date, and shall be deemed to have accepted the Property in its existing condition as of time of taking occupancy.
    (b) ☐ **CHECK IF PROPERTY IS SUBJECT TO LEASE(S) OR OCCUPANCY AFTER CLOSING.** If Property is subject to a lease(s) after Closing or is intended to be rented or occupied by third parties beyond Closing, the facts and terms thereof shall be disclosed in writing by Seller to Buyer and copies of the written lease(s) shall be delivered to Buyer, all within 5 days after Effective Date. If Buyer determines, in Buyer's sole discretion, that the lease(s) or terms of occupancy are not acceptable to Buyer, Buyer may terminate this Contract by delivery of written notice of such election to Seller within 5 days after receipt of the above items from Seller, and Buyer shall be refunded the Deposit thereby releasing Buyer and Seller from all further obligations under this Contract. Estoppel Letter(s) and Seller's affidavit shall be provided pursuant to STANDARD D. If Property is intended to be occupied by Seller after Closing, see Rider U. POST-CLOSING OCCUPANCY BY SELLER.

**7. ASSIGNABILITY: (CHECK ONE):** Buyer ☐ may assign and thereby be released from any further liability under this Contract; ☒ may assign but not be released from liability under this Contract; or ☐ may not assign this Contract.

<b>FINANCING</b>

**8. FINANCING:**
    ☒ (a) Buyer will pay cash for the purchase of the Property at Closing. There is no financing contingency to Buyer's obligation to close. If Buyer obtains a loan for any part of the Purchase Price of the Property, Buyer acknowledges that any terms and conditions imposed by Buyer's lender(s) or by CFPB Requirements shall not affect or extend the Buyer's obligation to close or otherwise affect any terms or conditions of this Contract.
    ☐ (b) This Contract is contingent upon Buyer obtaining approval of a ☐ conventional ☐ FHA ☐ VA or ☐ other _____ (describe) loan within _____ (if left blank, then 30) days after Effective Date ("Loan Approval Period") for **(CHECK ONE):** ☐ fixed, ☐ adjustable, ☐ fixed or adjustable rate in the Loan Amount (See Paragraph 2(c)), at an initial interest rate not to exceed _____ % (if left blank, then prevailing rate based upon Buyer's creditworthiness), and for a term of _____ (if left blank, then 30) years ("Financing").
        (i) Buyer shall make mortgage loan application for the Financing within _____ (if left blank, then 5) days after Effective Date and use good faith and diligent effort to obtain approval of a loan meeting the Financing terms ("Loan Approval") and thereafter to close this Contract. Loan Approval which requires a condition related to the sale by Buyer of other property shall not be deemed Loan Approval for purposes of this subparagraph.

    Buyer's failure to use diligent effort to obtain Loan Approval during the Loan Approval Period shall be considered a default under the terms of this Contract. For purposes of this provision, "diligent effort" includes, but is not limited to, timely furnishing all documents and information and paying of all fees and charges requested by Buyer's mortgage broker and lender in connection with Buyer's mortgage loan application.

        (ii) Buyer shall keep Seller and Broker fully informed about the status of Buyer's mortgage loan application, Loan Approval, and loan processing and authorizes Buyer's mortgage broker, lender, and Closing Agent to disclose such status and progress, and release preliminary and finally executed closing disclosures and settlement statements, to Seller and Broker.
        (iii) Upon Buyer obtaining Loan Approval, Buyer shall promptly deliver written notice of such approval to Seller.
        (iv) If Buyer is unable to obtain Loan Approval after the exercise of diligent effort, then at any time prior to expiration of the Loan Approval Period, Buyer may provide written notice to Seller stating that Buyer has been unable to obtain Loan Approval and has elected to either:
            (1) waive Loan Approval, in which event this Contract will continue as if Loan Approval had been obtained; or
            (2) terminate this Contract.

109    (v) If Buyer fails to timely deliver either notice provided in Paragraph 8(b)(iii) or (iv), above, to Seller prior to
110 expiration of the Loan Approval Period, then Loan Approval shall be deemed waived, in which event this Contract
111 will continue as if Loan Approval had been obtained, provided however, Seller may elect to terminate this Contract
112 by delivering written notice to Buyer within 3 days after expiration of the Loan Approval Period.

113    (vi) If this Contract is timely terminated as provided by Paragraph 8(b)(iv)(2) or (v), above, and Buyer is not in
114 default under the terms of this Contract, Buyer shall be refunded the Deposit thereby releasing Buyer and Seller
115 from all further obligations under this Contract.

116    (vii) If Loan Approval has been obtained, or deemed to have been obtained, as provided above, and Buyer
117 fails to close this Contract, then the Deposit shall be paid to Seller unless failure to close is due to: (1) Seller's
118 default or inability to satisfy other contingencies of this Contract; (2) Property related conditions of the Loan Approval
119 have not been met (except when such conditions are waived by other provisions of this Contract); or (3) appraisal
120 of the Property obtained by Buyer's lender is insufficient to meet terms of the Loan Approval, in which event(s) the
121 Buyer shall be refunded the Deposit, thereby releasing Buyer and Seller from all further obligations under this
122 Contract.

123* ☐ (c) Assumption of existing mortgage (see rider for terms).
124* ☐ (d) Purchase money note and mortgage to Seller (see riders; addenda; or special clauses for terms).

125 **CLOSING COSTS, FEES AND CHARGES**

126 **9. CLOSING COSTS; TITLE INSURANCE; SURVEY; HOME WARRANTY; SPECIAL ASSESSMENTS:**
127 (a) **COSTS TO BE PAID BY SELLER:**
128 • Documentary stamp taxes and surtax on deed, if any    • HOA/Condominium Association estoppel fees
129 • Owner's Policy and Charges (if Paragraph 9(c)(i) is checked)    • Recording and other fees needed to cure title
130 • Title search charges (if Paragraph 9(c)(iii) is checked)    • Seller's attorneys' fees
131* • Municipal lien search (if Paragraph 9(c)(i) or (iii) is checked)    • Other: <u>Broker's commissions</u>
132    If, prior to Closing, Seller is unable to meet the AS IS Maintenance Requirement as required by Paragraph 11
133 a sum equal to 125% of estimated costs to meet the AS IS Maintenance Requirement shall be escrowed at
134 Closing. If actual costs to meet the AS IS Maintenance Requirement exceed escrowed amount, Seller shall pay
135 such actual costs. Any unused portion of escrowed amount(s) shall be returned to Seller.

136 (b) **COSTS TO BE PAID BY BUYER:**
137 • Taxes and recording fees on notes and mortgages    • Loan expenses
138 • Recording fees for deed and financing statements    • Appraisal fees
139 • Owner's Policy and Charges (if Paragraph 9(c)(ii) is checked)    • Buyer's Inspections
140 • Survey (and elevation certification, if required)    • Buyer's attorneys' fees
141 • Lender's title policy and endorsements    • All property related insurance
142 • HOA/Condominium Association application/transfer fees    • Owner's Policy Premium (if Paragraph
143 • Municipal lien search (if Paragraph 9(c)(ii) is checked)      9 (c)(iii) is checked.)
144* • Other:_____

145* (c) **TITLE EVIDENCE AND INSURANCE:** At least _____ (if left blank, then 15, or if Paragraph 8(a) is checked,
146 then 5) days prior to Closing Date ("Title Evidence Deadline"), a title insurance commitment issued by a Florida
147 licensed title insurer, with legible copies of instruments listed as exceptions attached thereto ("Title
148 Commitment") and, after Closing, an owner's policy of title insurance (see STANDARD A for terms) shall be
149 obtained and delivered to Buyer. If Seller has an owner's policy of title insurance covering the Real Property, a
150 copy shall be furnished to Buyer and Closing Agent within 5 days after Effective Date. The owner's title policy
151 premium, title search and closing services (collectively, "Owner's Policy and Charges") shall be paid, as set
152 forth below. The title insurance premium charges for the owner's policy and any lender's policy will be calculated
153 and allocated in accordance with Florida law, but may be reported differently on certain federally mandated
154 closing disclosures and other closing documents.  For purposes of this Contract "municipal lien search" means a
155 search of records necessary for the owner's policy of title insurance to be issued without exception for unrecorded
156 liens imposed pursuant to Chapters 159 or 170, F.S., in favor of any governmental body, authority or agency.
157 **(CHECK ONE):**
158* ☐ (i) Seller shall designate Closing Agent and pay for Owner's Policy and Charges, and Buyer shall pay the
159 premium for Buyer's lender's policy and charges for closing services related to the lender's policy,
160 endorsements and loan closing, which amounts shall be paid by Buyer to Closing Agent or such other
161 provider(s) as Buyer may select; or
162* ☐ (ii) Buyer shall designate Closing Agent and pay for Owner's Policy and Charges and charges for closing
163 services related to Buyer's lender's policy, endorsements and loan closing; or

164*     ☒ (iii) **[MIAMI-DADE/BROWARD REGIONAL PROVISION]:** Seller shall furnish a copy of a prior owner's policy
165     of title insurance or other evidence of title and pay fees for: (A) a continuation or update of such title evidence,
166     which is acceptable to Buyer's title insurance underwriter for reissue of coverage; (B) tax search; and (C)
167     municipal lien search. Buyer shall obtain and pay for post-Closing continuation and premium for Buyer's owner's
168*     policy, and if applicable, Buyer's lender's policy. Seller shall not be obligated to pay more than $_____
169     (if left blank, then $200.00) for abstract continuation or title search ordered or performed by Closing Agent.

    (d) **SURVEY:** On or before Title Evidence Deadline, Buyer may, at Buyer's expense, have the Real Property
171     surveyed and certified by a registered Florida surveyor ("Survey"). If Seller has a survey covering the Real
172     Property, a copy shall be furnished to Buyer and Closing Agent within 5 days after Effective Date.

173*     (e) **HOME WARRANTY:** At Closing, ☐ Buyer ☐ Seller ☒ N/A shall pay for a home warranty plan issued by
174*     _____ at a cost not to exceed $_____. A home
175     warranty plan provides for repair or replacement of many of a home's mechanical systems and major built-in
176     appliances in the event of breakdown due to normal wear and tear during the agreement's warranty period.

177     (f) **SPECIAL ASSESSMENTS:** At Closing, Seller shall pay: (i) the full amount of liens imposed by a public body
178     ("public body" does not include a Condominium or Homeowner's Association) that are certified, confirmed and
179     ratified before Closing; and (ii) the amount of the public body's most recent estimate or assessment for an
180     improvement which is substantially complete as of Effective Date, but that has not resulted in a lien being
181     imposed on the Property before Closing. Buyer shall pay all other assessments. If special assessments may
182     be paid in installments **(CHECK ONE):**

183*     ☐ (a) Seller shall pay installments due prior to Closing and Buyer shall pay installments due after Closing.
184     Installments prepaid or due for the year of Closing shall be prorated.

185*     ☐ (b) Seller shall pay the assessment(s) in full prior to or at the time of Closing.
186     IF NEITHER BOX IS CHECKED, THEN OPTION (a) SHALL BE DEEMED SELECTED.
187     This Paragraph 9(f) shall not apply to a special benefit tax lien imposed by a community development district
188     (CDD) pursuant to Chapter 190, F.S., which lien shall be prorated pursuant to STANDARD K.

189 **DISCLOSURES**

190 **10. DISCLOSURES:**

191     (a) **RADON GAS:** Radon is a naturally occurring radioactive gas that, when it is accumulated in a building in
192     sufficient quantities, may present health risks to persons who are exposed to it over time. Levels of radon that
193     exceed federal and state guidelines have been found in buildings in Florida. Additional information regarding
194     radon and radon testing may be obtained from your county health department.

195     (b) **PERMITS DISCLOSURE:** Except as may have been disclosed by Seller to Buyer in a written disclosure, Seller
196     does not know of any improvements made to the Property which were made without required permits or made
197     pursuant to permits which have not been properly closed. If Seller identifies permits which have not been
198     properly closed or improvements which were not permitted, then Seller shall promptly deliver to Buyer all plans,
199     written documentation or other information in Seller's possession, knowledge, or control relating to
200     improvements to the Property which are the subject of such open permits or unpermitted improvements.

201     (c) **MOLD:** Mold is naturally occurring and may cause health risks or damage to property. If Buyer is concerned or
202     desires additional information regarding mold, Buyer should contact an appropriate professional.

203     (d) **FLOOD ZONE; ELEVATION CERTIFICATION:** Buyer is advised to verify by elevation certificate which flood
204     zone the Property is in, whether flood insurance is required by Buyer's lender, and what restrictions apply to
205     improving the Property and rebuilding in the event of casualty. If Property is in a "Special Flood Hazard Area"
206     or "Coastal Barrier Resources Act" designated area or otherwise protected area identified by the U.S. Fish and
207     Wildlife Service under the Coastal Barrier Resources Act and the lowest floor elevation for the building(s) and/or
208     flood insurance rating purposes is below minimum flood elevation or is ineligible for flood insurance coverage
209     through the National Flood Insurance Program or private flood insurance as defined in 42 U.S.C. §4012a, Buyer
210*     may terminate this Contract by delivering written notice to Seller within _____ (if left blank, then 20) days after
211     Effective Date, and Buyer shall be refunded the Deposit thereby releasing Buyer and Seller from all further
212     obligations under this Contract, failing which Buyer accepts existing elevation of buildings and flood zone
213     designation of Property. The National Flood Insurance Program may assess additional fees or adjust premiums
214     for pre-Flood Insurance Rate Map (pre-FIRM) non-primary structures (residential structures in which the insured
215     or spouse does not reside for at least 50% of the year) and an elevation certificate may be required for actuarial
216     rating.

217     (e) **ENERGY BROCHURE:** Buyer acknowledges receipt of Florida Energy-Efficiency Rating Information Brochure
218     required by Section 553.996, F.S.

Buyer's Initials    MB             Page 4 of 12             Seller's Initials    kS

FloridaRealtors/FloridaBar-ASIS-5   Rev.4/17 © 2017 Florida Realtors® and The Florida Bar. All rights reserved.
Serial#: 024044-300151-1846248

formsimplicity

(f) **LEAD-BASED PAINT:** If Property includes pre-1978 residential housing, a lead-based paint disclosure is mandatory.

(g) **HOMEOWNERS' ASSOCIATION/COMMUNITY DISCLOSURE: BUYER SHOULD NOT EXECUTE THIS CONTRACT UNTIL BUYER HAS RECEIVED AND READ THE HOMEOWNERS' ASSOCIATION/COMMUNITY DISCLOSURE, IF APPLICABLE.**

(h) **PROPERTY TAX DISCLOSURE SUMMARY:** BUYER SHOULD NOT RELY ON THE SELLER'S CURRENT PROPERTY TAXES AS THE AMOUNT OF PROPERTY TAXES THAT THE BUYER MAY BE OBLIGATED TO PAY IN THE YEAR SUBSEQUENT TO PURCHASE. A CHANGE OF OWNERSHIP OR PROPERTY IMPROVEMENTS TRIGGERS REASSESSMENTS OF THE PROPERTY THAT COULD RESULT IN HIGHER PROPERTY TAXES. IF YOU HAVE ANY QUESTIONS CONCERNING VALUATION, CONTACT THE COUNTY PROPERTY APPRAISER'S OFFICE FOR INFORMATION.

(i) **FOREIGN INVESTMENT IN REAL PROPERTY TAX ACT ("FIRPTA"):** Seller shall inform Buyer in writing if Seller is a "foreign person" as defined by the Foreign Investment in Real Property Tax Act ("FIRPTA"). Buyer and Seller shall comply with FIRPTA, which may require Seller to provide additional cash at Closing. If Seller is not a "foreign person", Seller can provide Buyer, at or prior to Closing, a certification of non-foreign status, under penalties of perjury, to inform Buyer and Closing Agent that no withholding is required. See STANDARD V for further information pertaining to FIRPTA. Buyer and Seller are advised to seek legal counsel and tax advice regarding their respective rights, obligations, reporting and withholding requirements pursuant to FIRPTA.

(j) **SELLER DISCLOSURE:** Seller knows of no facts materially affecting the value of the Real Property which are not readily observable and which have not been disclosed to Buyer. Except as provided for in the preceding sentence, Seller extends and intends no warranty and makes no representation of any type, either express or implied, as to the physical condition or history of the Property. Except as otherwise disclosed in writing Seller has received no written or verbal notice from any governmental entity or agency as to a currently uncorrected building, environmental or safety code violation.

## PROPERTY MAINTENANCE, CONDITION, INSPECTIONS AND EXAMINATIONS

**11. PROPERTY MAINTENANCE:** Except for ordinary wear and tear and Casualty Loss, Seller shall maintain the Property, including, but not limited to, lawn, shrubbery, and pool, in the condition existing as of Effective Date ("AS IS Maintenance Requirement").

**12. PROPERTY INSPECTION; RIGHT TO CANCEL:**

(a) *PROPERTY INSPECTIONS AND RIGHT TO CANCEL: Buyer shall have ___2___ (if left blank, then 15) days after Effective Date ("Inspection Period") within which to have such inspections of the Property performed as Buyer shall desire during the Inspection Period. If Buyer determines, in Buyer's sole discretion, that the Property is not acceptable to Buyer, Buyer may terminate this Contract by delivering written notice of such election to Seller prior to expiration of Inspection Period. If Buyer timely terminates this Contract, the Deposit paid shall be returned to Buyer, thereupon, Buyer and Seller shall be released of all further obligations under this Contract; however, Buyer shall be responsible for prompt payment for such inspections, for repair of damage to, and restoration of, the Property resulting from such inspections, and shall provide Seller with paid receipts for all work done on the Property (the preceding provision shall survive termination of this Contract). Unless Buyer exercises the right to terminate granted herein, Buyer accepts the physical condition of the Property and any violation of governmental, building, environmental, and safety codes, restrictions, or requirements, but subject to Seller's continuing AS IS Maintenance Requirement, and Buyer shall be responsible for any and all repairs and improvements required by Buyer's lender.*

(b) **WALK-THROUGH INSPECTION/RE-INSPECTION:** On the day prior to Closing Date, or on Closing Date prior to time of Closing, as specified by Buyer, Buyer or Buyer's representative may perform a walk-through (and follow-up walk-through, if necessary) inspection of the Property solely to confirm that all items of Personal Property are on the Property and to verify that Seller has maintained the Property as required by the AS IS Maintenance Requirement and has met all other contractual obligations.

(c) **SELLER ASSISTANCE AND COOPERATION IN CLOSE-OUT OF BUILDING PERMITS:** If Buyer's inspection of the Property identifies open or needed building permits, then Seller shall promptly deliver to Buyer all plans, written documentation or other information in Seller's possession, knowledge, or control relating to improvements to the Property which are the subject of such open or needed Permits, and shall promptly cooperate in good faith with Buyer's efforts to obtain estimates of repairs or other work necessary to resolve such Permit issues. Seller's obligation to cooperate shall include Seller's execution of necessary authorizations,

274 consents, or other documents necessary for Buyer to conduct inspections and have estimates of such repairs
275 or work prepared, but in fulfilling such obligation, Seller shall not be required to expend, or become obligated to
276 expend, any money.

277 (d) **ASSIGNMENT OF REPAIR AND TREATMENT CONTRACTS AND WARRANTIES:** At Buyer's option and
278 cost, Seller will, at Closing, assign all assignable repair, treatment and maintenance contracts and warranties
279 to Buyer.

280 **ESCROW AGENT AND BROKER**

281 **13. ESCROW AGENT:** Any Closing Agent or Escrow Agent (collectively "Agent") receiving the Deposit, other funds
282 and other items is authorized, and agrees by acceptance of them, to deposit them promptly, hold same in escrow
283 within the State of Florida and, subject to **COLLECTION**, disburse them in accordance with terms and conditions
284 of this Contract. Failure of funds to become **COLLECTED** shall not excuse Buyer's performance. When conflicting
285 demands for the Deposit are received, or Agent has a good faith doubt as to entitlement to the Deposit, Agent may
286 take such actions permitted by this Paragraph 13, as Agent deems advisable. If in doubt as to Agent's duties or
287 liabilities under this Contract, Agent may, at Agent's option, continue to hold the subject matter of the escrow until
288 the parties agree to its disbursement or until a final judgment of a court of competent jurisdiction shall determine
289 the rights of the parties, or Agent may deposit same with the clerk of the circuit court having jurisdiction of the
290 dispute. An attorney who represents a party and also acts as Agent may represent such party in such action. Upon
291 notifying all parties concerned of such action, all liability on the part of Agent shall fully terminate, except to the
292 extent of accounting for any items previously delivered out of escrow. If a licensed real estate broker, Agent will
293 comply with provisions of Chapter 475, F.S., as amended and FREC rules to timely resolve escrow disputes through
294 mediation, arbitration, interpleader or an escrow disbursement order.

295 In any proceeding between Buyer and Seller wherein Agent is made a party because of acting as Agent hereunder,
296 or in any proceeding where Agent interpleads the subject matter of the escrow, Agent shall recover reasonable
297 attorney's fees and costs incurred, to be paid pursuant to court order out of the escrowed funds or equivalent. Agent
298 shall not be liable to any party or person for mis-delivery of any escrowed items, unless such mis-delivery is due to
299 Agent's willful breach of this Contract or Agent's gross negligence. This Paragraph 13 shall survive Closing or
300 termination of this Contract.

301 **14. PROFESSIONAL ADVICE; BROKER LIABILITY:** Broker advises Buyer and Seller to verify Property condition,
302 square footage, and all other facts and representations made pursuant to this Contract and to consult appropriate
303 professionals for legal, tax, environmental, and other specialized advice concerning matters affecting the Property
304 and the transaction contemplated by this Contract. Broker represents to Buyer that Broker does not reside on the
305 Property and that all representations (oral, written or otherwise) by Broker are based on Seller representations or
306 public records. **BUYER AGREES TO RELY SOLELY ON SELLER, PROFESSIONAL INSPECTORS AND**
307 **GOVERNMENTAL AGENCIES FOR VERIFICATION OF PROPERTY CONDITION, SQUARE FOOTAGE AND**
308 **FACTS THAT MATERIALLY AFFECT PROPERTY VALUE AND NOT ON THE REPRESENTATIONS (ORAL,**
309 **WRITTEN OR OTHERWISE) OF BROKER.** Buyer and Seller (individually, the "Indemnifying Party") each
310 individually indemnifies, holds harmless, and releases Broker and Broker's officers, directors, agents and
311 employees from all liability for loss or damage, including all costs and expenses, and reasonable attorney's fees at
312 all levels, suffered or incurred by Broker and Broker's officers, directors, agents and employees in connection with
313 or arising from claims, demands or causes of action instituted by Buyer or Seller based on: (i) inaccuracy of
314 information provided by the Indemnifying Party or from public records; (ii) Indemnifying Party's misstatement(s) or
315 failure to perform contractual obligations; (iii) Broker's performance, at Indemnifying Party's request, of any task
316 beyond the scope of services regulated by Chapter 475, F.S., as amended, including Broker's referral,
317 recommendation or retention of any vendor for, or on behalf of, Indemnifying Party; (iv) products or services
318 provided by any such vendor for, or on behalf of, Indemnifying Party; and (v) expenses incurred by any such vendor.
319 Buyer and Seller each assumes full responsibility for selecting and compensating their respective vendors and
320 paying their other costs under this Contract whether or not this transaction closes. This Paragraph 14 will not relieve
321 Broker of statutory obligations under Chapter 475, F.S., as amended. For purposes of this Paragraph 14, Broker
322 will be treated as a party to this Contract. This Paragraph 14 shall survive Closing or termination of this Contract.

323 **DEFAULT AND DISPUTE RESOLUTION**

324 **15. DEFAULT:**

325 (a) **BUYER DEFAULT:** If Buyer fails, neglects or refuses to perform Buyer's obligations under this Contract,
326 including payment of the Deposit, within the time(s) specified, Seller may elect to recover and retain the Deposit
327 for the account of Seller as agreed upon liquidated damages, consideration for execution of this Contract, and
328 in full settlement of any claims, whereupon Buyer and Seller shall be relieved from all further obligations under

Buyer's Initials ___MB___     Page 6 of 12     Seller's Initials ___kS___

this Contract, or Seller, at Seller's option, may, pursuant to Paragraph 16, proceed in equity to enforce Seller's rights under this Contract. The portion of the Deposit, if any, paid to Listing Broker upon default by Buyer, shall be split equally between Listing Broker and Cooperating Broker; provided however, Cooperating Broker's share shall not be greater than the commission amount Listing Broker had agreed to pay to Cooperating Broker.

(b) **SELLER DEFAULT:** If for any reason other than failure of Seller to make Seller's title marketable after reasonable diligent effort, Seller fails, neglects or refuses to perform Seller's obligations under this Contract, Buyer may elect to receive return of Buyer's Deposit without thereby waiving any action for damages resulting from Seller's breach, and, pursuant to Paragraph 16, may seek to recover such damages or seek specific performance.

This Paragraph 15 shall survive Closing or termination of this Contract.

**16. DISPUTE RESOLUTION:** Unresolved controversies, claims and other matters in question between Buyer and Seller arising out of, or relating to, this Contract or its breach, enforcement or interpretation ("Dispute") will be settled as follows:

(a) Buyer and Seller will have 10 days after the date conflicting demands for the Deposit are made to attempt to resolve such Dispute, failing which, Buyer and Seller shall submit such Dispute to mediation under Paragraph 16(b).

(b) Buyer and Seller shall attempt to settle Disputes in an amicable manner through mediation pursuant to Florida Rules for Certified and Court-Appointed Mediators and Chapter 44, F.S., as amended (the "Mediation Rules"). The mediator must be certified or must have experience in the real estate industry. Injunctive relief may be sought without first complying with this Paragraph 16(b). Disputes not settled pursuant to this Paragraph 16 may be resolved by instituting action in the appropriate court having jurisdiction of the matter. This Paragraph 16 shall survive Closing or termination of this Contract.

**17. ATTORNEY'S FEES; COSTS:** The parties will split equally any mediation fee incurred in any mediation permitted by this Contract, and each party will pay their own costs, expenses and fees, including attorney's fees, incurred in conducting the mediation. In any litigation permitted by this Contract, the prevailing party shall be entitled to recover from the non-prevailing party costs and fees, including reasonable attorney's fees, incurred in conducting the litigation. This Paragraph 17 shall survive Closing or termination of this Contract.

## STANDARDS FOR REAL ESTATE TRANSACTIONS ("STANDARDS")

**18. STANDARDS:**

**A. TITLE:**

(i) **TITLE EVIDENCE; RESTRICTIONS; EASEMENTS; LIMITATIONS:** Within the time period provided in Paragraph 9(c), the Title Commitment, with legible copies of instruments listed as exceptions attached thereto, shall be issued and delivered to Buyer. The Title Commitment shall set forth those matters to be discharged by Seller at or before Closing and shall provide that, upon recording of the deed to Buyer, an owner's policy of title insurance in the amount of the Purchase Price, shall be issued to Buyer insuring Buyer's marketable title to the Real Property, subject only to the following matters: (a) comprehensive land use plans, zoning, and other land use restrictions, prohibitions and requirements imposed by governmental authority; (b) restrictions and matters appearing on the Plat or otherwise common to the subdivision; (c) outstanding oil, gas and mineral rights of record without right of entry; (d) unplatted public utility easements of record (located contiguous to real property lines and not more than 10 feet in width as to rear or front lines and 7 1/2 feet in width as to side lines); (e) taxes for year of Closing and subsequent years; and (f) assumed mortgages and purchase money mortgages, if any (if additional items, attach addendum); provided, that, none prevent use of Property for **RESIDENTIAL PURPOSES**. If there exists at Closing any violation of items identified in (b) – (f) above, then the same shall be deemed a title defect. Marketable title shall be determined according to applicable Title Standards adopted by authority of The Florida Bar and in accordance with law.

(ii) **TITLE EXAMINATION:** Buyer shall have 5 days after receipt of Title Commitment to examine it and notify Seller in writing specifying defect(s), if any, that render title unmarketable. If Seller provides Title Commitment and it is delivered to Buyer less than 5 days prior to Closing Date, Buyer may extend Closing for up to 5 days after date of receipt to examine same in accordance with this STANDARD A. Seller shall have 30 days ("Cure Period") after receipt of Buyer's notice to take reasonable diligent efforts to remove defects. If Buyer fails to so notify Seller, Buyer shall be deemed to have accepted title as it then is. If Seller cures defects within Cure Period, Seller will deliver written notice to Buyer (with proof of cure acceptable to Buyer and Buyer's attorney) and the parties will close this Contract on Closing Date (or if Closing Date has passed, within 10 days after Buyer's receipt of Seller's notice). If Seller is unable to cure defects within Cure Period, then Buyer may, within 5 days after expiration of Cure Period,

**STANDARDS FOR REAL ESTATE TRANSACTIONS ("STANDARDS") CONTINUED**

383 deliver written notice to Seller: (a) extending Cure Period for a specified period not to exceed 120 days within which
384 Seller shall continue to use reasonable diligent effort to remove or cure the defects ("Extended Cure Period"); or
385 (b) electing to accept title with existing defects and close this Contract on Closing Date (or if Closing Date has
386 passed, within the earlier of 10 days after end of Extended Cure Period or Buyer's receipt of Seller's notice), or (c)
387 electing to terminate this Contract and receive a refund of the Deposit, thereby releasing Buyer and Seller from all
388 further obligations under this Contract. If after reasonable diligent effort, Seller is unable to timely cure defects, and
389 Buyer does not waive the defects, this Contract shall terminate, and Buyer shall receive a refund of the Deposit,
390 thereby releasing Buyer and Seller from all further obligations under this Contract.
391 **B. SURVEY:** If Survey discloses encroachments on the Real Property or that improvements located thereon
392 encroach on setback lines, easements, or lands of others, or violate any restrictions, covenants, or applicable
393 governmental regulations described in STANDARD A (i)(a), (b) or (d) above, Buyer shall deliver written notice of
394 such matters, together with a copy of Survey, to Seller within 5 days after Buyer's receipt of Survey, but no later
395 than Closing. If Buyer timely delivers such notice and Survey to Seller, such matters identified in the notice and
396 Survey shall constitute a title defect, subject to cure obligations of STANDARD A above. If Seller has delivered a
397 prior survey, Seller shall, at Buyer's request, execute an affidavit of "no change" to the Real Property since the
398 preparation of such prior survey, to the extent the affirmations therein are true and correct.
399 **C. INGRESS AND EGRESS:** Seller represents that there is ingress and egress to the Real Property and title to
400 the Real Property is insurable in accordance with STANDARD A without exception for lack of legal right of access.
401 **D. LEASE INFORMATION:** Seller shall, at least 10 days prior to Closing, furnish to Buyer estoppel letters from
402 tenant(s)/occupant(s) specifying nature and duration of occupancy, rental rates, advanced rent and security
403 deposits paid by tenant(s) or occupant(s)("Estoppel Letter(s)"). If Seller is unable to obtain such Estoppel Letter(s)
404 the same information shall be furnished by Seller to Buyer within that time period in the form of a Seller's affidavit
405 and Buyer may thereafter contact tenant(s) or occupant(s) to confirm such information. If Estoppel Letter(s) or
406 Seller's affidavit, if any, differ materially from Seller's representations and lease(s) provided pursuant to Paragraph
407 6, or if tenant(s)/occupant(s) fail or refuse to confirm Seller's affidavit, Buyer may deliver written notice to Seller
408 within 5 days after receipt of such information, but no later than 5 days prior to Closing Date, terminating this
409 Contract and receive a refund of the Deposit, thereby releasing Buyer and Seller from all further obligations under
410 this Contract. Seller shall, at Closing, deliver and assign all leases to Buyer who shall assume Seller's obligations
411 thereunder.
412 **E. LIENS:** Seller shall furnish to Buyer at Closing an affidavit attesting (i) to the absence of any financing
413 statement, claims of lien or potential lienors known to Seller and (ii) that there have been no improvements or
414 repairs to the Real Property for 90 days immediately preceding Closing Date. If the Real Property has been
415 improved or repaired within that time, Seller shall deliver releases or waivers of construction liens executed by all
416 general contractors, subcontractors, suppliers and materialmen in addition to Seller's lien affidavit setting forth
417 names of all such general contractors, subcontractors, suppliers and materialmen, further affirming that all charges
418 for improvements or repairs which could serve as a basis for a construction lien or a claim for damages have been
419 paid or will be paid at Closing.
420 **F. TIME:** Calendar days shall be used in computing time periods. **Time is of the essence in this Contract.** Other
421 than time for acceptance and Effective Date as set forth in Paragraph 3, any time periods provided for or dates
422 specified in this Contract, whether preprinted, handwritten, typewritten or inserted herein, which shall end or occur
423 on a Saturday, Sunday, or a national legal holiday (see 5 U.S.C. 6103) shall extend to 5:00 p.m. (where the Property
424 is located) of the next business day.
425 **G. FORCE MAJEURE:** Buyer or Seller shall not be required to perform any obligation under this Contract or be
426 liable to each other for damages so long as performance or non-performance of the obligation, or the availability of
427 services, insurance or required approvals essential to Closing, is disrupted, delayed, caused or prevented by Force
428 Majeure. "Force Majeure" means: hurricanes, floods, extreme weather, earthquakes, fire, or other acts of God,
429 unusual transportation delays, or wars, insurrections, or acts of terrorism, which, by exercise of reasonable diligent
430 effort, the non-performing party is unable in whole or in part to prevent or overcome. All time periods, including
431 Closing Date, will be extended a reasonable time up to 7 days after the Force Majeure no longer prevents
432 performance under this Contract, provided, however, if such Force Majeure continues to prevent performance under
433 this Contract more than 30 days beyond Closing Date, then either party may terminate this Contract by delivering
434 written notice to the other and the Deposit shall be refunded to Buyer, thereby releasing Buyer and Seller from all
435 further obligations under this Contract.
436 **H. CONVEYANCE:** Seller shall convey marketable title to the Real Property by statutory warranty, trustee's,
437 personal representative's, or guardian's deed, as appropriate to the status of Seller, subject only to matters
438 described in STANDARD A and those accepted by Buyer. Personal Property shall, at request of Buyer, be

Buyer's Initials ___MB___  Page 8 of 12  Seller's Initials ___kS___ ___

FloridaRealtors/FloridaBar-ASIS-5  Rev.4/17 © 2017 Florida Realtors® and The Florida Bar. All rights reserved.

Serial#: 024044-300151-1846248

formsimplicity

**STANDARDS FOR REAL ESTATE TRANSACTIONS ("STANDARDS") CONTINUED**

439  transferred by absolute bill of sale with warranty of title, subject only to such matters as may be provided for in this
440  Contract.
441  **I.   CLOSING LOCATION; DOCUMENTS; AND PROCEDURE:**
442  (i)  **LOCATION:** Closing will be conducted by the attorney or other closing agent ("Closing Agent") designated by
443  the party paying for the owner's policy of title insurance and will take place in the county where the Real Property
444  is located at the office of the Closing Agent, or at such other location agreed to by the parties. If there is no title
445  insurance, Seller will designate Closing Agent. Closing may be conducted by mail, overnight courier, or electronic
446  means.
447  (ii)  **CLOSING DOCUMENTS:** Seller shall at or prior to Closing, execute and deliver, as applicable, deed, bill of
448  sale, certificate(s) of title or other documents necessary to transfer title to the Property, construction lien affidavit(s),
449  owner's possession and no lien affidavit(s), and assignment(s) of leases. Seller shall provide Buyer with paid
450  receipts for all work done on the Property pursuant to this Contract. Buyer shall furnish and pay for, as applicable,
451  the survey, flood elevation certification, and documents required by Buyer's lender.
452  (iii) **FinCEN GTO NOTICE.  If Closing Agent is required to comply with the U.S. Treasury Department's**
453  **Financial Crimes Enforcement Network ("FinCEN") Geographic Targeting Orders ("GTOs"), then Buyer**
454  **shall provide Closing Agent with the information related to Buyer and the transaction contemplated by this**
455  **Contract that is required to complete IRS Form 8300, and Buyer consents to Closing Agent's collection and**
456  **report of said information to IRS.**
457  (iv) **PROCEDURE:** The deed shall be recorded upon **COLLECTION** of all closing funds. If the Title Commitment
458  provides insurance against adverse matters pursuant to Section 627.7841, F.S., as amended, the escrow closing
459  procedure required by STANDARD J shall be waived, and Closing Agent shall, **subject to COLLECTION of all**
460  **closing funds**, disburse at Closing the brokerage fees to Broker and the net sale proceeds to Seller.
461  **J.   ESCROW CLOSING PROCEDURE:** If Title Commitment issued pursuant to Paragraph 9(c) does not provide
462  for insurance against adverse matters as permitted under Section 627.7841, F.S., as amended, the following
463  escrow and closing procedures shall apply: (1) all Closing proceeds shall be held in escrow by the Closing Agent
464  for a period of not more than 10 days after Closing; (2) if Buyer's title is rendered unmarketable, through no fault of
465  Buyer, Buyer shall, within the 10 day period, notify Seller in writing of the defect and Seller shall have 30 days from
466  date of receipt of such notification to cure the defect; (3) if Seller fails to timely cure the defect, the Deposit and all
467  Closing funds paid by Buyer shall, within 5 days after written demand by Buyer, be refunded to Buyer and,
468  simultaneously with such repayment, Buyer shall return the Personal Property, vacate the Real Property and re-
469  convey the Property to Seller by special warranty deed and bill of sale; and (4) if Buyer fails to make timely demand
470  for refund of the Deposit, Buyer shall take title as is, waiving all rights against Seller as to any intervening defect
471  except as may be available to Buyer by virtue of warranties contained in the deed or bill of sale.
472  **K.   PRORATIONS; CREDITS:** The following recurring items will be made current (if applicable) and prorated as of
473  the day prior to Closing Date, or date of occupancy if occupancy occurs before Closing Date: real estate taxes
474  (including special benefit tax assessments imposed by a CDD), interest, bonds, association fees, insurance, rents
475  and other expenses of Property. Buyer shall have option of taking over existing policies of insurance, if assumable,
476  in which event premiums shall be prorated. Cash at Closing shall be increased or decreased as may be required
477  by prorations to be made through day prior to Closing. Advance rent and security deposits, if any, will be credited
478  to Buyer. Escrow deposits held by Seller's mortgagee will be paid to Seller. Taxes shall be prorated based on
479  current year's tax. If Closing occurs on a date when current year's millage is not fixed but current year's assessment
480  is available, taxes will be prorated based upon such assessment and prior year's millage. If current year's
481  assessment is not available, then taxes will be prorated on prior year's tax. If there are completed improvements
482  on the Real Property by January 1st of year of Closing, which improvements were not in existence on January 1st
483  of prior year, then taxes shall be prorated based upon prior year's millage and at an equitable assessment to be
484  agreed upon between the parties, failing which, request shall be made to the County Property Appraiser for an
485  informal assessment taking into account available exemptions. In all cases, due allowance shall be made for the
486  maximum allowable discounts and applicable homestead and other exemptions.  A tax proration based on an
487  estimate shall, at either party's request, be readjusted upon receipt of current year's tax bill. This STANDARD K
488  shall survive Closing.
489  **L.   ACCESS TO PROPERTY TO CONDUCT APPRAISALS, INSPECTIONS, AND WALK-THROUGH:** Seller
490  shall, upon reasonable notice, provide utilities service and access to Property for appraisals and inspections,
491  including a walk-through (or follow-up walk-through if necessary) prior to Closing.
492  **M.   RISK OF LOSS:** If, after Effective Date, but before Closing, Property is damaged by fire or other casualty
493  ("Casualty Loss") and cost of restoration (which shall include cost of pruning or removing damaged trees) does not
494  exceed 1.5% of Purchase Price, cost of restoration shall be an obligation of Seller and Closing shall proceed
495  pursuant to terms of this Contract. If restoration is not completed as of Closing, a sum equal to 125% of estimated

Buyer's Initials _MB_                Page 9 of 12                   Seller's Initials _kS_

**STANDARDS FOR REAL ESTATE TRANSACTIONS ("STANDARDS") CONTINUED**

496 cost to complete restoration (not to exceed 1.5% of Purchase Price) will be escrowed at Closing. If actual cost of
497 restoration exceeds escrowed amount, Seller shall pay such actual costs (but, not in excess of 1.5% of Purchase
498 Price). Any unused portion of escrowed amount shall be returned to Seller. If cost of restoration exceeds 1.5% of
499 Purchase Price, Buyer shall elect to either take Property "as is" together with the 1.5%, or receive a refund of the
500 Deposit thereby releasing Buyer and Seller from all further obligations under this Contract. Seller's sole obligation
501 with respect to tree damage by casualty or other natural occurrence shall be cost of pruning or removal.
502 **N.  1031 EXCHANGE:** If either Seller or Buyer wish to enter into a like-kind exchange (either simultaneously with
503 Closing or deferred) under Section 1031 of the Internal Revenue Code ("Exchange"), the other party shall cooperate
504 in all reasonable respects to effectuate the Exchange, including execution of documents; provided, however,
505 cooperating party shall incur no liability or expense related to the Exchange, and Closing shall not be contingent
506 upon, nor extended or delayed by, such Exchange.
507 **O.  CONTRACT NOT RECORDABLE; PERSONS BOUND; NOTICE; DELIVERY; COPIES; CONTRACT**
508 **EXECUTION:** Neither this Contract nor any notice of it shall be recorded in any public records. This Contract shall
509 be binding on, and inure to the benefit of, the parties and their respective heirs or successors in interest. Whenever
510 the context permits, singular shall include plural and one gender shall include all. Notice and delivery given by or to
511 the attorney or broker (including such broker's real estate licensee) representing any party shall be as effective as
512 if given by or to that party. All notices must be in writing and may be made by mail, personal delivery or electronic
513 (including "pdf") media. A facsimile or electronic (including "pdf") copy of this Contract and any signatures hereon
514 shall be considered for all purposes as an original. This Contract may be executed by use of electronic signatures,
515 as determined by Florida's Electronic Signature Act and other applicable laws.
516 **P.  INTEGRATION; MODIFICATION:** This Contract contains the full and complete understanding and agreement
517 of Buyer and Seller with respect to the transaction contemplated by this Contract and no prior agreements or
518 representations shall be binding upon Buyer or Seller unless included in this Contract. No modification to or change
519 in this Contract shall be valid or binding upon Buyer or Seller unless in writing and executed by the parties intended
520 to be bound by it.
521 **Q.  WAIVER:** Failure of Buyer or Seller to insist on compliance with, or strict performance of, any provision of this
522 Contract, or to take advantage of any right under this Contract, shall not constitute a waiver of other provisions or
523 rights.
524 **R.  RIDERS; ADDENDA; TYPEWRITTEN OR HANDWRITTEN PROVISIONS:** Riders, addenda, and typewritten
525 or handwritten provisions shall control all printed provisions of this Contract in conflict with them.
526 **S.  COLLECTION or COLLECTED: "COLLECTION" or "COLLECTED" means any checks tendered or**
527 **received, including Deposits, have become actually and finally collected and deposited in the account of**
528 **Escrow Agent or Closing Agent. Closing and disbursement of funds and delivery of closing documents**
529 **may be delayed by Closing Agent until such amounts have been COLLECTED in Closing Agent's accounts.**
530 **T.  RESERVED.**
531 **U.  APPLICABLE LAW AND VENUE:** This Contract shall be construed in accordance with the laws of the State
532 of Florida and venue for resolution of all disputes, whether by mediation, arbitration or litigation, shall lie in the
533 county where the Real Property is located.
534 **V.  FIRPTA TAX WITHHOLDING:** If a seller of U.S. real property is a "foreign person" as defined by FIRPTA,
535 Section 1445 of the Internal Revenue Code ("Code") requires the buyer of the real property to withhold up to 15%
536 of the amount realized by the seller on the transfer and remit the withheld amount to the Internal Revenue Service
537 (IRS) unless an exemption to the required withholding applies or the seller has obtained a Withholding Certificate
538 from the IRS authorizing a reduced amount of withholding.
539 (i)  No withholding is required under Section 1445 of the Code if the Seller is not a "foreign person". Seller can
540 provide proof of non-foreign status to Buyer by delivery of written certification signed under penalties of perjury,
541 stating that Seller is not a foreign person and containing Seller's name, U.S. taxpayer identification number and
542 home address (or office address, in the case of an entity), as provided for in 26 CFR 1.1445-2(b). Otherwise, Buyer
543 shall withhold the applicable percentage of the amount realized by Seller on the transfer and timely remit said funds
544 to the IRS.
545 (ii)  If Seller is a foreign person and has received a Withholding Certificate from the IRS which provides for reduced
546 or eliminated withholding in this transaction and provides same to Buyer by Closing, then Buyer shall withhold the
547 reduced sum required, if any, and timely remit said funds to the IRS.
548 (iii)  If prior to Closing Seller has submitted a completed application to the IRS for a Withholding Certificate and has
549 provided to Buyer the notice required by 26 CFR 1.1445-1(c) (2)(i)(B) but no Withholding Certificate has been
550 received as of Closing, Buyer shall, at Closing, withhold the applicable percentage of the amount realized by Seller
551 on the transfer and, at Buyer's option, either (a) timely remit the withheld funds to the IRS or (b) place the funds in
552 escrow, at Seller's expense, with an escrow agent selected by Buyer and pursuant to terms negotiated by the

Buyer's Initials ___MB___          Page 10 of 12          Seller's Initials ___ES___  _____

formsimplicity

**STANDARDS FOR REAL ESTATE TRANSACTIONS ("STANDARDS") CONTINUED**

553 parties, to be subsequently disbursed in accordance with the Withholding Certificate issued by the IRS or remitted
554 directly to the IRS if the Seller's application is rejected or upon terms set forth in the escrow agreement.
555 (iv) In the event the net proceeds due Seller are not sufficient to meet the withholding requirement(s) in this
556 transaction, Seller shall deliver to Buyer, at Closing, the additional COLLECTED funds necessary to satisfy the
557 applicable requirement and thereafter Buyer shall timely remit said funds to the IRS or escrow the funds for
558 disbursement in accordance with the final determination of the IRS, as applicable.
559 (v) Upon remitting funds to the IRS pursuant to this STANDARD, Buyer shall provide Seller copies of IRS Forms
560 8288 and 8288-A, as filed.
561 **W. RESERVED**
562 **X. BUYER WAIVER OF CLAIMS:** *To the extent permitted by law, Buyer waives any claims against Seller*
563 *and against any real estate licensee involved in the negotiation of this Contract for any damage or defects*
564 *pertaining to the physical condition of the Property that may exist at Closing of this Contract and be*
565 *subsequently discovered by the Buyer or anyone claiming by, through, under or against the Buyer. This*
566 *provision does not relieve Seller's obligation to comply with Paragraph 10(j). This Standard X shall survive*
567 *Closing.*

568 **ADDENDA AND ADDITIONAL TERMS**

569 **19. ADDENDA:** The following additional terms are included in the attached addenda or riders and incorporated into this
570 Contract (**Check if applicable**):

[X] A. Condominium Rider
[ ] B. Homeowners' Assn.
[ ] C. Seller Financing
[ ] D. Mortgage Assumption
[ ] E. FHA/VA Financing
[ ] F. Appraisal Contingency
[ ] G. Short Sale
[ ] H. Homeowners/Flood Ins.
[ ] I. RESERVED
[ ] J. Interest-Bearing Acct.

[ ] K. RESERVED
[ ] L. RESERVED
[ ] M. Defective Drywall
[ ] N. Coastal Construction Control Line
[ ] O. Insulation Disclosure
[ ] P. Lead Paint Disclosure (Pre-1978)
[ ] Q. Housing for Older Persons
[ ] R. Rezoning
[ ] S. Lease Purchase/ Lease Option

[ ] T. Pre-Closing Occupancy
[ ] U. Post-Closing Occupancy
[ ] V. Sale of Buyer's Property
[ ] W. Back-up Contract
[ ] X. Kick-out Clause
[ ] Y. Seller's Attorney Approval
[ ] Z. Buyer's Attorney Approval
[ ] AA. Licensee Property Interest
[ ] BB. Binding Arbitration
[ ] Other: _____

571 **20. ADDITIONAL TERMS:** _____
572 Seller must close all open permits and/or city code violations (if any) prior to Closing Date at Seller's expense and present evidence to Buyer that
573 said items have been closed, corrected, repaired and/or paid.
574 _____
575 _____
576 _____
577 _____
578 _____
579 _____
580 _____
581 _____
582 _____
583 _____
584 _____
585 _____
586 _____
587 _____

588 **COUNTER-OFFER/REJECTION**

589 [ ] Seller counters Buyer's offer (to accept the counter-offer, Buyer must sign or initial the counter-offered terms and
590 deliver a copy of the acceptance to Seller).
591 [ ] Seller rejects Buyer's offer.

Buyer's Initials _MB_          Page 11 of 12          Seller's Initials _kS_
FloridaRealtors/FloridaBar-ASIS-5   Rev.4/17 © 2017 Florida Realtors® and The Florida Bar. All rights reserved.
Serial#: 024044-300151-1846248

formsimplicity

DocuSign Envelope ID: DE070C9F-3F7E-45AB-A94F-E78ACF6DE715

592  **THIS IS INTENDED TO BE A LEGALLY BINDING CONTRACT. IF NOT FULLY UNDERSTOOD, SEEK THE**
593  **ADVICE OF AN ATTORNEY PRIOR TO SIGNING.**

594  **THIS FORM HAS BEEN APPROVED BY THE FLORIDA REALTORS AND THE FLORIDA BAR.**

595  *Approval of this form by the Florida Realtors and The Florida Bar does not constitute an opinion that any of the*
596  *terms and conditions in this Contract should be accepted by the parties in a particular transaction. Terms and*
597  *conditions should be negotiated based upon the respective interests, objectives and bargaining positions of all*
598  *interested persons.*

599  AN ASTERISK (*) FOLLOWING A LINE NUMBER IN THE MARGIN INDICATES THE LINE CONTAINS A BLANK
600  TO BE COMPLETED.

601*  Buyer: *Meyer Birbrier*                                    Date: 2/8/2021

602*  Buyer: _____                            Date: _____

603*  Seller: *Kirill Stadnikov*                                 Date: 2/8/2021

604*  Seller: _____                           Date: _____

605  Buyer's address for purposes of notice           Seller's address for purposes of notice
606*  c/o Attorney on page 1                            4045 Sheridan Ave, Unit 322, Miami Beach, FL 33140
607*  _____                          _____
608*  _____                          _____

609  **BROKER:** Listing and Cooperating Brokers, if any, named below (collectively, "Broker"), are the only Brokers
610  entitled to compensation in connection with this Contract. Instruction to Closing Agent: Seller and Buyer direct
611  Closing Agent to disburse at Closing the full amount of the brokerage fees as specified in separate brokerage
612  agreements with the parties and cooperative agreements between the Brokers, except to the extent Broker has
613  retained such fees from the escrowed funds. This Contract shall not modify any MLS or other offer of compensation
614  made by Seller or Listing Broker to Cooperating Brokers.

615*  Gleb Klioner                                      Gleb Klioner
616  **Cooperating Sales Associate, if any**           **Listing Sales Associate**

617*  ONE Sotheby's International Realty                ONE Sotheby's International Realty
618  **Cooperating Broker, if any**                    **Listing Broker**

COMMISSION AGREEMENT BETWEEN BROKER AND BUYER: Broker, hereby, agrees to credit the Buyer at Closing 2.5% of the
purchase price from Broker's commission.

Agreed, Acknowledged and Accepted by:

_____  2/7/2021        _____  2/8/2021
Gleb Klioner                              Meyer Birbrier
On behalf of ONE Sotheby's Int'l Realty

DocuSign Envelope ID: DE070C9F-3F7E-45AB-A94F-E78ACF6DE715

## Comprehensive Rider to the
## Residential Contract For Sale And Purchase
THIS FORM HAS BEEN APPROVED BY THE FLORIDA REALTORS AND THE FLORIDA BAR



If initialed by all parties, the clauses below will be incorporated into the Florida Realtors®/Florida Bar Residential Contract
For Sale And Purchase between   Heliac Inc, a FL corp                                                                                  (SELLER)
and   Meyer Bierbrier and/or Assigns                                                                                                    (BUYER)
concerning the Property described as   9701 Collins Ave, Unit 502S, Bal Harbour, FL 33154

**Buyer's Initials**   MB          **Seller's Initials**   kS

### A. CONDOMINIUM RIDER

1. **CONDOMINIUM ASSOCIATION APPROVAL:**
   The Association's approval of Buyer (CHECK ONE): ☒ is ☐ is not required. If approval is required, this Contract is
   contingent upon Buyer being approved by the Association no later than _____ (if left blank, then 5) days
   prior to Closing. Within _____ (if left blank, then 5) days after Effective Date Seller shall initiate the
   approval process with the Association and Buyer shall apply for such approval. Buyer and Seller shall sign and deliver
   any documents required by the Association in order to complete the transfer of the Property and each shall use
   diligent effort to obtain such approval, including making personal appearances if required. If Buyer is not approved
   within the stated time period, this Contract shall terminate and Buyer shall be refunded the Deposit, thereby releasing
   Buyer and Seller from all further obligations under this Contract.

2. **RIGHT OF FIRST REFUSAL:**
   (a) The Association (CHECK ONE): ☒ has ☐ does not have a right of first refusal ("Right"). If the Association has
       a Right, this Contract is contingent upon the Association, within the time permitted for the exercise of such Right,
       either providing written confirmation to Buyer that the Association is not exercising that Right, or failing to timely
       exercise such Right pursuant to the terms of the Declaration of Condominium ("Declaration", which reference
       includes all amendments thereto).
   (b) The members of the Association (CHECK ONE): ☒ have ☐ do not have a Right. If the members do have a
       Right, this Contract is contingent upon the members, within the time permitted for the exercise of such Right,
       either providing written confirmation to Buyer that the members are not exercising that Right, or failing to timely
       exercise such Right pursuant to the terms of the Declaration.
   (c) Buyer and Seller shall, within _____ (if left blank, then 5) days after Effective Date, sign and deliver
       any documents required as a condition precedent to the exercise of the Right, and shall use diligent effort to
       submit and process the matter with the Association and members, including personal appearances, if required.
   (d) If, within the stated time period, the Association, the members of the Association, or both, fail to provide the
       written confirmation or the Right has not otherwise expired, then this Contract shall terminate and the Deposit
       shall be refunded to the Buyer, thereby releasing Buyer and Seller from all further obligations under this Contract.
   (e) If the Association or a member timely exercises its or their Right, this Contract shall terminate and the Deposit
       shall be refunded to Buyer (unless this Contract provides otherwise), thereby releasing Buyer and Seller from all
       further obligations under this Contract, and Seller shall pay to Broker the full commission at Closing in recognition
       that Broker procured the sale.

3. **FEES; ASSESSMENTS; PRORATIONS; LITIGATION:**
   (a) Condominium Association assessment(s) and Rents: Seller represents that the current Association
       assessment(s) installments is/are

   $ 4,350         payable (CHECK ONE): ☒ monthly ☐ quarterly ☐ semi-annually ☐ annually

   and if more than one Association assessment
   $ _____   payable (CHECK ONE): ☐ monthly ☐ quarterly ☐ semi-annually ☐ annually

   and the current rent on recreation areas, if any, is
   $ _____   payable (CHECK ONE): ☐ monthly ☐ quarterly ☐ semi-annually ☐ annually

CR-4 Rev. 9/15 © 2015 Florida Realtors® and The Florida Bar. All rights reserved.

Serial# 084495-700145-1446788

## A. CONDOMINIUM RIDER (CONTINUED)

All annual assessments levied by the Association and rent on recreational areas, if any, shall be made current by Seller at Closing, and Buyer shall reimburse Seller for prepayments.

(b) Fees: Seller shall, at Closing, pay all fines imposed against the Unit by the Condominium Association as of Closing Date and any fees the Association charges to provide information about the Property, assessment(s) and fees.

*If Property is part of a Homeowners' Association, see Rider B. HOMEOWNERS' ASSOCIATION/COMMUNITY DISCLOSURE for further information including additional assessments and fees.*

(c) Special Assessments and Prorations:

    (i) Seller represents that Seller is not aware of any special or other assessment that has been levied by the Association or that has been an item on the agenda, or reported in the minutes, of the Association within twelve (12) months prior to Effective Date, ("pending") except as follows: _____

_____

    (ii) If special assessments levied or pending exist as of the Effective Date are disclosed above by Seller and may be paid in installments (**CHECK ONE**):  ☐ Buyer  ☒ Seller (if left blank, then Buyer) shall pay installments due after Closing Date. **If Seller is checked, Seller shall pay the assessment in full prior to or at the time of Closing.**

    (iii) If special assessments levied or pending exist as of the Effective Date and have not been disclosed above by Seller, then Seller shall pay such assessments in full at the time of Closing.

    (iv) If, after Effective Date, the Association imposes a special assessment for improvements, work or services, which was not pending as of the Effective Date, then Seller shall pay all amounts due before Closing Date and Buyer shall pay all amounts due after Closing Date.

    (v) A special assessment shall be deemed levied for purposes of this paragraph on the date when the assessment has been approved as required for enforcement pursuant to Florida law and the condominium documents listed in Paragraph 5.

    (vi) Association assets and liabilities, including Association reserve accounts, shall not be prorated.

(d) Litigation: Seller represents that Seller is not aware of pending or anticipated litigation affecting the Property or the common elements, if any, except as follows: _____

_____
_____

**4. SPRINKLER SYSTEM RETROFIT:**

If, pursuant to Sections 718.112(2)(l), F.S., the Association has voted to forego retrofitting its fire sprinkler system or handrails and guardrails for the condominium units, then prior to Closing Seller shall furnish to Buyer the written notice of Association's vote to forego such retrofitting.

**5. NON-DEVELOPER DISCLOSURE:**

(CHECK ONE):

☒ **(a) THE BUYER HEREBY ACKNOWLEDGES THAT BUYER HAS BEEN PROVIDED A CURRENT COPY OF THE DECLARATION OF CONDOMINIUM, ARTICLES OF INCORPORATION OF THE ASSOCIATION, BYLAWS AND RULES OF THE ASSOCIATION, AND A COPY OF THE MOST RECENT YEAR-END FINANCIAL INFORMATION AND FREQUENTLY ASKED QUESTIONS AND ANSWERS DOCUMENT MORE THAN 3 DAYS, EXCLUDING SATURDAYS, SUNDAYS, AND LEGAL HOLIDAYS, PRIOR TO EXECUTION OF THIS CONTRACT.**

☐ **(b) THIS AGREEMENT IS VOIDABLE BY BUYER BY DELIVERING WRITTEN NOTICE OF THE BUYER'S INTENTION TO CANCEL WITHIN 3 DAYS, EXCLUDING SATURDAYS, SUNDAYS, AND LEGAL HOLIDAYS, AFTER THE DATE OF EXECUTION OF THIS AGREEMENT BY THE BUYER AND RECEIPT BY BUYER OF A CURRENT COPY OF THE DECLARATION OF CONDOMINIUM, ARTICLES OF INCORPORATION, BYLAWS AND RULES OF THE ASSOCIATION, AND A COPY OF THE MOST RECENT YEAR-END FINANCIAL INFORMATION AND FREQUENTLY ASKED QUESTIONS AND ANSWERS DOCUMENT IF SO REQUESTED IN WRITING. ANY PURPORTED WAIVER OF THESE VOIDABILITY RIGHTS SHALL BE OF NO EFFECT. BUYER MAY EXTEND THE TIME FOR CLOSING FOR A PERIOD OF NOT MORE THAN 3 DAYS, EXCLUDING SATURDAYS, SUNDAYS, AND**

Serial#: 084495-700145-1446788

DocuSign Envelope ID: DE070C9F-3F7E-45AB-A94F-E78ACF6DE715

**A. CONDOMINIUM RIDER (CONTINUED)**

**LEGAL HOLIDAYS, AFTER THE BUYER RECEIVES THE DECLARATION, ARTICLES OF INCORPORATION, BYLAWS AND RULES OF THE ASSOCIATION, AND A COPY OF THE MOST RECENT YEAR-END FINANCIAL INFORMATION AND FREQUENTLY ASKED QUESTIONS AND ANSWERS DOCUMENT IF REQUESTED IN WRITING. BUYER'S RIGHT TO VOID THIS AGREEMENT SHALL TERMINATE AT CLOSING.**

6. **BUYER'S REQUEST FOR DOCUMENTS:**
   Buyer is entitled, at Seller's expense, to current copies of the condominium documents specified in Paragraph 5, above. Buyer (**CHECK ONE**): ☐ requests ☒ does not request a current copy of the documents specified in Paragraph 5, above. If this Contract does not close, Buyer shall immediately return the documents to Seller or reimburse Seller for the cost of the documents.

7. **BUYER'S RECEIPT OF DOCUMENTS:**
   (**COMPLETE AND CHECK ONLY IF CORRECT**) ☒ Buyer received the documents described in Paragraph 5, above, ~~on~~ during a prior transaction of another unit which did not come to fruition.

8. **COMMON ELEMENTS; PARKING:**
   The Property includes the unit being purchased and an undivided interest in the common elements and appurtenant limited common elements of the condominium, as specified in the Declaration. Seller's right and interest in or to the use of the following parking space(s), garage, and other areas are included in the sale of the Property and shall be assigned to Buyer at Closing, subject to the Declaration:
   Parking Space(s) # 1 assigned  Garage # _____    Other: _____

9. **INSPECTIONS AND REPAIRS:**
   The rights and obligations arising under Paragraphs 11 and 12 of this Contract to maintain, repair, replace or treat are limited to Seller's individual condominium unit and unless Seller is otherwise responsible do not extend to common elements, limited common elements, or any other part of the condominium property.

10. **GOVERNANCE FORM:**
    PURSUANT TO CHAPTER 718, FLORIDA STATUTES, BUYER IS ENTITLED TO RECEIVE FROM SELLER A COPY OF THE GOVERNANCE FORM IN THE FORMAT PROVIDED BY THE DIVISION OF FLORIDA CONDOMINIUMS, TIMESHARES AND MOBILE HOMES OF THE DEPARTMENT OF BUSINESS AND PROFESSIONAL REGULATION, SUMMARIZING THE GOVERNANCE OF THE CONDOMINIUM ASSOCIATION.

CR-4 Rev. 9/15 © 2015 Florida Realtors® and The Florida Bar. All rights reserved.

Serial# 084495-700145-1445788

BR: 00052                  DOMESTIC MONEY TRANSFER              BUS: 016

01/27/21                   CITIBANK REFERENCE NUMBER:    0270278087

SENDER INFORMATION         HELIAC INC.
                           502-S 9701 COLLINS AVE BAL HARBOUR
                           FL  USA 33154

                           1  786█████████

BENEFICIARY INFORMATION    GLEB KLIONER




                           ACCOUNT:  ████████████

BENEFICIARY BANK           ABA#: 121000248
  INFORMATION              WELLS FARGO

**Exhibit 3**

SPECIAL INSTRUCTIONS

---

---

ACCT TITLE: HELIAC INC.

---

SOURCE ACCOUNT:        ██████████ CHECKING   (FIMP: 016)
AMOUNT OF WIRE:        20000.00          BANK FEE:          0.00
DATE OF REQUEST:       01/27/21   CITIBANK REF NUM: 0270278087
FEDERAL REF NUM: 20210127B1Q8021C031369   GLOBAL ID: G0110273834801

BANKER:   P8301379SANTAMARIA,MICHEL

RE TRANSFER

AUTHORIZE THE FUNDS TRANSFER AND AGREE TO THE TERMS AND CONDITIONS.

TIBANK REFERENCE: 0270278087

THOD OF AUTHENTICATION:

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

THORIZED CUSTOMER'S SIGNATURE          DATE: MM/DD/YYYY

BR: 00052                    DOMESTIC MONEY TRANSFER                BUS: 016

03/17/21                     CITIBANK REFERENCE NUMBER:    0760229694

SENDER INFORMATION           HELIAC INC.
                             502-S 9701 COLLINS AVE BAL HARBOUR
                             FL  USA 33154

                             1  786█████████

BENEFICIARY INFORMATION      GLEB KLIONER




                             ACCOUNT:  ███████████

BENEFICIARY BANK             ABA#: 121000248
  INFORMATION                WELLS FARGO

**Exhibit 4**

SPECIAL INSTRUCTIONS

ACCT TITLE: HELIAC INC.

SOURCE ACCOUNT:        ███████  CHECKING    (FIMP: 016)
AMOUNT OF WIRE:       3734277.21            BANK FEE:           0.00
DATE OF REQUEST:       03/17/21   CITIBANK REF NUM: 0760229694
FEDERAL REF NUM: 20210317B1Q8021C023218   GLOBAL ID: G0110762051201

BANKER:  P5880112ST HILAIRE,GIRL H

RE TRANSFER

AUTHORIZE THE FUNDS TRANSFER AND AGREE TO THE TERMS AND CONDITIONS.

TIBANK REFERENCE: 0760229694

THOD OF AUTHENTICATION:

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

THORIZED CUSTOMER'S SIGNATURE                    DATE: MM/DD/YYYY



February 14, 2022

**_Via Hand Delivery_**                                    **_Via E-mail to michael@blfmiami.com_**

Mr. Gleb Klioner                                          Michael Bernstein, Esquire
3146 Prairie Avenue                                       The Bernstein Law Firm
Miami Beach, Florida 33140                                3050 Biscayne Boulevard, Suite 403
                                                          Miami, Florida 33137

        Re:     **<u>Heliac, Inc., Demand for $11,262,831.60</u>**

Mr. Klioner,

       My law firm represents the interests of Heliac, Inc. ("Heliac"). This letter constitutes a demand, pursuant to § 772.11 of the Florida Statutes, for treble damages in the amount of $11,262,831.60, resulting from two incidents of your theft from Heliac's bank account, including $20,000.00 on January 27, 2021, and $3,734,277.21 on March 17, 2021 (collectively, the "Funds").

       Without Heliac's knowledge, consent, and authorization, you improperly transferred the Funds from Heliac's operating account at Citibank, N.A., into your bank account at Wells Fargo Bank, N.A., via two wire transfers on two separate occasions. By your wrongful actions you deprived Heliac of its right to the Funds and misappropriated Heliac's property to your own use. Further, your continuing failure to return the funds is evidence of your intent to permanently deprive my client of the Funds.  Your conduct constitutes theft, in violation of § 812.014 of the Florida Statutes, entitling Heliac to file a civil lawsuit against you for triple the sum of the stolen Funds, pursuant to § 772.11 of the Florida Statutes.

       Section 772.11 requires that, before Heliac can pursue such a lawsuit for civil theft against you, a written demand for the treble damages amount must be made. Therefore, a demand is made to you for the sum of $11,262,831.60 to compensate Heliac for the above-described theft.

       If you pay the damages demanded within thirty (30) days after receipt of this letter, Heliac is required to release you in writing from further civil liability for the specific acts of civil theft alleged above, in accordance with § 772.11 of the Florida Statutes.  If, however, you do not pay

**Exhibit 5**

the damages demanded within thirty (30) days after receipt of this letter, Heliac is entitled to pursue a lawsuit against you for the recovery of $11,262,831.60, as well as for the recovery of the reasonable attorneys' fees and costs incurred by Heliac in such a lawsuit.

Please be advised that, in addition to all rights provided by § 772.11 of the Florida Statutes, mentioned above, Heliac intends to pursue all other legal and equitable remedies against you, and does not, by this letter, waive any additional claims or causes of action against you it may have.

Please govern yourself accordingly.

Sincerely,

Olesia Y. Belchenko

cc: Carolyn N. Budnik, Esquire